## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| California Cattlemen's Association, ) | Civil Action No._____ |
| California Wool Growers Association, and ) | |
| California Farm Bureau Federation, ) | |
| ) | **PLAINTIFFS' COMPLAINT FOR** |
| Plaintiffs, ) | **DECLARATORY JUDGMENT AND** |
| ) | **INJUNCTIVE RELIEF** |
| v. ) | |
| ) | |
| United States Fish and Wildlife Service; ) | |
| United States Department of the Interior; ) | |
| Ryan Zinke, in his official capacity as ) | |
| Secretary of the Interior; Greg Sheehan, in ) | |
| his official capacity as Acting Director of the ) | |
| U.S. Fish and Wildlife Service, ) | |
| ) | |
| Defendants ) | |

### INTRODUCTION

1.     This action seeks declaratory and injunctive relief against the Federal Defendants for failure to comply with the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601, *et seq.*, as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA), 5 U.S.C. § 801, *et seq.,* in the designation of critical habitat for three amphibian species covering over 1.8 million acres in sixteen counties of the State of California under the Endangered Species Act. 16 U.S.C. § 1532, *et seq. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad; Final Rule*, 81 Fed. Reg. 59046 (Aug. 26, 2016).

2.     The RFA requires a federal agency to conduct a detailed Regulatory Flexibility Analysis when proposing a rule under the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq*. A Regulatory Flexibility Analysis details the impacts of the rule on small entities (*i.e.*, small

businesses, small organizations, and small government jurisdictions) and requires the agency to consider alternatives to the rule that lessen significant impacts. The U.S. Fish and Wildlife Service claims it is exempt from providing such an analysis because the ESA imposes regulatory burdens only on federal agencies which are not small entities under the RFA. This is incorrect, both factually and legally. The ESA imposes direct and indirect regulatory burdens on anyone who owns or uses critical habitat, such as the plaintiff ranchers and farmers who are small entities under the RFA and who rely on critical habitat areas for grazing and livestock production. The Service's claim that it is exempt from the RFA when designating critical habitat conflicts with the RFA itself, case law interpreting the Act, guidance documents for implementing the Act, and executive orders directing compliance with the Act and other laws. Accordingly, this Court should declare the Service is not exempt from conducting a Regulatory Flexibility Analysis when designating critical habitat and enjoin the Final Rule from enforcement until the required analysis is completed.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (civil action arising under the laws of the United States); 5 U.S.C. § 701 – 706 (judicial review of final agency action under the APA); 5 U.S.C. § 611 (judicial review of final agency action under the RFA, as amended); 28 U.S.C. § 2201 (authorizing declaratory relief); and 28 U.S.C. § 2202 (authorizing injunctive relief).

4.       Venue in this district is proper under 28 U.S.C. § 1391(e) because the Federal Defendants reside in the District of Columbia.

## PARTIES

**Plaintiffs**

5.      The California Cattlemen's Association is a nonprofit association that represents California's ranchers and beef producers in legislative and regulatory matters.  The association is a grassroots organization comprised of cattle-producing families who have been providing beef

2

for generations and who determine the direction and policy of the organization. For the benefit of its members, the Association tracks and evaluates legal developments that could affect cattle operations in the State of California, such as the designation of critical habitat in this case. Association members are committed to producing safe, wholesome food while responsibly maintaining and improving wildlife habitat, preserving our natural resources, and protecting imperiled species. The Service identified livestock grazing and management as a danger to the species' habitat and a risk to the conservation of the species that will result in significant reduction or elimination of grazing rights on federal and private lands. The critical habitat designation subjects Association members to substantial regulatory burdens that impose, among other things, study costs, risk assessments, mitigation fees, operational changes, permit fees, and consulting expenses. In some cases, these burdens put the rancher's livelihood at risk. The critical habitat designation also subjects Association members to citizen suits and agency enforcement actions under the Endangered Species Act and other federal and state laws, further adding to the members' operational costs.

6.     The California Wool Growers Association is a nonprofit organization that represents more than 500 sheep producers including farm-flock, large commercial operations, lamb feeders, seedstock producers, wool producers, and industry stakeholders. Since 1860, California Wool Growers Association has provided essential support to grow all segments of the California sheep industry. The Association is the voice for the industry in legislative and regulatory matters, including ESA issues that affect its members, such as the designation of critical habitat in this case. Association members are committed to producing lamb, wool and fiber while responsibly maintaining and improving wildlife habitat, preserving our natural resources, and protecting imperiled species. The Service identified livestock grazing and management as a danger to the

species' habitat and a risk to the conservation of the species that will result in a significant reduction or elimination of grazing rights on federal and private lands. As a result of the critical habitat designation, Association members are subject to substantial regulatory burdens that impose, among other things, study costs, risk assessments, mitigation fees, operational changes, permit fees, and consulting expenses. In some cases, these burdens put the ranchers' livelihood at risk. The critical habitat designation also subjects Association members to citizen suits and agency enforcement actions under the Endangered Species Act and other federal and state laws, further adding to the members' operational costs.

7.      The California Farm Bureau Federation is a non-profit, California corporation whose purpose is to protect and promote agricultural interests throughout the state of California and to find solutions to the problems of the farm, the farm home and the rural community.  The Farm Bureau is California's largest farm organization representing more than 48,000 agricultural, associate, and collegiate members in 56 counties.  The Farm Bureau strives to protect and improve the ability of farmers and ranchers engaged in production agriculture to provide a reliable supply of food and fiber through responsible stewardship of California's resources. As a key aspect of this effort the Farm Bureau works on behalf of its members to ensure the appropriate implementation of the ESA and other Federal laws.  The Farm Bureau has a direct and important interest in this case because its membership of family farmers and ranchers own or operate enterprises that rely on access to federal land for grazing and federal programs for certain conservation projects.  Because of the critical habitat designation, these members are subject to significant regulatory burdens that impose, among other things, study costs, risk assessments, mitigation fees, operational changes, permit fees, and consulting expenses. These burdens, in some circumstances, put the viability of the agricultural enterprise at risk. The critical habitat designation also subjects

Farm Bureau members to citizen suits and agency enforcement actions under the Endangered Species Act and other federal and state laws, further adding to the members' operational costs.

