UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CALIFORNIA CATTLEMEN'S ASSOCIATION, *et al.*,<br><br>                  Plaintiffs,<br><br>                  v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, *et al.*,<br><br>                  Defendants,<br><br>                  and<br><br>CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>                  Defendant-Intervenors | Case No. 1:17-cv-01536 (TNM) |

## **MEMORANDUM OPINION**

In this suit, three associations representing California ranchers and farmers challenge the federal designation of over 1.8 million acres in the Sierra Nevada mountains as critical habitat for three amphibian species. Before me are two Motions to Dismiss: one from the Government and one from Defendant-Intervenors (collectively, Defendants), each raising jurisdictional and pleading arguments. At this initial stage, I conclude with one exception that I have jurisdiction, and that the Complaint survives applicable pleading standards.

### **I. BACKGROUND**

The Complaint contains two causes of action. In the first, the Plaintiffs contend that the Government violated the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 (RFA), by issuing proposed and final critical habitat designations (the Proposed and Final Rule) under the Endangered Species Act, 16 U.S. § 1531 *et seq.*, without conducting regulatory flexibility

1

analyses of the impact of the designation on small entities. Compl. 12-13. In the second, the Plaintiffs argue that violating the RFA in turn violates the Administrative Procedure Act (APA), 5 U.S.C. § 706. Compl. 13. The Complaint seeks declaratory, injunctive, and other forms of relief. *Id.* 11-14. After the Government moved to dismiss, ECF No. 11, I granted three environmental groups leave to intervene as defendants, ECF No. 34, and they also filed their own Motion to Dismiss, ECF No. 36. The motions are fully briefed, and the parties have supplemented the record with affidavits and documentary evidence.

## II. LEGAL STANDARDS

The Defendants seek dismissal for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1), on standing and ripeness grounds, and for failure to state a claim under Fed. R. Civ. P. 12(b)(6). A plaintiff bears the burden of establishing subject-matter jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks and citations omitted). "While the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction . . . the court must still accept all of the factual allegations in [the] complaint as true." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (internal quotation marks and citations omitted). Ultimately, the jurisdictional claims must be plausible, not speculative. *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2001).

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim

crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). A court must "draw all reasonable inferences from those allegations in the plaintiff's favor," but not "assume the truth of legal conclusions." *Id.*

## III. ANALYSIS

### A. The Plaintiffs Have Largely Satisfied Applicable Jurisdictional Standards

"Where, as here, a plaintiff alleges that it will suffer future economic harm as the result of a government action, the complaint and declarations must together demonstrate a substantial probability of injury-in-fact, causation, and redressability." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).[1] Even one dollar of "[e]conomic harm to a business clearly constitutes an injury-in-fact." *Id.* On the "more difficult question" of causation and the linked issue of redressability, "common sense can be a useful tool." *Carpenters Indus. Council*, 854 F.3d at 5-6, & n. 1. Although the Defendants dispute each prong, common sense is on the Plaintiffs' side, and I conclude that they have satisfied the motion to dismiss standards.

The Final Rule designates over 1.8 million acres as critical habitat, Compl. ¶ 1, identifies "inappropriate grazing" as a threat to the three amphibians, Gov. Mot. Dismiss Ex. 1 (Final Rule) at 59065, and creates a legal requirement that federal agencies consult with the U.S. Forest Service to jointly "insure" that federally-authorized activities (such as grazing) do not "result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2). The

---

[1] An organization has standing to raise a claim if even one of its members has standing, *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014), and if at least one organization has standing, a court "need not consider the standing of the other plaintiffs." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

3

Plaintiffs allege that "a significant number of CCA [California Cattlemen's Association] members have been impacted or stand to be impacted" by this designation, because the land "includes 59 active [U.S.] Forest Service [grazing] allotments . . . [with] significant overlap between . . . grazing permittees and CCA members." Decl. of Kirk Wilbur, Opp. Ex. 1, ECF No. 38-2 (Wilber Decl.). I must credit the Plaintiffs' general allegations at this stage. *Lujan*, 504 U.S. at 561.