8.      These non-profit organizations are small entities under the RFA. Each organization brings this suit on behalf of itself and its individual members who have been aggrieved or will be aggrieved by the Federal Defendants' final agency action designating critical habitat for the frogs and toad. They provided public comments opposing the designation that included a detailed assessment of the scientific studies of grazing effects on the listed species and underscored the burdens their members would suffer under the critical habitat designation. These organizations and members have standing to sue and the challenged action is ripe for judicial review.

**Defendants**

9.      Defendant United States Fish and Wildlife Service is a federal agency within the Department of Interior with the delegated responsibility of day-to-day administration of the ESA, including the designation of critical habitat. The Service is responsible for compliance with the RFA.

10.      Defendant Greg Sheehan is sued in his official capacity as Acting Director of the United States Fish and Wildlife Service.  The Director oversees the Service's compliance with statutory law.

11.      Defendant United States Department of the Interior is an agency of the United States with ultimate responsibility for the Service's administration of the ESA and compliance with the RFA.

12.      Defendant Ryan Zinke is sued in his official capacity as Secretary of the United States Department of the Interior.  Secretary Zinke oversees the Department of Interior.

## LEGAL FRAMEWORK

### Endangered Species Act

13.    Section 4 of the ESA authorizes Federal Defendants to list species as either endangered or threatened due to the existence of any of several factors, including threats to a species' habitat, overutilization, disease or predation, the inadequacy of existing regulations, and other factors. 16 U.S.C. § 1533(a)(1).

14.    Section 4 also requires Federal Defendants to designate "critical habitat" for a listed species. 16 U.S.C. § 1533(b)(2). "Critical habitat" includes occupied areas with the physical or biological features essential to the conservation of a species and which must be managed or protected, and unoccupied areas the Secretary of Interior finds essential for the conservation of the species. 16 U.S.C. § 1532(5).

15.    Under Section 4, Federal Defendants may exclude any area from critical habitat if the economic impacts of inclusion outweigh the benefits of designating the area as critical habitat. 16 U.S.C. § 1533(b)(2). This includes the economic impact on small entities.

16.    Listed species are protected by Section 9 of the ESA which makes it unlawful for any person to "take" a listed species. 16 U.S.C. § 1538(a)(1)(B). The term "take" means to "harass, harm, hunt, pursue, shoot, wound, kill, trap, or collect, or attempt to engage in any such conduct," and may include habitat modification. 16 U.S.C. § 1532(19).

17.    Under Section 7 of the ESA, a federal agency that permits a private or public activity that may affect critical habitat must consult with the Service to determine what conditions, mitigation, or alternatives will be imposed on the activity to protect or preserve the habitat. 16 U.S.C. § 1536.

18.    The ESA provides for citizen enforcement of the Act. 16 U.S.C. § 1536.

19.     To avoid liability for "taking" a protected species, a party may seek a permit for a proposed activity which may harm a species or its habitat under Section 10 of the Act. 16 U.S.C. § 1539(a).

### Regulatory Flexibility Act

20.     The RFA, as amended by SBREFA, requires the Service to prepare and make available for public comment an initial Regulatory Flexibility Analysis describing the impact of the proposed rule on small entities. 5 U.S.C. § 603(a). The term "small entity" includes small business, small organization, and small governmental organization. A "small organization" like the Plaintiff organizations means "any not-for-profit enterprise which is independently owned, and is not dominant in its field." 5 U.S.C. § 601.

21.     More specifically,

(b) Each initial regulatory flexibility analysis required under this section shall contain—

(1)  a description of the reasons why action by the agency is being considered;

(2)  a succinct statement of the objectives of, and legal basis for, the proposed rule;

(3)  a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

(4)  a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(5)  an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

(c) Each initial regulatory flexibility analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. Consistent with the stated objectives of applicable statutes, the analysis shall discuss significant alternatives such as—

> (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;
>
> (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;
>
> (3) the use of performance rather than design standards; and
>
> (4) an exemption from coverage of the rule, or any part thereof, for such small entities.

5 U.S.C. § 603.

22. The RFA also requires the agency to complete a final Regulatory Flexibility Analysis when adopting a final rule, which includes:

> (1) a statement of the need for, and objectives of, the rule;
>
> (2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;
>
> (3) the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;
>
> (4) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;
>
> (5) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;
>
> (6) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604.

23.     Section 605 of the RFA provides that sections 603 and 604 shall not apply to any proposed or final rule if the agency certifies the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 605.

24.     The RFA provides that "any small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with the [APA]." 5 U.S.C. § 611(a).

## ADMINISTRATIVE PROCEDURE ACT

25.     The APA provides adversely affected parties judicial review of final agency action for which there is no other adequate remedy in a court of law. 5 U.S.C. § 704.

26.     The APA authorizes the courts to:

(1)   compel agency action unlawfully withheld or unreasonably delayed; and

(2)   hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)   contrary to constitutional right, power, privilege, or immunity;

(C)   in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)   without observance of procedure required by law;

(E)   unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)   unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

## FACTUAL ALLEGATIONS

27.     The Service published a proposed rule designating critical habitat for three amphibian species on April 25, 2013. *Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad; Proposed Rule.* 78 Fed. Reg. 24516.

28.     That rule included a draft economic analysis of impacts on some small entities but the analysis was incomplete under the RFA. Among other things, the draft economic analysis did not consider all the impacts of the designation on small entities including loss of property and business value, increased compliance costs, and livestock management changes. Instead, the draft economic analysis limited its review to the cost of Section 7 consultations by so-called third parties, such as the Plaintiffs in this case.

29.     The draft economic analysis also did not discuss the impacts of duplicative or overlapping federal rules or provide an adequate analysis of alternatives that would minimize impacts on small entities.

30.     In the proposed rule, the Service stated: "It is our position that only Federal action agencies will be directly regulated by this designation. Therefore, because Federal agencies are not small entities, the Service may certify that the proposed critical habitat rule will not have a significant economic impact on a substantial number of small entities." *Id*. at 24542-24543.

31.     On August 26, 2016, the Service issued its Final Rule designating critical habitat. 81 Fed. Reg. 59046.

32.     The Service did not publish a final Regulatory Flexibility Analysis as directed by Section 604 of the RFA. Instead, in response to comments, the Service restated its position that

the critical habitat designation only regulates federal agencies and, therefore, "no initial or final regulatory flexibility analysis is required." *Id*. at 59056. .