The Defendants argue, among other things, that the Plaintiffs have failed to provide a relevant example of actual or impending injury, and that the critical habitat designation will only marginally increase consulting requirements, with no reduction to grazing rights. But the Government is restricting land use on 1.8 million acres, citing potentially inappropriate grazing. The Plaintiffs use at least some of that land to "obtain" feed for their livestock, "a necessary raw material." *Carpenters Indus. Council*, 854 F.3d at 6; Wilbur Decl. ¶ 12. And even when consultations allow grazing permits to continue, associated delays and requirements impose economic costs. Wilbur Decl. 2-5; Leinassar Decl. 2-6. Existing protections for these species may have been extensive, but common sense tells me that a 1.8 million acre land use rule will have some impact on ranchers and farmers who utilize the land. I find a "substantial probability" (1) that this action will at least marginally decrease the supply of feed, (2) that the Plaintiffs obtain feed from these lands, and (3) that the Plaintiffs will suffer at least one dollar of economic harm as a result. *See Carpenters Indus. Council*, 854 F.3d at 6.[2] Invalidating the Final Rule would redress this harm.

---

[2] The Plaintiffs have also shown the "imminent future injury" required for injunctive relief standing. *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) ("to shift[] injury from conjectural to imminent, the [companies] must show that there is a substantial . . . probability of injury") (internal quotation marks and citation omitted) (alterations original).

The Plaintiffs' claims are also ripe. Ripeness requires evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1987). "[F]itness of an issue for judicial decision depends on [1] whether it is purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final." *Energy Future Coal v. EPA*, 793 F.3d 141, 146 (D.C. Circ. 2014) (quoting *Nat'l Assoc. of Home Builders v. Army Corps of Engineers*, 417 F.3d 1272, 1281 (D.C. Cir. 2005)). The Defendants do not dispute that the issues here are purely legal, or that the Final Rule is final, only whether the case "would be better litigated in the context of a . . . consultation resulting in a biological opinion that restricts members' grazing allotments." Gov. Mot. Dismiss 20. But the ultimate issue is whether the Government correctly reasoned that no RFA analyses were required, because "only Federal action agencies will be directly regulated," Compl. 10, and thus the critical habitat designation "will not . . . have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). This inquiry turns on whether private parties like the Plaintiffs are "directly regulated" within the meaning of the RFA, *Mid-Tex Elec. Co-op., Inc. v. F.E.R.C.*, 773 F.2d 327, 342 (D.C. Cir. 1985), by a critical habitat designation triggering consultation requirements under 16 U.S.C. § 1536. Because the legal issue has so little to do with any particular injury, and the Plaintiffs provide at least one concrete example of a member using land designated as critical habitat, Wilbur Decl. ¶ 12, additional concrete facts would be of little benefit. And I am satisfied that the hardships imposed on the Plaintiffs are "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Labs*, 387 U.S. at 153.

The Defendant-Intervenors also claim that "Plaintiffs' [RFA] challenge . . . under 5 U.S.C. § 603," is not reviewable under the judicial review provisions in 5 U.S.C. § 611. Interv. Mot. Dismiss 8. To the extent that the Plaintiffs invoke the RFA alone to test compliance with Section 603, that claim must be dismissed for lack of jurisdiction. *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000) ("Section 611(a) specifically lists the sections of the RFA subject to judicial review, and section 603 is not on the list"); *see* Compl. ¶¶ 45-47. However, I can consider compliance with Section 603 under APA arbitrary and capricious review. *Id.* (finding jurisdiction to "consider [a Section 603 challenge] in determining whether EPA complied with the overall requirement that an agency's decisionmaking be neither arbitrary nor capricious.").

### B. The Plaintiffs Successfully State a Claim

The Defendants also argue that the Plaintiffs' claims do not fall within the zone of interests protected by the RFA, and therefore fail to satisfy Fed. R. Civ. P. 12(b)(6). Gov. Mot. Dismiss 21-24; Def. Interv. Mot. Dismiss 8-10. In this inquiry, a court must "apply traditional principles of statutory interpretation" to determine "whether [the Plaintiffs] ha[ve] a cause of action under the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–88 (2014) (explaining that the term "'prudential standing' is a misnomer as applied to the zone-of-interests analysis, which asks whether "'this particular class of persons ha[s] a right to sue under this substantive statute.'") (citation omitted). "[T]he 'zone of interests' test is not meant to be 'especially demanding,'" but to prevent suits when a "plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 871 (D.C. Cir. 2001) (citations omitted). In the context of an APA claim

that invokes another statute, a claim needs only to "arguably" fall within the underlying statute's zone of protected interests. *Id.* at 1389.