33.     Contrary to the Service, the Small Business Administration Office of Advocacy interprets the RFA to apply to critical habitat designations. The Office of Advocacy is an independent office within the SBA and was established to represent the views of small entities before federal agencies and Congress.

34.     On March 7, 2014, Plaintiffs filed comments with the Service opposing the proposed critical habitat designation and, based on the disproportionate economic impacts on its members, requested the Service to exclude grazing allotments from the Final Rule. *See* letter to Daniel M. Ashe, Director, U.S. Fish and Wildlife Service, dated March 7, 2014, attached hereto as Exhibit 1.

## ALLEGATIONS SUPPORTING DECLARATORY RELIEF

35.     Plaintiffs hereby incorporate the allegations contained in paragraphs 1 through 34 as though fully set forth herein.

36.     An actual and substantial controversy exists between Plaintiffs and Federal Defendants over the Defendants' duty to comply with the RFA and the APA to issue an initial and final Regulatory Flexibility Analysis when proposing and adopting a rule designating critical habitat under the ESA 5 U.S.C. § 603, 604.

37.     This case is justiciable because Federal Defendants have failed to issue an initial and final Regulatory Flexibility Analysis and wrongfully assert the designation of critical habitat does not directly affect or regulate small entities as defined by the RFA.  15 U.S.C. § 611(a).

38.     Declaratory relief will clarify the rights and obligations of the parties and is, therefore, appropriate to resolve this controversy.

## ALLEGATIONS SUPPORTING INJUNCTIVE RELIEF

39.     Plaintiffs hereby incorporate the allegations contained in paragraphs 1 through 38 as though fully set forth herein.

40.     Plaintiffs have been injured by Federal Defendants' failure to issue an initial and final Regulatory Flexibility Analysis in compliance with the RFA and APA. Plaintiffs will be irreparably harmed if an injunction does not issue enjoining Federal Defendants from enforcing the Final Rule designating critical habitat against small entities.

41.     Plaintiff have no plain, speedy, or adequate remedy at law.

42.     Plaintiffs' claims for relief are ripe.

43.     If not enjoined by this Court, Plaintiffs allege on information and belief that Federal Defendants will continue to violate the law that requires them to issue an initial and final Regulatory Flexibility Analysis when designating critical habitat under the ESA.

44.     Accordingly, injunctive relief is appropriate.

### FIRST CAUSE OF ACTION
### (Violation of the RFA, 5 U.S.C. § 611(a),
### Failure To Issue Regulatory Flexibility Analyses)

45.     Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 44 as though fully set forth herein.

46.     The RFA requires federal agencies to issue an initial and final Regulatory Flexibility Analysis in accordance with Sections 603 and 604 of the Act, detailing the impact of any final agency action on small entities, such as the plaintiff organizations in this case. Federal Defendants have not issued these analyses. Instead, Federal Defendants erroneously claim (or certify) that the designation of critical habitat only regulates federal agencies, not small entities, and, under Section 605, are exempt from the requirements of Sections 603 and 604 of the RFA.

47.   Federal Defendants' failure to issue the initial and final Regulatory Flexibility Analyses, based on an erroneous and categorical certification that the Final Rule will have no significant economic impact on a substantial number of small entities, violates the RFA and is unlawful.

## SECOND CAUSE OF ACTION
### (Violation of APA, 5 U.S.C. § 706,
### *Inter Alia*, Final Agency Action Not In Accordance With The Law)

48.   Plaintiffs hereby incorporate the allegations contained in Paragraphs 1 through 47 as though fully set forth herein.

49.   Section 603 and 604 of the RFA require federal agencies to issue an initial and final Regulatory Flexibility Analysis with the promulgation of any final agency action unless the agency can certify, under Section 605 of the Act, that the action will not have a significant impact on a substantial number of small entities. Federal Defendants' reliance on Section 605 in this case is unlawful because Federal Defendants wrongfully maintain the designation of critical habitat only directly regulates federal agencies, and not small entities, like the Plaintiffs in this case.

50.   Federal Defendants' failure to issue the initial and final Regulatory Flexibility Analyses, based on an erroneous and categorical certification that the Final Rule will have no significant economic impact on a substantial number of small entities, is arbitrary and capricious, not in accordance with the law, without observance of procedure required by law, in excess of statutory authority, and short of statutory right under 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court will:

1.   Declare the designation of critical habitat under the ESA is not categorically exempt from the requirements of Sections 603 and 604 of the RFA because the designation only directly regulates federal agencies and not small entities;

2.   Set aside the Final Rule or enjoin its enforcement against small entities, including the

plaintiff organizations;

3.   Remand the Final Rule to the Service to complete the initial and final Regulatory

Flexibility Analyses;

4.   Award Plaintiffs reasonable attorney fees and cost; and

5.   Award Plaintiffs any other relief the Court deems just and proper under the

circumstances of this case.

DATED:  July 31, 2017.

Respectfully submitted,

    /s/ Jonathan Wood
    JONATHAN WOOD
     D.C. Bar No. 1045015
    *Counsel of Record*
    Pacific Legal Foundation
    3033 Wilson Blvd, Suite 700
    Arlington, VA  22201
    Telephone: (202) 888-6881
    Email:  jw@pacificlegal.org

    M. REED HOPPER
    CA Bar No. 131291
    *Of Counsel*
    Pacific Legal Foundation
    10940 NE 33rd Place, Suite 210
    Bellevue, WA  98004
    Telephone: (360) 279-0937
    Email: rhopper@pacificlegal.org

    *Counsel for Plaintiffs*

# EXHIBIT 1

  

March 7, 2014

The Honorable Daniel M. Ashe, Director
U.S. Fish and Wildlife Service
Public Comments Processing,
Attn: FWS-R8-ES-2012-0100
Division of Policy and Directives Management
4401 N. Fairfax Drive, MS 2042-PDM
Arlington, VA 22203

RE: FWS-R8-ES-2012-0100: Proposal to Add Sierra Nevada Yellow Legged Frog, Northern
DPS of the Mountain Yellow Legged Frog and Yosemite Toad to the list of Threatened and
Endangered Species

Dear Mr. Ashe:

The California Cattlemen's Association, California Farm Bureau Federation, and California
Wool Growers Association are writing to provide additional comments on the proposed listing of
the Sierra Nevada yellow-legged frog, the northern distinct population segment of the mountain
yellow-legged frog and the Yosemite toad under the Endangered Species Act.  Our organizations
previously submitted comments June 24, 2013 jointly with three other agricultural and rural
organizations representing members impacted by the proposed listing.  Our organizations are
providing additional comments to alert the U.S. Fish and Wildlife Service (the Service) to a
recently published peer-reviewed article studying the effects of fencing meadows inhabited by
Yosemite toads to prevent grazing and to provide information regarding the economic impacts
the proposed designation of critical habitat will have on our members who rely on the proposed
critical habitat areas for both forage and timber production.