The RFA provides a cause of action for "a small entity that is adversely affected or aggrieved by final agency action." 5 U.S.C. § 611. This Circuit has held that the RFA's requirements only apply to "small entities that would be directly regulated" by a challenged rule. *Mid-Tex Elec. Co-op., Inc.*, 773 F.2d at 342. The Plaintiffs represent numerous small livestock operations that meet the RFA definition of "small entity," Compl. ¶¶ 5-8; *see* 5 U.S.C. § 601(3)-(6), which the Defendants do not dispute. The Defendants contend that the Plaintiffs are not "directly regulated" because the Final Rule requires consultation between federal agencies, and nothing more. *E.g.* Gov. Mot. Dismiss 3-4, 23. But that argument understates the Final Rule's impact. The Rule requires not just consultation, but consultation so that federal agencies "insure" that federally-authorized actions are not "likely to . . . result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2). If a consulting agency determines that one of the Plaintiffs' grazing permits is "likely to . . . result in [] destruction or adverse modification" of critical habitat, then the designation itself operates to forbid the offending permit. *Id.* In other words, any effects felt by this Final Rule will be *direct* effects, as federal agencies determine what the critical habitat designation requires in specific cases.

This is not a case where the Government is regulating private entities, with impacts felt by other entities outside the RFA's zone of interests that then seek to challenge the rulemaking. *Cf. Mid-Tex Elec. Co-op., Inc.*, 773 F.2d at 330, 342-343 ("petitioners . . . are wholesale customers of . . . utilities whose wholesale rates are regulated by the Federal Energy Regulatory Commission"); *Cement Kiln Recycling Coal.*, 255 F.3d at 869 ("EPA's rule regulates hazardous waste combustors, not waste generators [like plaintiff]."); *Permapost Prod., Inc. v. McHugh*, 55

F. Supp. 3d 14, 20 (D.D.C. 2014) ("plaintiffs do not allege . . . that they are directly regulated," and it is their "customers" and "clients" who are subject to the applicable requirements). Rather, this is a Final Rule that requires one federal agency to consult with another federal agency about the Final Rule's impact on land use, although the ultimate impact of these consultations will be felt by small entities like the Plaintiffs and their members. Indeed, the Final Rule was promulgated by the U.S. Fish and Wildlife Service under statutory authority granted to Interior Secretary Zinke, who also oversees the National Park Service, one of the agencies ordered to consult with the Fish and Wildlife Service about implementation of the Final Rule on parkland. Defendant Zinke may not avoid the requirements of the RFA by passing the conductor's baton from his right hand to his left. The D.C. Circuit has never held that the involvement of multiple federal agencies breaks the chain of RFA causation, and indeed it would run contrary to the RFA's design if one component of the Department of the Interior could escape the requirement that "the agency . . . prepare a regulatory flexibility analysis" for a "final rule," 5 U.S.C. § 604, by simply ordering a sister agency to implement the rule on its behalf. Because the Plaintiffs seem to be "precisely the type of entities Congress had in mind when it passed the RFA," *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 84 (D.D.C. 2007), I conclude that both the RFA and the APA counts survive.

## IV. CONCLUSION

Under binding precedent, on a motion to dismiss I must "presum[e] that general allegations embrace those specific facts that are necessary to support [a] claim," *Lujan*, 504 U.S. at 561, and "accept[] [factual allegations] as true." *Iqbal*, 556 U.S. at 678. Under these forgiving standards, the Government's Motion to Dismiss will be denied without prejudice, and

the Defendant-Intervenor's Motion to Dismiss will be granted as to the Complaint's 5 U.S.C. § 603 claim, but otherwise denied without prejudice. A separate order will issue.

Dated: May 29, 2018

TREVOR N. MCFADDEN
United States District Judge