**Best Available Science**

On November 5, 2013 the third and final paper[1] from an extensive study to determine grazing
impacts on the Yosemite toad was published.  McIlroy's paper focuses on the effects different
fencing treatments had on the Yosemite toad.  The paper found that neither fencing cattle from
the toad breeding area, nor from the entire meadow improved toad populations.  These findings

---

[1] McIlroy SK, Lind AJ, Allen-Diaz BH, Roche LM, Frost WE, et al. (2013) Determining the Effects of Cattle
Grazing Treatments on Yosemite Toads (*Anazyrus* [=*Bufo*] *canorus*) in Montane Meadows. PLoS ONE 8(11):
e79263.

along with the findings in the other two previously published papers[2,3] refute the conclusions in the listing proposal that grazing is a definitive risk to the Yosemite toad.

As discussed in our June 24, 2013 comments, the Service failed to properly examine the "best scientific . . . data available," as required by ESA § 4, in forming the basis for the Proposed Rule to List and the Proposed Rule to Designate Critical Habitat. We again address the insufficiency of this scientific analysis, both to supplement our prior comments and because the flawed scientific analysis employed by the Service formed the partial basis for the Draft Economic Analysis (DEA).[4] We here limit our discussion to the evidence regarding the Yosemite toad, as our former comments fully address our concerns about the science examined regarding the Yellow-legged frog and the Northern DPS of the mountain Yellow-legged frog.

### *The Service should consider newly available evidence prior to issuing a Final Rule*

Recently, a group of scientists who conducted a five-year study into the relationship between livestock grazing and Yosemite toad populations published their third peer-reviewed article analyzing the study.[5] **McIlroy *et al.* (2013)** examined three fencing methods in an effort to determine the impact of livestock grazing on amphibian populations. The methods used included (1) allotments complying with existing US Forest Service annual grazing standards, (2) fencing Yosemite toad breeding areas so livestock grazing did not directly impact the Yosemite toad, and (3) fencing the whole meadow to exclude cattle, so that grazing would have no direct *or* dispositional impact on the Yosemite toad. The study found that, regardless of which fencing method was used, there was "no benefit of fencing to Yosemite toad populations."[6]

This extensive study suggests that there are no clear direct *or* indirect impacts of livestock grazing on the population of the Yosemite toad throughout the Sierra Nevada. Indeed, the authors explicitly state that "[o]ur results do not support previous studies that found a negative impact of grazing on amphibian populations."[7]

Additionally, we recognized in our June 24, 2013 comments that though the Service had referenced Roche *et al.* (2012a) in its Proposed Rule to Designate Critical Habitat, it had entirely omitted another source—**Roche *et al.* (2012b)**—from the Proposed Rule to List and the Proposed Rule to Designate Critical Habitat.

---

[2] Roche LM, Latimer AM, Eastburn DJ, Tate KW. (2012). Cattle Grazing and Conservation of a Meadow-Dependent Amphibian Species in the Sierra Nevada.  PLos ONE 7(4): e35734 [hereinafter Roche *et al*. (2012b).]
[3] Roche LM, Allen-Diaz BH, Eastburn DJ, Tate KW (2012) . Cattle Grazing and Yosemite toad (*Bufo canorus* Camp) breeding habitat in Sierra Nevada meadows. Rangeland Ecol Manag 65: 56-65 [hereinafter Roche *et al.* (2012a).
[4] *See, e.g.,* INDUSTRIAL ECONOMICS, INC., ECONOMIC ANALYSIS OF CRITICAL HABITAT DESIGNATION FOR THREE SIERRA NEVADA CALIFORNIA AMPHIBIANS ES-2 at ¶ 7 [hereinafter DEA].
[5] McIlroy SK, Lind AJ, Allen-Diaz BH, Roche LM, Frost WE, et. Al. (2013) Determining the Effects of Cattle Grazing Treatments on Yosemite Toads (*Anazyrus* [=*Bufo*] *canorus*) in Montane Meadows. PLoS ONE 8(11): e79263.
[6] McIlroy *et al.* (2013), p. 5.
[7] Ibid., p. 5.

The value of Roche *et al.* (2012b) to the Service's analysis cannot be overstated. While Roche *et al.* (2012a) dealt with the subject of fencing (addressed elsewhere in this comment), Roche *et al.* (2012b) examined a different issue entirely—the intersection between meadow hydrology, Yosemite toad prevalence, and grazing intensity. The omission of Roche *et al.* (2012b) is particularly alarming because, according to study authors (as discussed below), this publication supersedes Lind *et al.* (2011), an unpublished and non-peer-reviewed report which the Service relied on within the Proposed Rule to List. Roche *et al.* (2012b) is discussed at length in the following section of these comments, and thus will not be examined further here, but as it appears the Service has not yet examined it, it constitutes new evidence which the Service ought to investigate prior to considering any Final Rule.

The Service ought to fully incorporate the findings of Roche *et al.* (2012b) and McIlroy *et al.* (2013) into its analysis of livestock grazing and Yosemite toad populations prior to making any listing decision.

*The Service's concerns regarding Allen-Diaz* et al. *(2010) are unfounded, and its reliance on* Lind et al. *(2011) is misguided*

In its Proposed Rule to List, the Service cites concerns about the study methods of Allen-Diaz *et al.* (2010), while simultaneously advancing conclusions from the addendum to that publication, Lind *et al.* (2011), as evidence that livestock negatively impact Yosemite toad populations. For the reasons discussed below, the Service's concerns about Allen-Diaz *et al.* (2010) are unfounded and its use of Lind *et al.* (2011) to suggest livestock grazing negatively impacts the toad is in error. Regardless, the Service advances no scientific and/or statistical evidence to contradict the findings of Allen-Diaz *et al.* (2010), and we maintain that it and the other reports based on the USFS's five-year study[8] represent the "best scientific . . . data available."

One major concern the service had about Allen-Diaz *et al.* (2010) was that "the design of these studies did not include direct measurements of toad survival (for example, mark-recapture analysis of population trends)."[9] In fact, this assertion is incorrect. Its inclusion in the Proposed Rule is particularly puzzling, as the researchers' intent to use such mark-recapture methods was specifically detailed in the Final Study Plan, available as an appendix to Allan Diaz *et al.* (2010).[10] In that study plan, the researchers specifically note that "we do not expect the field methods we are using (e.g. counting, **mark/recapture**, measuring habitat) to negatively affect the . . . populations of toads."[11] Moreover, "Appendix C. Yosemite Toad Populations and Habitat Detailed Field Methods"[12] within the Final Study Plan appended to Allen-Diaz *et al.* (2010) extensively documents the mark/capture/recapture methods the researchers intended to implement throughout the course of their five-year study. Specifically, the study authors noted that "[o]ver a period of at least three years, **we expect to derive survival estimates for at least**

[8] Roche *et al.* (2012a), Roche *et al.* (2012b), and McIlroy *et al.* (2013).
[9] Proposed Rule to List, p. 24503.
[10] Allen-Diaz, B., A. Lind, S. McIlroy, K. Tate. 2007. Determining the Effects of Livestock Grazing on Yosemite Toads (*Bufo canorus*) and Their Habitat: An Adaptive Management Study, Appendix A—Study Plan, *available online at* http://www.carangeland.org/images/Tate_-_Yosemite_yellow_Toads.pdf.
[11] Ibid, p. 24 (emphasis added).
[12] Ibid, pp. 34-39.

**the adult life stage**."[13] Table 2 of Lind *et al.* (2011), which the Service also cites within the Proposed Rule to List, also details the cap/recap measurement methods undertaken by the researchers.[14]

Furthermore, the newly-available McIlroy (2013) also directly refutes this perceived inadequacy, pointing out that "each [young of the year] was batch marked with a meadow color and year color using visible implant elastomer to avoid double counting. Annual counts of YOY for each meadow were calculated as the average of two counts spaced approximately three weeks to one month apart within each year."[15] The five-year study thus *did* directly measure toad survival, contrary to the Service's assertion, and nevertheless concluded that there was no negative impact of grazing on Yosemite toad populations.

The Service's Proposed Rule to List continues by stating that

> "it is plausible that for longer-lived species with irregular female breeding activity over the time course of this particular study, statistical power was not sufficient to discern a treatment effect. Further, there may be a time lag between effect and discernible impacts, and significant confounding variability in known drivers such as interannual variation in climate."[16]

Of particular importance here is the Service's use of the words "**plausible**" and "**may**." The Service also cites no scientific evidence lending credence to this concern. Consequently, it appears that the Service's reservations about the study's duration is based not on the "best scientific . . . data available" as required by ESA § 4, but upon mere conjecture about perceived inadequacy.

The Service next begins an analysis of Lind *et al.* (2011), an addendum to the Allen-Diaz *et al.* (2010) final report which was submitted to US Forest Service Region 5 on April 6, 2011. Specifically, the Service focuses on the "statistically significant negative (inverse) relationships for tadpole density and grazing intensity (tadpole densities decreased when percent use [of meadows for grazing] exceeded between 30 and 40 percent)."[17] This assertion derives from Figure 6 and associated conclusions detailed within the Lind addendum. It is important to note that, according to study co-author Dr. Kenneth Tate, though the research team agreed with Figure 2 of the Lind addendum and associated conclusions (which were later incorporated in the peer-reviewed McIlroy *et al.* paper), "[t]he rest of the addendum is generally not signed off on by

---

[13] Ibid., p. 34 (emphasis added).

[14] Lind, A., R. Grasso, J. Nelson, K. Vincent, C. Liang, K. Tate, L. Roche, B. Allen-Diaz, S. McIlroy. 2011. Determining the Effects of Livestock Grazing on Yosemite Toads (Anaxyrus [Bufo] canorus) and Their Habitat: An Adaptive Management Study. Pacific Southwest Research Station, Sierra Nevada Research Center, Davis, California, p.5 Table 2.

[15] McIlroy *et al.* (2013), p. 4.

[16] Proposed Rule to List at 24503. Though the Service does not cite a source for this conjecture, it appears to derive from one of the conclusions in Lind *et al.* (2011), p. 21. As discussed below, the conclusions of the Lind addendum have not been peer reviewed nor published, and these conclusions are superseded by the study authors' analysis in Roche *et al.* (2012b).

[17] Proposed Rule to List, p. 24503, citing Lind *et al.* (2011), pp. 12-14.

the rest of the research team. In particular Figure 6 and associated conclusions."[18] This is because the analytical approach applied to that data is inaccurate and doesn't tell the full story. According to Dr. Tate, "*if you analyze the data holistically, as was done in Roche* [*et al.* (2012b)],[19] *then you can see the real relationships between hydrology, the toad, and grazing—as well as the fundamental underlying mechanisms explaining the relationship.*"

The conclusion of Roche *et al.* (2012b) (which, according to study co-author Dr. Tate, *supersedes* the conclusions in the Lind addendum), is that this correlation between tadpole density and grazing intensity may be best explained by the fact that "Yosemite toads and cattle largely select for divergent meadow types based on habitat and forage values, respectively," with Yosemite toads preferring to breed in wetter areas and cattle preferring to graze in drier areas.[20] Low tadpole density is thus not *caused* by higher grazing intensity—they merely correlate because the species select for different meadow preferences. The deficiency in the Lind addendum, then, is that it examines tadpole prevalence compared with livestock use and tadpole prevalence compared with hydrology separately, rather than examining all three of these data sets holistically. It is also important to note that Roche *et al.* (2012b) and the two other papers based on the five year study[21] were published in peer-reviewed journals, while the Lind addendum has been neither peer-reviewed nor published.

Though the Service does end its discussion of Allen-Diaz *et al.* (2010) and the Lind addendum by recognizing there may be "segregation of toad and livestock use in meadow habitats, so that at least direct mortality threats may be mitigated by behavioral isolation,"[22] it does so without reference to Roche *et al.* (2012b), failing to recognize the full import and weight of that peer-reviewed study. Instead, the Service seems to dismiss this important conclusion and immediately leaps into an analysis of Martin (2008),[23] which it inexplicably grants great weight.

*The Service improperly relies upon Martin (2008) in concluding that livestock grazing represents a prevalent threat to the Yosemite toad and its habitat*

Martin (2008) is the Service's only citation which purports to establish a causal link between livestock grazing and decline in Yosemite toad populations. Though we extensively discussed the Service's troubling use of Martin (2008) in our June 24, 2013 comments, it is worth further explicating those concerns here. As we noted in those comments: (1) Martin (2008) was not published in a peer-reviewed journal; (2) much of Martin's analysis is not based upon direct measurements of toad populations, such as mark/recapture analysis, but is instead based upon personal, anecdotal observation, (3) Martin's study duration appears to have been much shorter

---

[18] Email from Dr. Kenneth Tate, Professor and Cooperative Extension Specialist, Department of Plant Sciences at U.C. Davis, to Kirk Wilbur, Director of Government Relations, California Cattlemen's Association (March 4, 2014, 17:17 PST) (on file with author).
[19] Telephone Interview with Dr. Kenneth Tate, Professor and Cooperative Extension Specialist, Department of Plant Sciences at U.C. Davis (March 5, 2014).
[20] Roche *et al.* (2012b), p. 7.
[21] Roche *et al.* (2012a) and McIlroy *et al.* (2013).
[22] Proposed Rule to List, p. 24503.
[23] Martin, D.L. 2008. Decline, Movement, and Habitat Utilization of the Yosemite Toad (*Bufo canorus*): An Endangered Anuran Endemic to the Sierra Nevada of California. Doctoral thesis. University of California, Santa Barbara.

in duration than the five-year study discussed in Allen-Diaz *et al.* (2010) and its three resulting studies (which is particularly troubling considering the Service casts doubt on Allen-Diaz for its perceived limited duration[24]); and (4) the entirety of the Service's conclusion that grazing negatively impacts survivorship in Yosemite toads[25] is based on what Martin admits to be *personal observation* and *opinion*, and which he concedes he did not study as part of his experimental study.[26] For greater detail on these areas of concern, we direct you to our June 24, 2013 comments.

We have additional concerns regarding Martin (2008), however, which were not fully addressed in our former comments. First, the sample size in Martin's analysis of meadows was much smaller than the sample size used by the research group in Allen-Diaz *et al.* (2010) (addressed throughout the rest of this section by reference to their final published article, McIlroy *et al.* (2013)). Martin (2008) examined only three meadows,[27] whereas McIlroy *et al.* (2013) examined the effects of grazing on the Yosemite toad throughout 14 meadows.[28]

Secondly, McIlroy *et al.* (2013) is also superior to Martin (2008) in the geographic range of its study area: McIlroy *et al.* (2013)'s research group sampled meadows between an elevation of 2,113 and 2,717 meters, while Martin's three meadows ranged in elevation only from 2,567 meters to 2,620 meters. Unfortunately, information on the size of meadows sampled cannot be compared—though McIlroy *et al.* (2013) specifies that "meadows ranged in size from 0.7-23.3 [hectares],"[29] Martin does not seem to have reported the size of the three meadows he studied.[30] Regardless, McIlroy (2013) examined a greater number and range (within the Yosemite toad's habitat) of meadows than Martin (2008), and its statistical analysis is thus preferable.

All of these factors combined definitively establish Allen-Diaz *et al.* (2010), Roche *et al.* (2012a), Roche *et al.* (2012b), and McIlroy *et al.* (2013) as far more reputable sources for the "best scientific . . . data available" than Martin (2008).

### *Conclusion regarding "best scientific . . . evidence available" on the relationship between livestock grazing and the Yosemite toad*

By virtually every measure, the methods, analysis, and conclusions reached by the study group in Allen-Diaz *et al.* (2010), Roche *et al.* (2012a), Roche *et al.* (2012b), and McIlroy *et al.* (2013) are far superior to those of Martin (2008) and the Lind addendum to Allen-Diaz *et al.* (2010). Importantly, neither Martin (2008) nor the Lind addendum—which represent the only two sources invoked by the Service to establish a causal nexus between grazing and Yosemite toad decline —were published or peer-reviewed. Until and unless these reports are peer-reviewed, they simply cannot be deemed by the scientific and regulatory communities to represent the "best scientific . . . data available."

---

[24] Proposed Rule to List, p. 24503.
[25] Ibid., p. 24504.
[26] Martin (2008), p. 306.
[27] Ibid., p. 43.
[28] McIlroy *et al.* (2013), p. 2.
[29] Ibid., p. 2. This is equivalent to 1.7-57.6 acres.
[30] *See generally* Martin (2008), pp. 43-50 (describing the research area but omitting details as to the size, in area, of meadows studied).

As discussed above, the best scientific evidence available establishes that livestock grazing **does not** negatively impact toad populations. This is based on holistic analysis of toad population, hydrology, and grazing, which concluded that livestock and the Yosemite toad tend to segregate themselves from one another based on habitat and forage preferences.[31] This conclusion is further supported by evidence recognizing that fencing techniques that limited grazing within breeding areas or entire meadows did not significantly impact toad populations.[32]

Based on the foregoing, we urge the service to recognize the best scientific data available and to remove from its Proposed Rule all mention of grazing as a threat to the Yosemite toad. We likewise request that, if the Service nevertheless lists the Yosemite Toad as a threatened species, that it exclude grazing allotments from its designation of critical habitat.

We urge the Service to recognize the best available science and remove mention of grazing as a risk from its proposal.  Additionally, as was requested in our previously submitted comments, it is important to recognize Dr. Knapp's peer review of the proposed rule.  In his review he concluded that the Service's data used to justify a listing of the Yosemite toad "provide a relatively weak foundation for listing" and that a "'not warranted' conclusion could also be justified."

**Economic Impacts of Critical Habitat Designation**

We urge the Service to exercise its authority under Section 4(b)(2) of the Endangered Species Act and exclude proposed critical habitat units that include active grazing allotments and areas where timber harvest occurs.  Current science does not support the Service's assertion that grazing is a significant threat to the species.  The loss of use, or reduction in available use, of grazing allotments on National Forests would significantly impact the ranchers who currently depend on the livestock forage provided by federal grazing allotments.

Ranchers who hold federal grazing permits are required to have private property where their cattle graze for part of the year.  Access to federal grazing allotments is limited to the short growing season in the Sierra Nevada Mountains and permittees must have other land the remaining nine months of the year.  Lost access to summer forage places additional pressure on the private lands grazed by livestock when they are not grazing the allotments.  This additional grazing pressure negatively impacts the conservation values of these rangelands in both the short and long term.  Ultimately, lost access to federal grazing allotments often leads to the sale of the private ranches that used to access National Forest grazing allotments.  Often these ranches are sold for conversion to other land uses, which removes the significant habitat values that private rangelands provide to California wildlife.  Further as more rangeland is converted to other uses it becomes harder for ranchers to replace access to lost forage.  It is estimated that in California between 10,000 and 20,000 acres of rangeland are converted to other uses every year.

It is important to recognize that the Service has acknowledged the value that private ranches provide to two other listed amphibian species, California tiger salamander (CTS) and California

---

[31] Roche *et al.* (2012b), p. 7.
[32] McIlroy *et al.* (2013), p. 5.

red-legged frog (CRLF) and adopted special rules to allow take incidental to routine livestock ranching activities to occur.  In its final rule to list the central population of the CTS, the Service stated: "Maintaining California tiger salamander use of stock ponds on livestock ranches for breeding appears to be a critical link in the conservation and recovery of this species."[33]  In its final rule to list the CRLF, the Service similarly stated: "Maintaining California red-legged frog's use of stock ponds on livestock ranches for breeding appears to be an important link in the conservation and recovery of this subspecies."[34]  Both decisions were made after a recognition that private livestock ranches provide important habitat to these amphibian species and removing regulatory burdens that could drive a livestock producer to convert their property to other uses is critical to the long term success of each species.  The designation of critical habitat on federal grazing allotments could lead directly to the loss of the very ranches that the Service was trying to protect in its decision to create species rules for the CTS and CRLF.

A federal grazing permittee on the Sierra National Forest whose allotment is within the Iron Mountain unit would be forced out of business by the loss of access to the summer pasture that the allotment provides.  Her allotment, the Iron Creek Allotment, is entirely within the proposed Iron Mountain critical habitat unit.  This permittee would be forced to sell all of her 320 head of cattle and lose the annual income generated by these mother cows if significant restrictions are placed on her allotment.   A second federal grazing permittee on the Stanislaus National Forest expects she would have to sell half of her cow herd if her allotment is reduced.  She grazes the Bear Valley allotment, which has 29 percent included in a critical habitat unit for Sierra Nevada Yellow-legged frog.  The permittee estimates a loss of access to nearly one third of her allotment would lead to a need to sell half of her cows and she estimates that a loss that large would likely drive her out of business.

Between the three amphibian species, the proposed critical habitat units include 1,269,098 acres of National Forest lands that are actively grazed by federal grazing permittees.  This acreage includes 59 active National Forest grazing allotments.  Of the active allotments, 38 have more than 50 percent of the acreage included in a proposed critical habitat unit and 34 are entirely included in proposed critical habitat units.  Lost grazing opportunities on national forest lands would impact both the individual ranchers as well as the local communities, as goods and services will be used at a lower rate when grazing is reduced.

It is important to recognize that there has been a significant decline in the levels of grazing on our national forests.  Since the peak in 1918, the number of cattle grazing national forests has seen a 69 percent reduction.[35]  Since the peak in 1919, the number of sheep grazing national forests has seen a 94 percent reduction.[36]  Grazing permittees have changed their grazing practices to limit impacts to amphibians through the revised standards and guidelines in the 2004 Sierra Nevada Forest Plan Amendment.  One of the studies concluded that "cattle production and

---

[33]Endangered and threatened wildlife and plants: determination of threatened status for the California tiger salamander; and special rule exemption for existing routine ranching activities; final rule (69 FR 47241)

[34] Designation of Critical Habitat for the California Red-Legged Frog, and Special Rule Exemption Associated With Final Listing for Existing Routine Ranching Activities: Final Rule (71 FR 19285)

[35] Kenneth W. Tate, personal communication derived from data at:
http://www.fs.fed.us/rangelands/reports/index.shtml

[36] Kenneth W. Tate, personal communication derived from data at:
http://www.fs.fed.us/rangelands/reports/index.shtml

amphibian conservation can be compatible goals within this working landscape."[37]  Studies further found that grazing pursuant to the Sierra Nevada Forest Plan Amendment Standards and Guidelines "resulted in no detectable impacts on [Yosemite] toad occupancy."[38]  Roche et al. (2012a) also found that: "Pool habitat conditions and toad response observed during this study do not indicate habitat impairment under standard USFS grazing management."[39]
Additionally, with regard to livestock grazing the DEA states that "the Service believes that additional project modifications due to the designation of critical habitat are unlikely."[40] Because project modifications are necessary where destruction or adverse modification of critical habitat are likely,[41] this conclusion that project modifications are *unlikely* serves as an implicit recognition that livestock grazing is not likely to pose a threat of destruction or adverse modification to the habitat of these three amphibian species. Thus, as the ESA suggests that a critical habitat designation ought only be made "within the geographical area occupied by the species . . . on which are found those physical or biological features . . . which may require special management considerations or protections,"[42] and the Service's DEA implicitly suggests that such special management considerations or protections will be *unnecessary*, inclusion of grazing allotments in the critical habitat designation is unwarranted.

There are, then, two possibilities which may result from including grazing allotments within designated critical habitat: either (1) designation of critical habitat will not result in modifications on grazing allotments, in which instance the administrative costs of additional consultations outweigh any benefit of designating grazing land as critical habitat, or (2) in fact modifications *will* be required, and, as described above, will cause significant economic hardship to grazing permittees and in some circumstances require them to cease operation entirely. In either scenario, the benefits of *excluding* grazing lands from critical habitat outweigh the benefit of including these areas within critical habitat, and thus grazing allotments should be excepted from the designation of critical habitat under § 4(b)(2) of the ESA. This analysis is strengthened by the best science available, which consistently demonstrates no risk to the habitat of the three species from grazing activities as currently practiced.

Recognizing that existing Standards and Guidelines governing grazing practices on national forest lands proposed for inclusion in critical habitat designations for three amphibian species are protective of these species is of paramount importance.  Given reductions in historic grazing levels on these forests, further reductions will have significant economic impacts on the federal grazing permittees.  Even if reductions were not proposed, costly monitoring or changes in timing of use will also significantly impact these permittees.  Given that current practices do not impact the species, there is no need for additional restrictions and we would strongly urge the Service to accept this as it consults with the U.S. Forest Service (USFS) on its grazing program.

---

[37] Roche *et al.* (2012b), p. 1.

[38] Ibid., p. 1.

[39] Roche *et al.* (2012a), p. 64.

[40] DEA at ES 4-16.

[41] After Section 7 consultations, the Secretary of the Interior must issue an opinion detailing how a proposed activity will impact a species or its critical habitat. "If . . . adverse modification is found, the Secretary **shall** suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2)." Endangered Species Act § 7(b)(3)(A) (emphasis added).

[42] ESA § 3(5)(a)(1).

**The proposed critical habitat designation may negatively impact species currently protected under the ESA**

McIlroy (2013) notes that implementing grazing restrictions in an effort to reduce the perceived threat of grazing on the Yosemite toad's habitat may negatively impact other vulnerable species, stating that "[i]mplementing any of these management strategies could affect other meadow-associated species (e.g., willow flycatchers, special status fish species)."[43] While the willow flycatcher as a species is not a federally listed endangered species, the Southwestern Willow Flycatcher (*Empidonax traillii extimus*) is a federally endangered subspecies.[44] There are at least two areas where proposed critical habitat designation for the Sierra Nevada yellow-legged frog and the Yosemite Toad overlap with the critical habitat of the Southwestern Willow Flycatcher: Mono Creek (subunit 3D) and Bear Creek (within subunits 1B and 1C).[45] As critical habitat designation for the amphibians may adversely impact this endangered species, we further urge against critical habitat designation for the amphibians on public lands where grazing takes place.

**Impacts to Timber Harvest and Forest Management**

California's national forests have had limited management for decades.  This has resulted in severely overgrown forests and catastrophic wildfires.  This is evidenced by last summer's Rim Fire, the third largest fire in California History.  It consumed over 250,000 acres and destroyed 111 structures, costing $127 million to fight and estimates are that it will cost an additional $70 million for cleanup.  There are numerous impacts to wildlife from this fire, including an expectation of increased sedimentation and/or peak flows downstream, which are likely to cause injury or mortality of all frog life stages, eggs masses and tadpoles, in particular.

The USFS intends to perform forest health and/or fuels reduction treatments on up to 9 million acres of national forest land over the next 15-20 years.  This is at least a three to four fold increase in current intensity of activity.  Recognizing this increased forest management activity is imperative to understanding the true economic impacts of the proposed critical habitat designation.

The economic analysis has not identified the likelihood that acres of proposed forest health and fuels reduction activities will be eliminated because of consultation and, thus, has not addressed the economic impact of foregone opportunities to manage the vegetation.  Not managing the vegetation means lost jobs and payroll, which then leads to reduction in economic activity in the rural counties affected by the 1.8 million acre proposed critical habitat designation.  Not managing the vegetation in the Sierra Nevada means that the vegetation density continues to rise, leading to ever-increasing risk of insects, disease, and eventual wildfires.

---

[43] McIlroy (2013), p. 2.
[44] Endangered and Threatened Wildlife and Plants; Final Rule Determining Endangered Status for the Southwestern Willow Flycatcher, 60 Fed. Reg. 10,694 (Feb. 27, 1995) (codified at 50 C.F.R. pt. 17).
[45] *See* Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Southwestern Willow Flycatcher; Final Rule, 78 Fed. Reg. 344, 363 (Jan. 3, 2013) (codified at 50 C.F.R. pt. 17) (designating Mono Creek and Bear Creek within critical habitat for the Southwestern Willow Flycatcher); DEA at ES-4, 4-14 (identifying Mono Creek and Bear Creek as areas for proposed critical habitat designation for SNYLF and YT).

The benefits of proper forest management far outweigh the potential benefits to the three amphibian species if critical habitat is designated.  It is likely that critical habitat designation of unoccupied areas will lead to a reduction in thinning and timber harvest, which is likely to lead to increased forest fire risks.  Catastrophic forest fires as we've seen recently significantly impact wildlife habitat.  It is important that the proposed fuels reduction treatment be able to continue as proposed by the USFS.

Timber harvests on private lands are also likely to be impacted by a critical habitat designation and we respectfully request that all private land be excluded from the critical habitat designation. Private forest lands in California are held to high environmental standards when conducting timber harvests.  It is expected that critical habitat designation will add additional costs to private timber harvest activities through additional monitoring requirements.  Family forest landowners, of which there are 197,000 in California, operate their forests on very thin economic margins. Additional costs can make harvest uneconomical and lead to a huge loss in the economic value of the property.  This impact needs to be recognized and is reason enough to exclude private forest lands from the critical habitat designation under the Service's authority provided by Section 4(b)(2) of the Endangered Species Act.

Our organizations hope that the USFWS will meaningfully consider these comments as they relate to both the listings and proposed critical habitat. In particular, the USFWS should seriously consider the protections already being employed by the USFS. As previously stated, we believe that the science used in the proposed rule mischaracterizes real threats to both species and we implore the USFWS to further review and expand its literature review to the studies cited herein in order to modernize the record with comprehensive, relevant information.

Sincerely,

Kirk Wilbur
California Cattlemen's Association

Noelle G. Cremers
California Farm Bureau Federation

Lesa Eidman
California Wool Growers Association