# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CALIFORNIA CATTLEMEN'S ASSOCIATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 1:17-CV-01536-TNM |
| v. | ) ) ) | |
| UNITED STATES FISH & WILDLIFE SERVICE, *et al.*, | ) ) ) | |
| Defendants and | ) ) ) | |
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | ) ) ) | |
| Defendant-Intervenors. | ) | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................ 1

LEGAL BACKGROUND .................................................................................................. 3

Endangered Species Act ............................................................................................ 3

Administrative Procedure Act ................................................................................... 4

Regulatory Flexibility Act ......................................................................................... 4

FACTUAL AND PROCEDURAL BACKGROUND ................................................................ 5

Proposed and Final Rules Were Issued Without Required Economic-Impact Analyses ............... 5

Economic Impact on Small Entities ........................................................................... 7

The Service's Excuse for Failing To Prepare Regulatory Flexibility Analyses ........................... 10

The Court Previously Denied Motions To Dismiss ...................................................... 11

ARGUMENT ................................................................................................................ 11

    I.  STANDARD OF REVIEW ..................................................................................... 12

    II. THE GOVERNMENT ERRONEOUSLY FAILED TO
        PREPARE REGULATORY FLEXIBILITY ANALYSES ................................................. 13

      A. Plaintiffs and Their Members Are "Small Entities" ...................................... 13

      B. Plaintiffs and Their Members Are Directly Regulated by the Final Rule ........... 15

      C. The Service Erred as a Matter of Law by Failing To
         Conduct a Final Regulatory Flexibility Analysis ........................................... 17

        1. The Service's Failure To Consider the "Small Entities"
           Impacted by the Proposed and Final Rules Is Error ................................. 17

        2. The Service Failed To Conduct a Regulatory-Flexibility
           Analysis With the Proposed Rule ........................................................... 20

        3. The Service Failed To Conduct a Regulatory-Flexibility
           Analysis With the Final Rule ................................................................. 21

      D. The Service's Failure To Prepare Regulatory Flexibility
        Analyses Violates the Regulatory Flexibility Act and the
        Administrative Procedure Act ................................................................... 21

    III. REQUESTED REMEDIES ..................................................................................... 22

CONCLUSION ............................................................................................................. 24

CERTIFICATE OF SERVICE ........................................................................................... 26

## TABLE OF AUTHORITIES

### Cases

*Ass'n of Private Sector Colls. and Univs. v. Duncan*,
  70 F. Supp. 3d 446 (D.D.C. 2014) ............................................................................ 12

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................... 3

*Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*,
  --- F. Supp. 3d ---, No. 1:17-cv-01536 (TNM), 2018 WL 2417852,
  (D.D.C. May 29, 2018) ...................................................................................... *passim*

*Carpenters Indus. Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017) ...................................................................................... 16

*Cement Kiln Recycling Coal. v. EPA*,
  255 F.3d 855 (D.C. Cir. 2001) .................................................................................. 16

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) .................................................................................................. 12

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015) .............................................................................................. 23

*Mid-Tex Elec. Coop. Inc. v. FERC*,
  773 F.2d 327 (D.C. Cir. 1985) ............................................................................ 16, 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983). ........................................................................................ 12, 21-22

*N. Carolina Fisheries Ass'n, Inc. v. Daley*,
  16 F. Supp. 2d 647 (E.D. Va. 1997), *later proceeding*,
  27 F. Supp. 2d 650 (E.D. Va. 1998) .................................................................... 19-21

*Nat'l Ass'n for Home Care v. Shalala*,
  135 F. Supp. 2d 161 (D.D.C. 2001) .......................................................................... 18

*Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*,
  120 F. Supp. 2d 33 (D.D.C. 2000) ............................................................................ 18

*NLRB v. Brown*,
  380 U.S. 278 (1965) .................................................................................................. 13

*Nw. Mining Ass'n v. Babbitt*,
  5 F. Supp. 2d 9 (D.D.C. 1998) ......................................................................... 17-18, 21, 23

*S. Offshore Fishing Ass'n v. Daley*
   995 F. Supp. 1411 (M.D. Fla. 1998), *later proceedings*,
   55 F. Supp. 2d 1336 (M.D. Fla. 1999), *vacated upon settlement*,
   2000 WL 33171005 (M.D. Fla. Dec. 7, 2000) ................................................. 18-20

## Statutes

5 U.S.C. §§ 500, *et seq.* ................................................................................... 4

5 U.S.C. § 553 ................................................................................................... 4

5 U.S.C. §§ 601–612 ......................................................................................... 4

5 U.S.C. § 601(3) ............................................................................................. 13

5 U.S.C. § 601(6) ....................................................................................... 13, 17

*5 U.S.C. § 603 ................................................................................................. 22

5 U.S.C. § 603(a) ...................................................................................... 1, 4, 10

5 U.S.C. § 603(b)–(d) ........................................................................................ 4

5 U.S.C. § 603(b)(3) ........................................................................................ 16

5 U.S.C. § 603(b)(5) ........................................................................................ 21

*5 U.S.C. § 604 ......................................................................................... 10, 22

5 U.S.C. § 604(a) ........................................................................................... 1, 4

5 U.S.C. § 604(a)(1)–(6) ................................................................................... 4

5 U.S.C. § 604(a)(6) ........................................................................................ 19

5 U.S.C. § 605(a)(5) ........................................................................................ 18

5 U.S.C. § 605(b) .......................................................................................... 1-2, 4

*5 U.S.C. § 611(a) .............................................................................................. 4

5 U.S.C. § 611(a)(1) ........................................................................................... 2

5 U.S.C. § 611(a)(2) .................................................................................... 12, 21

5 U.S.C. § 611(a)(4) ...................................................................................... 5, 22

5 U.S.C. § 704 ................................................................................................... 4

*5 U.S.C. § 706(2)(A) ............................................................................... *passim*

15 U.S.C. § 632(a)(1) ...................................................................................... 13

15 U.S.C. § 632(a)(2)(A) ................................................................................. 14

16 U.S.C. §§ 1531–44 ........................................................................................ 3

16 U.S.C. § 1532(5)(A)(i), (ii) .......................................................................... 3

16 U.S.C. § 1532(15) ................................................................................................ 3

16 U.S.C. § 1533(a) ................................................................................................. 3

16 U.S.C. § 1533(a)(1) ............................................................................................ 3

16 U.S.C. § 1533(b)(2) ............................................................................................ 3

16 U.S.C. 1536 ..................................................................................................... 2-3

16 U.S.C. § 1536(a)(2) ........................................................................................... 15

## Rule

Fed. R. Civ. P. 56(a) ............................................................................................. 12

## Regulations

13 C.F.R. § 121.201 .............................................................................................. 14

78 Fed. Reg. 24,542 .............................................................................................. 10

78 Fed. Reg. 24,542–43 ........................................................................................ 10

81 Fed. Reg. 59,054 ................................................................................................ 7

81 Fed. Reg. 59,056 .............................................................................................. 11

81 Fed. Reg. 59,065 ................................................................................................ 7

81 Fed. Reg. 59,065–66 .......................................................................................... 7

81 Fed. Reg. 93,312–13 ........................................................................................ 17

82 Fed. Reg. 39,235 .............................................................................................. 16

82 Fed. Reg. 39,236 .............................................................................................. 16

*Endangered and Threatened Wildlife and Plants; Designation of
    Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the
    Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad*,
    78 Fed. Reg. 24,516 (proposed Apr. 25, 2013) .................................................. 1, 5

*Endangered and Threatened Wildlife and Plants; Designation of
    Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern
    DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad*,
    81 Fed. Reg. 59,046 (Aug. 26, 2016) .......................................................... 1, 5, 11

*Stream Protection Rule*,
  81 Fed. Reg. 93,066 (Dec. 20, 2016), https://www.federalregister
  .gov/documents/2016/12/20/2016-29958/stream-protection-rule ........................................... 17

*Endangered and Threatened Species; Designation of Critical Habitat
  for the Endangered New York Bight, Chesapeake Bay, Carolina and
  South Atlantic Distinct Population Segments of Atlantic Sturgeon and
  the Threatened Gulf of Maine Distinct Population Segment of Atlantic Sturgeon*,
  82 Fed. Reg. 39,160 (Aug. 17, 2017), https://www.federalregister.gov/documents/
  2017/08/17/2017 17207/endangered-and-threatened-species-designation-of-critical
  -habitat-for-the-end angered-new-york-bight ........................................................................ 16

## Other Authorities

S. Rep. No. 878, 96th Cong., 2d Sess. 3 ...................................................................... 22

Small Business Regulatory Enforcement Fairness Act,
  Pub. L. No. 104-121, 110 Stat. 847 (1996) ............................................................... 5

Electronic Code of Federal Regulations,
  *Part 121-Small Business Size Regulations*, (August 21, 2018),
  https://www.ecfr.gov/cgibin/textidx?SID=b919ec8f32159d9edaaa36a7eaf6b695&mc
  =true&node=pt13.1.121&rgn=div5#se13.1.121_1201. ........................................... 14

United States Census Bureau,
  *North American Industry Classification System*, (last visited Aug. 23, 2018),
  https://www.census.gov/eos/www/naics ................................................................... 14

## INTRODUCTION

In 2016, the U.S. Fish and Wildlife Service[1] designated over 1.8 million acres in 16 California counties as critical habitat for three frog and toad species. 81 Fed. Reg. 59,046 (Aug. 26, 2016) (Final Rule) (AR 000007–81). The Service proposed this rule in 2013. 78 Fed. Reg. 24,516 (proposed Apr. 25, 2013) (Proposed Rule) (AR 000579–638). Among other things, the designation restricts the use of public and private lands for grazing and timber harvesting and threatens the livelihood of farmers, ranchers, landowners, and local enterprises dependent on these activities. Plaintiffs California Cattlemen's Association (CCA), California Wool Growers Association, and California Farm Bureau Federation are associations representing individuals and businesses directly impacted by the Service's Final Rule.

The Regulatory Flexibility Act (RFA) requires federal agencies to consider the economic impacts that regulations, such as critical-habitat designations, will have on "small entities" (*e.g.*, small businesses and local governments). And so, whenever a federal agency is required by the Administrative Procedure Act (APA) to publish a general notice of proposed rulemaking, and whenever an agency adopts a final rule, the agency must also publish, respectively, an initial and a final "regulatory flexibility analysis." 5 U.S.C. §§ 603(a), 604(a). An agency may not avoid these obligations unless the head of the issuing agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b).

---

[1] Plaintiffs sued the U.S. Fish and Wildlife Service; the United States Department of the Interior; Ryan Zinke, in his official capacity as Secretary of the Interior; and Greg Sheehan, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service. The Defendants will be collectively referred to here as the Government.

The Center for Biological Diversity, Central Sierra Environmental Resource Center, and Western Watersheds intervened. They are collectively referred to as Intervenors.

The U.S. Fish & Wildlife Service did not prepare the regulatory flexibility analyses in connection with the Proposed and Final Rules, because, the Service asserted, the Rules did not impact any small entities. Rather, according to the Service, the only entities impacted by the designation are federal agencies, which must engage in "Section 7" consultations under the Endangered Species Act (16 U.S.C. § 1536). Therefore, the service maintains, since only federal agencies are directly regulated by the critical-habitat designation and since federal agencies are not small entities, it certified (under 5 U.S.C. § 605(b)) that the designation would not have a significant economic impact on a substantial number of small entities.

But as this Court explained in its opinion denying Defendants' motions to dismiss, the "ultimate impact of these [Section 7] consultations will be felt by small entities like the Plaintiffs and their members." *California Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, --- F. Supp. 3d ---, No. 1:17-cv-01536(TNM), 2018 WL 2417852, at *4 (D.D.C. May 29, 2018) (Dkt. No. 42). Therefore, the Service was required to engage in the RFA analyses.

As detailed below, Plaintiffs and their members have suffered injury and will continue to be injured by the Service's critical-habitat designation. Because the Service failed to conduct the proper regulatory flexibility analyses, the Proposed and Final Rules are invalid. Plaintiffs are entitled to relief under the RFA, which guarantees judicial review to small entities adversely affected by final agency action. 5 U.S.C. § 611(a)(1). The APA also requires a ruling in Plaintiffs' favor. The Service's failure to prepare the regulatory flexibility analyses renders its Final Rule "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Accordingly, Plaintiffs ask the Court to grant their motion for summary judgment, declare that a critical-habitat designation under the Endangered Species Act is not categorically exempt

from the requirements of Sections 603 and 604 of the RFA, set aside or defer enforcement of the Final Rule against Plaintiffs and other small entities, and remand the Final Rule to the Service with an order to complete the necessary economic analyses required by the RFA. A Proposed Order is attached.

LEGAL BACKGROUND

**Endangered Species Act**

The Endangered Species Act, 16 U.S.C. §§ 1531–44 (ESA), provides certain protections for species listed as "threatened" or "endangered." *Id.* § 1533(a). Section 4 of the ESA authorizes the Service to list species as either endangered or threatened and requires the Service to designate "critical habitat" for a designated species. *Id.* § 1533(a)(1), (b)(2); *see Bennett v. Spear*, 520 U.S. 154, 157–58 (1997). "Critical habitat" includes any species-occupied areas that have the physical or biological features "essential to the conservation" of the species and that may require special management considerations or protection, and unoccupied areas that the Secretary of Interior finds "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(i), (ii). The determination of what constitutes a "critical habitat" is to be made (in this case) by the Secretary of the Interior, who delegated that responsibility to the Service. *Id.* § 1532(15).

The government may exclude an area from a critical-habitat designation if the economic impacts of inclusion—such as the negative economic impacts on small entities like Plaintiffs' members here—outweigh the benefits of the critical habitat. 16 U.S.C. § 1533(b)(2).

Under Section 7 of the ESA, federal agencies that issue permits for activity that may affect critical habitat must consult with the Service to determine what conditions, mitigation, or alternatives may be imposed on the activity to protect or preserve the habitat. 16 U.S.C. § 1536; *see Bennett*, 520 U.S. at 158.

3

**Administrative Procedure Act**

The Administrative Procedure Act, 5 U.S.C. §§ 500, *et seq*., establishes the procedures by which federal agencies may issue rules that bind private conduct. *Id.* § 553. The APA also establishes the right of judicial review of any "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id*. § 704. Section 706 authorizes courts to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

**Regulatory Flexibility Act**

The Regulatory Flexibility Act, 5 U.S.C. §§ 601–612, requires federal agencies to consider the impacts that agency rules will have on "small entities," including small businesses. Whenever an agency is required by the APA to publish a general notice of proposed rulemaking for a proposed rule, it must also "prepare and make available for public comment" an "initial regulatory flexibility analysis." *Id.* § 603(a). This analysis "shall describe the impact of the proposed rule on small entities." *Id*.; *see id*. § 603(b)–(d) (listing requirements that "shall" be included in initial analysis). The RFA further requires an agency, when adopting a final rule, to prepare and publish a Final Regulatory Flexibility Analysis. *Id*. § 604(a); *see id*. § 604(a)(1)–(6) (listing requirements that "shall" be included in final analysis).

An agency may not avoid these requirements unless the head of the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). If the agency head so certifies, the agency must publish the certification, "along with a statement providing the factual basis for such certification." *Id*.

Finally, any "small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), . . . and 610 in accordance with [the APA]." 5 U.S.C. § 611(a). In granting relief under the

4

RFA, a court shall order the agency to take corrective action including, but not limited to, remanding the rule to the agency and deferring the enforcement of the rule against small entities. *Id.* § 611(a)(4).

This judicial-review provision was added to the RFA in 1996 as part of the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, 110 Stat. 847. One purpose of the amendments was "to make Federal regulators more accountable for their enforcement actions by providing small entities with a meaningful opportunity for redress of excessive enforcement activities." *Id.* § 203(7).

### FACTUAL AND PROCEDURAL BACKGROUND

### Proposed and Final Rules Were Issued Without Required Economic-Impact Analyses

Pursuant to its authority under the ESA, the Service published a Proposed Rule[2] and in 2016 a Final Rule,[3] designating approximately 1,812,164 acres of land in California as critical habitat for three amphibian species. 81 Fed. Reg. at 59,046 (AR 000008); *see also* Gov't Answer [Dkt. No. 44] ¶¶ 1, 27, 31 (admitting that the Service issued Proposed and Final Rules). As stated above, the Regulatory Flexibility Act requires agencies, to publish a regulatory flexibility analyses unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. *See also* AR 000606 (Proposed Rule) (explaining agency's obligations under RFA) & AR 000018 (Final Rule) (same).

---

[2] *See Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad*, 78 Fed. Reg. 24,516 (proposed Apr. 25, 2013) (Proposed Rule); AR 000579–638.

[3] *See Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad*, 81 Fed. Reg. 59,046 (Aug. 26, 2016) (Final Rule); AR 000007–81.

The Service did not prepare the required analyses.

In both the Proposed Rule and the Final Rule, the Service certified that no regulatory flexibility analysis was required because: (1) the RFA requires an evaluation of impacts on directly regulated small entities; (2) the only impacts of the Proposed and Final Rules occur through Section 7 consultations, which require federal agencies to consult with the Service to ensure that the actions of the (other) federal agencies do not harm the designated critical habitat; (3) thus, only federal agencies are directly regulated by the designation; (4) federal agencies are not "small entities" under the RFA; and, therefore, (5) the Service could certify that neither the proposed nor the final designation would have a significant economic impact on a substantial number of small entities. *See* Proposed Rule (AR 000606–07); Final Rule (AR 000018).

Plaintiffs (and others) submitted comments to the Proposed Rule. *See* June 24, 2013 Comment Ltr. (AR 000545–54). In this letter, Plaintiffs (along with Rural County Representatives of California, Public Lands Council, and National Cattlemen's Beef Association) explained that the proposed designation would negatively impact, "at a minimum," agricultural industries—particularly cattle grazing—in the 17 rural counties where land was designated. *Id.* (AR 000547).

In connection with the Proposed Rule, the Government belatedly prepared a "draft" economic analysis. *See* Draft Analysis (AR 000418–544). The Service restated its conclusion that no analysis was required since no small entities were directly regulated, but it also "acknowledge[d]" that in some cases, "third-party proponents" of the designation may be impacted through participation in Section 7 consultations. *Id.* (AR 000516). The Draft Analysis discussed, in only cursory form, the estimated impacts that Section 7 consultations would have on some utilities. *See Id.* (AR 000514–21). This analysis did not consider any other impacts of the designation, and as discussed further below, did not include several items required by the RFA.

The Service admits that it did not prepare a final regulatory flexibility analysis. *See* Gov't Answer ¶¶ 32, 46. [4]

### Economic Impact on Small Entities

Included in the Rule are certain actions that the Service believes will either exacerbate or ameliorate threats posed to the listed species. *See* Final Rule, 81 Fed. Reg. at 59,065–66 (AR 000027–28). The Service also identified certain features of the critical habitat that, it says, are "essential to the conservation" of the species. *Id.* at 59,065 (AR 000027). These features include "impacts associated with inappropriate livestock grazing; and intensive use by recreationists, including packstock camping and grazing." *Id.* The Service identified seven grazing allotments that overlap the critical-habitat designation. *Id.* at 59,054 (AR 000016). And the Service acknowledged that the total incremental costs of the designation "associated with grazing activities" will be $155,100. *See id.* (estimating costs of the designation associated with packstock grazing activities as $63,200).

Plaintiffs' members are individuals and businesses that engage in, among other things, livestock grazing on allotments within the newly designated critical habitat, and their grazing rights have been restricted as a result of the Service's Final Rule and the Service's failure to conduct regulatory flexibility analyses.

***Brennan Ranch***, a member of Plaintiff CCA, has suffered and continues to suffer economic losses as a result of the critical-habitat designation. *See* Declaration of Sherri Brennan (Brennan Decl.) ¶¶ 2, 4. Brennan Ranch is a small, family-owned cattle ranch in Sonora,

---

[4] Nor can the Service claim ignorance. For example, the Rural County Representatives of California (RCRC) advised the Service that because of the flawed methodology in its Draft Analysis, "the actual costs to small entities and hydroelectric facilities are not estimated[,] as the [] Analysis is limited to the 'administrative costs' related to consultation." RCRC Feb. 20, 2014 Comment Ltr., AR 000380–85, 383.

California. *Id*. ¶ 2. The Ranch has grazing permits issued by the Service, including a permit to graze cattle in the Long Valley Eagle Meadow Allotment, which is located within the critical-habitat designation at issue here. *Id*. ¶¶ 5–8.

Because of the designation, Brennan Ranch's grazing has been restricted, imposing compliance costs and resulting in business losses. Brennan Decl. ¶¶ 9–17. For example, before the Final Rule was adopted, Brennan Ranch was permitted a 60% utilization of the Eagle Meadow Allotment. *Id*. ¶ 9. "Utilization" refers to the maximum amount of forage (or plant material) permitted to be consumed by animals during a grazing period in a particular allotment. *Id*. Therefore, a 60% utilization meant that Brennan Ranch's cattle were permitted to consume no more than 60% of the forage in the Eagle Meadow Allotment. *Id. See id*., Ex. 1, *2016 Grazing Permit*, III.B.

After the Final Rule was issued, (August 26, 2016) the Service reduced Brennan Ranch's use of the Eagle Meadow Allotment to 40% utilization. Brennan Decl. ¶¶ 11–12. *See id*., Ex. 2, *2017 Grazing Permit*, II.E.1. To meet this reduced utilization maximum, Brennan Ranch was forced to reduce its turnout numbers in the "Niagara Unit" of the Eagle Meadow Allotment from 150 cow/calf pairs to 120 cow/calf pairs. Brennan Decl. ¶ 12. To feed the remaining 30 pairs, Brennan Ranch must send them to Stanislaus County, California, for "winter pasture." *Id*. The additional cost to do so equals approximately $900 per month (which does not include the additional cost of travel to the winter pasture and related management costs). *Id*.

Further, because the Eagle Meadow Allotment was the most productive allotment permitted for use by the Brennan Ranch, the Ranch has suffered losses resulting from slimmer cattle. Before the Final Rule was adopted, Brennan Ranch's calves had weighed (on average) approximately 50 to 75 pounds more than calves who fed off other allotments. This additional

weight equated to approximately $17,000 worth of increased pounds gained each year. The Ranch has therefore incurred these losses because of the critical-habitat designation. Brennan Decl. ¶ 13.

Finally, because of the designation, Brennan Ranch must—each year—erect, monitor, and remove fencing on the Eagle Meadow Allotment to protect the habitat of the protected Yosemite Toad. Brennan Decl. ¶¶ 14–16. This fence restricts Brennan Ranch's grazing in the allotment, and it also imposes maintenance and monitoring costs. *Id.*

*FIM Corporation*, a member of Plaintiff California Wool Growers, suffered economic losses due to the critical-habitat designation. FIM held grazing permits with Forest Service Allotments, some of which overlap with the critical habitat. Declaration of Marrianne F. Leinassar (Leinassar Decl.) ¶¶ 2–3. During the 2017 grazing season, FIM suffered from regulatory delays due to critical-habitat consultations. *Id.* ¶¶ 7, 8(a). FIM was denied permission to graze until after the consultation was complete. *Id.* ¶ 8(b)–(d). Further, FIM was denied permission to graze its sheep at higher elevations within its allotments in the critical habitat. *Id.* ¶¶ 7, 8, 10. FIM grazed its sheep at lower elevations, which provide less nutritious food. *Id.* ¶ 7. As a result, FIM's lambs failed to gain approximately 7,000 pounds, which cost FIM $1.60/pound in lost revenue. *Id.*[5]

*Other members of Plaintiff California Cattlemen's Association* have also been adversely impacted by the Service's Final Rule. Mar. 8, 2018 Declaration of Kirk Wilbur [Dkt. No. 38-2] (Wilbur Decl. 1) ¶ 9. For example, one member, which held a grazing permit on the McKesick Peak Ferris Fields Allotment, was advised that its "grazing numbers ha[d] been reduced" to

---

[5] As explained in the declaration of Ms. Leinassar, based on FIM's experience, lambs that graze in its allotments were expected to weigh between 110 to 112 pounds when weaned in the fall. Leinassar Decl. ¶ 7. Because of the grazing restrictions imposed by the Rule and its resulting consultation requirements, approximately 1,000 of FIM's lambs weighed (on average) only 104 pounds in the fall of 2017—a shortfall of approximately 7,000 pounds. *Id.*

improve the critical habitat for the yellow-legged frog. *Id.* ¶ 10. As a result, the member's grazing rate was reduced nearly 30%. *Id.*

Finally, ***Plaintiffs' members, as well as Plaintiff CCA itself***, have also incurred compliance costs resulting from the Service's Rule and the mandatory Section 7 consultation process. Brennan Decl. ¶¶ 6-9, Leinassar Decl. ¶ 6, Wilbur Decl. 1 ¶ 6.

### The Service's Excuse for Failing
### To Prepare Regulatory Flexibility Analyses

These negative impacts on Plaintiffs' members—and on others—were not considered by the Service when it issued the Proposed and Final Rules. As noted above, under the RFA, agencies are required to prepare and publish an "initial regulatory flexibility analysis" when publishing a notice of proposed rulemaking for a proposed rule, 5 U.S.C. § 603(a), and a final Regulatory Flexibility Analysis when publishing a final rule, i*d.* § 604. These analyses are supposed to identify and describe the impacts of the (proposed and final) rule on "small entities." The Service failed to follow the RFA here.

Instead, in connection with the proposed rule, the Service provided (four months after the rule was initially proposed) a "draft" analysis (AR 000418–544), which did not consider all of the proposed designation's impacts on small entities. A full analysis was not required, the Service asserted, because the proposed designation would have "directly regulate[d]" "only Federal action agencies[,]" which are not "small entities" under the RFA. *See* Proposed Rule, 78 Fed. Reg. at 24,542 (AR 000606). Therefore, the Service "certif[ied] that the proposed critical habitat rule w[ould] not have a significant economic impact on a substantial number of small entities." *Id*. at 24,542–43 (AR 000606–07).

The Service relied on the same excuse when it issued its Final Rule without a final Regulatory Flexibility Analysis. Final Rule (81 Fed. Reg. 59,046) (AR 000008). The Service

asserted that the Final Rule regulates only federal agencies, which are not "small entities," and that therefore, "no initial or final regulatory flexibility analysis [wa]s required." *Id.* at 59,056 (AR 000018).

As a result of the Final Rule, and the Service's failure to prepare Regulatory Flexibility Analyses, Plaintiffs' members have suffered and will continue to suffer injury, in the form of restricted grazing rights that harms the members' businesses; costs they must incur for risk assessment and operational changes; compliance costs such as permit fees, consulting fees, and consulting expenses; and lost revenues and profits. *See* Brennan Decl., Leinassar Decl., and Wilbur Decl. 1.

### The Court Previously Denied Motions To Dismiss

The Government and Intervenors moved the Court to dismiss the Complaint on various grounds. The Court denied the motions, holding that Plaintiffs have standing, that their claims are ripe, and that Plaintiffs have stated claims upon which relief may be granted. *See California Cattlemen's Ass'n*, 2018 WL 2417852, at *3-4.[6] Accordingly, with one exception, the Court allowed Plaintiffs' claims to proceed. *Id.* at *4.[7]

### ARGUMENT

### I.

---

[6] Plaintiffs included declarations in support of their opposition to the motions to dismiss. These declarations established that Plaintiffs' standing is based on undisputed facts, and not simply on allegations in their Complaint. *See* Mem. in Opp. [Dkt. No. 37] at 11–24. Here, Plaintiffs have included an additional declaration from CCA's Director of Government Affairs, Kirk Wilbur, who confirms that CCA qualifies as a "small entity" under the RFA. Plaintiffs also include here a declaration from the owner of a cattle ranch subject to the critical-habitat designation. *See* Declaration of Sherri Brennan. Ms. Brennan's declaration further establishes that Plaintiffs have standing to pursue their claims.

[7] The Court held that Plaintiffs' claims under RFA Section 604 could proceed. The Court further ruled that Plaintiffs could challenge the Government's violation of Section 603 only under the APA's arbitrary-and-capricious review, not under the RFA. *Id.* 2018 WL 2417852, at *3.

## STANDARD OF REVIEW

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The non-moving party "may not rely solely on allegations or conclusory statements[,]" and to defeat a summary judgment motion, it "must establish more than 'the mere existence of a scintilla of evidence' in support of its position." *Ass'n of Private Sector Colls. and Univs. v. Duncan*, 70 F. Supp. 3d 446, 452 (D.D.C. 2014) (citations omitted).

According to the RFA, agency action is reviewed for compliance with the APA. 5 U.S.C. §§ 611(a)(2), 706(2)(A). When reviewing an agency action such as the Final Rule under the APA, the Court must "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.* § 706(2)(A). An agency acts in a way that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law when it fails to apply criteria for its action contained in relevant statutes, applies criteria for its decision not authorized by its statutory authority, fails to consider relevant information, fails adequately to explain the basis for its action or to respond to important public comments, acts inconsistent with the purpose and intent of the statutes granting it authority, or offers an explanation for its action that runs counter to the evidence before it. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In considering whether an agency acted in an arbitrary and capricious manner, a court must carefully review the record to "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Courts should not "rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291–92 (1965).

## II.

### THE GOVERNMENT ERRONEOUSLY FAILED
### TO PREPARE REGULATORY FLEXIBILITY ANALYSES

The analysis for the Court is easily stated: (A) Plaintiffs and their members are "small entities;" (B) Plaintiffs and their members are directly regulated by the Final Rule; therefore, (C) the Service was required to conduct an initial and a final regulatory flexibility analyses. Its failure to do so violates the RFA and the APA. Accordingly, the Court should grant Plaintiffs' motion for summary judgment.

### A.        Plaintiffs and Their Members Are "Small Entities"

As this Court previously noted, and as Defendants do not dispute, Plaintiffs and their members are "small entities" under the RFA. *California Cattlemen's Ass'n*, 2018 WL 2417852, at *3–4.

A "small entity" under the RFA "shall have the same meaning as the terms 'small business', 'small organization' and 'small governmental jurisdiction' defined in [5 U.S.C. §§ 601(3), (4) and (5)]." 5 U.S.C. § 601(6). The term "small business" has the "same meaning as the term 'small business concern' under section 3 of the Small Business Act [15 U.S.C. § 632] . . . ." *Id.* § 601(3).

According to the Small Business Act, a "small business concern," "including but not limited to enterprises that are engaged in the business of production of food and fiber, ranching and raising of livestock, aquaculture, and all other farming and agricultural related industries, shall be deemed to be one which is independently owned and operated and which is not dominant in its field of operation." 15 U.S.C. § 632(a)(1). The Administrator of the Small Business Administration (SBA) may specify detailed definitions or standards by which a business concern may be determined to be a small business concern. *Id*. § 632(a)(2)(A).

13

The SBA has established size standards based on the North American Industry Classification System (NAICS), a publication of the Office of Management and Budget. 13 C.F.R. § 121.201. A "small business concern" within the "Beef Cattle Ranching and Farming Industry" (NAICS Code No. 112111) is an entity with annual receipts of $750,000 or less. *Id.*[8] CCA's member Brennan's Ranch meets this threshold and is a small entity under the RFA. Brennan Decl. ¶ 2.

Similarly, Plaintiff CCA itself qualifies as a "small entity" under the RFA. CCA is a trade association that endeavors "'to ensure a more favorable business environment for the cattle producers in California and the beef cattle industry' by working to influence government" so that cattle producers can "'conduct their business in a manner free of unnecessary and burdensome restrictions and expenses . . . .'" Wilbur Decl. 1 ¶ 3 (quoting CCA bylaws). As such it is a "Business Association" under the NAICS (Code No. 813910).[9] According to SBA regulations, a Business Association is a small business concern if it has annual receipts of $7.5 million or less. 13 C.F.R. § 121.201. CCA's annual receipts are less than $7.5 million. *See* Aug. 22, 2018 Declaration of Kirk Wilbur, ¶ 3.

Therefore, the Plaintiffs and their members are "small entities" under the RFA.

---

[8] The SBA's "size standards" are set forth in 13 C.F.R. § 121.201. *See* Electronic Code of Federal Regulations, *Part 121-Small Business Size Regulations*, (August 21, 2018), https://www.ecfr.gov/cgi-bin/text-idx?SID=b919ec8f32159d9edaaa36a7eaf6b695&mc=true&node=pt13.1.121&rgn=div5#se13.1.121_1201.

[9] *See* United States Census Bureau, *North American Industry Classification System*, (last visited Aug. 23, 2018), https://www.census.gov/eos/www/naics/.

**B.      Plaintiffs and Their Members Are
         Directly Regulated by the Final Rule**

As this Court has already acknowledged, while the Final Rule "requires one federal agency

to consult with another federal agency about the Final Rule's impact on land use," the "*ultimate*

*impact* of these consultations *will be felt by* small entitites like the *Plaintiffs and their members*."

*California Cattlemen's Ass'n*, 2018 WL 2417852, at *4 (emphasis added).

The Service claims that only federal agencies are directly regulated by the Proposed and

Final Rules. *See* Proposed Rule (AR 000606–07); Final Rule (AR 000018). According to the

Service, therefore, ranchers and timber-harvesters and others, whose access to and use of the lands

within the designated critical habitat, are only indirectly regulated. The Service's reading

contradicts the plain language of the law,  and it is based on a misstatement of effects of the critical-

habitat designation.

First, The Service's interpretation is too narrow, as it ignores the scope and reach of the

critical-habitat designation in the Proposed and Final Rules. This designation impacts both federal

agencies who must engage in Section 7 consultations and those whose activities form the basis of

those consultations. *See California Cattlemen's Ass'n*, 2018 WL 2417852, at *3. The designation

"requires not just consultation, but consultation so that federal agencies 'insure' that federally

authorized actions are not 'likely to . . . result in the destruction of adverse modification of [critical]

habitat.'" *Id.* (quoting 16 U.S.C. § 1536(a)(2)) (ellipses supplied by the Court). Thus, "any effects

felt by this Final Rule will be direct effects, as federal agencies determine what the critical habitat

designation requires in specific cases." *Id.*

Further as the D.C. Circuit recently recognized, "[c]ommon sense and basic economics tell

us that a business will be harmed by a government action when (i) the government action decreases

the supply of a raw material from a source that the business relies on and (ii) the business cannot

find a replacement without incurring additional cost." *Carpenters Industrial Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (reversing district court's order of dismissal). Here, as discussed above, the critical-habitat designation negatively impacts Plaintiffs' members by, among other things, decreasing their supply of raw material (feed) from a source on which these businesses rely and for which they cannot replace without additional costs.

In short, Plaintiffs' members are "subject to" the Final Rule; *i.e.*, they are "those to which" the Final Rule "appl[ies]." *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (quoting *Mid-Tex Elec. Coop. Inc. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985)); 5 U.S.C. § 603(b)(3).

Other federal agencies recognize that critical-habitat designations directly regulate small businesses and therefore that the agencies must conduct the RFA analysis. For example, the National Marine Fisheries Service (NMFS) last year designated a critical habitat.[10] While the NMFS ultimately concluded that its designation would "not have significant economic impacts on small entities[,]" 82 Fed. Reg. at 39,235, the agency first engaged in the proper review—identifying small businesses (*see, e.g.*, *id.* at 39,235–36) and considering the designation's impact on those businesses. Notably, according to the NMFS, the costs of complying with Section 7 consultations *do* constitute costs on small businesses. *Id.* at 39,236. The Office of Surface Mining

---

[10] *See Endangered and Threatened Species; Designation of Critical Habitat for the Endangered New York Bight, Chesapeake Bay, Carolina and South Atlantic Distinct Population Segments of Atlantic Sturgeon and the Threatened Gulf of Maine Distinct Population Segment of Atlantic Sturgeon*, 82 Fed. Reg. 39,160 (Aug. 17, 2017), https://www.federalregister.gov/documents/2017/08/17/2017-17207/endangered-and-threatened-species-designation-of-critical-habitat-for-the-end angered-new-york-bight.

Reclamation and Enforcement also applies the plain reading of the RFA. *See Stream Protection Rule*, 81 Fed. Reg. 93,066, 93,312–13 (Dec. 20, 2016).[11]

**C.     The Service Erred as a Matter of Law
         by Failing To Conduct a Final Regulatory
         Flexibility Analysis**

       **1.     The Service's Failure To Consider the
                 "Small Entities" Impacted by the Proposed
                 and Final Rules Is Error**

Because Plaintiffs and their members are "small entities" that are directly regulated by the critical-habitat designation in the Proposed and Final Rules, the Service was required to prepare initial and final regulatory flexibility analyses.

The decision in *Northwest Mining Association v. Babbitt*, 5 F. Supp. 2d 9 (D.D.C. 1998), is particularly instructive. There, the U.S. Bureau of Land Management (BLM) proposed a rule to require bonds from miners in certain situations to provide funding for the environmental restoration of lands in the event of a miner's default of its reclamation obligation. *Id*. at 11. Six years after the rule was proposed, BLM issued the final rule, which had "several substantive differences." *Id*. at 12. The agency certified that the rule would not have a significant impact on a substantial number of small entities. *Id*.

The court found that this certification failed to meet the requirements of the RFA and APA because the BLM used an erroneous definition of "small entities" by ignoring the definition set forth in the RFA (5 U.S.C. § 601(6)). *See Nw. Mining Ass'n*, 5 F. Supp. 2d at 15 ("By using a definition other than [that required by the RFA], the BLM violated the procedure of law mandated by the statute."). The court granted the challengers' motion for summary judgment and remanded

---

[11] *Stream Protection Rule*, 81 Fed. Reg. 93,066 (Dec. 20, 2016), https://www.federalregister .gov/documents/2016/12/20/2016-29958/stream-protection-rule.

the matter to the BLM for a proper economic-impact analysis. *Id*. at 16. *See also Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 44 (D.D.C. 2000) (remanding matter because agency's final regulatory flexibility analysis "totally failed to comply" with one of the required components of the RFA (5 U.S.C. § 605(a)(5)), *later proceeding*, *Nat'l Ass'n for Home Care v. Shalala*, 135 F. Supp. 2d 161 (D.D.C. 2001).

The decision in *S. Offshore Fishing Ass'n v. Daley* similarly demonstrates that the Service violated the RFA and APA here. 995 F. Supp. 1411 (M.D. Fla. 1998), *later proceedings*, 55 F. Supp. 2d 1336 (M.D. Fla. 1999), *vacated upon settlement*, 2000 WL 33171005 (M.D. Fla. Dec. 7, 2000). There, the NMFS adopted a "Fishery Management Plan" intended to prevent a destructive intensity of shark fishing and to incrementally rebuild the shark stock. *Id*. at 1417. To prevent overfishing and stimulate rebuilding of stocks, this management plan created a comprehensive permitting system and established various (limiting) quotas on fishermen. In both the proposed and final rules, the agency certified that a reduced commercial quota was not expected to have a significant impact on a substantial number of small entities. *Id*. at 1424. According to the agency, shark fishermen could pursue sharks in season and other fish at other times, and the shark fishing season was historically too brief to permit a prudent fisherman to rely exclusively on annual revenue from shark fishing. *Id*. at 1434. The court found "plentiful" evidence in the record undermining the agency's certification. *Id*. at 1435. According to the court, the "lapses and inconsistencies in the record most likely stem from [the agency's] failure to prepare an [initial analysis] in the first instance." *Id*. at 1436.

Perhaps most relevant here, the court concluded that the agency's "refusal to recognize the economic impacts of its regulations on small businesses also raises serious questions about its efforts to minimize those impacts through less drastic alternatives." *S. Offshore Fishing*, 995 F.

Supp. at 1436 (citing 5 U.S.C. § 604(a)(6), which requires each final analysis to "descri[be] . . . the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes" and then to explain why the agency chose a particular course).

The court granted the plaintiffs' motion for summary judgment and remanded the matter to the agency with instructions to conduct the RFA-required economic-impact analysis. *S. Offshore Fishing*, 995 F. Supp. at 1437.

Another court reached the same conclusion. *N. Carolina Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647 (E.D. Va. 1997), *later proceeding*, 27 F. Supp. 2d 650 (E.D. Va. 1998). There, a challenge was brought to the NMFS's reduced quota for summer flounder fishing. Again, the agency certified that the rule would have no significant impacts on a substantial number of small entities. 16 F. Supp. 2d at 651–52. The court found that while the agency cannot be expected to consider every possible contingency before making this certification, the record showed that the agency failed to consider even the potential effects of that year's quota. *Id*. at 652. Instead, the agency declared that the quota remained the same from the previous year—but it did not make any comparisons between the conditions existing in the previous and current years. *Id*. at 652–53. Accordingly, the court held that the certification was arbitrary and capricious since the agency failed to give any serious consideration to the impacts of the quota. *Id*. at 653. The court remanded the matter to the agency and ordered a proper economic-impact analysis. *Id*.

 After remand, the agency again certified that the rule would have no significant impacts on a substantial number of small entities. *N. Carolina Fisheries*, 27 F. Supp. 2d at 655. The court held that this certification failed to comply with the RFA because, among other things, the analysis on which the certification was based (1) did not consider an entity smaller than the entire state of

North Carolina, (2) ignored data showing the number of fishing vessels impacted by the agency's action, and (3) erroneously overstated the number of entities engaged in flounder fishing so as to create a reduced percentage of entities that would be affected by the agency's action (*i.e.*, to make it appear as if only an insubstantial number of small entities would be impacted). *Id*. at 659–60. And like the court in *S. Offshore Fishing*, the court expressed concern that the "Secretary's conscious refusal to recognize the economic impacts of his regulatory actions calls into question the agency's willingness to consider less severe alternatives." *Id*. at 661. But "[s]urely, Congress [did] not intend[] for administrative agencies to circumvent the fundamental purposes of the RFA by invocation of the certification provision." *Id*. The court granted the challengers' motion for summary judgment; denied the government's cross-motion for summary judgment; and, having previously ordered the agency to conduct a proper RFA analysis, sanctioned the agency for its noncompliance. *Id*. at 668–69.

> ### 2.    The Service Failed To Conduct a Regulatory-Flexibility Analysis With the Proposed Rule

Here, the Service did not conduct *any* analysis before certifying that the Proposed and Final Rules would not significantly impact a substantial number of small entities. And it seeks to avoid its obligation to go through the required analysis by employing an admittedly "strict" interpretation of a "directly regulated entity." Draft Analysis (AR 000516). The Service contends that only federal agencies are directly regulated by the Proposed and Final Rules, and that since federal agencies are not "small entities," no economic analyses were required. *See* Draft Analysis (AR 000516); Proposed Rule (AR 000606–07); Final Rule (AR 000018). In the "draft" analysis, the Service admitted that the magnitude of impact on small entity revenues is "unknown." Draft Analysis (AR 000436). Further, the "draft" analysis failed to consider economic impacts of the proposed critical-habitat designation—impacts such as those identified in the attached

declarations, including loss of property and business value, increased compliance costs, and livestock management changes. Nor did the draft analysis discuss the impacts of duplicative or overlapping federal rules or provide an adequate analysis of alternatives that would minimize impacts on small entities, as required by the RFA. *See* 5 U.S.C. § 603(b)(5) (Each initial analysis "shall" contain "an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.").

"Surely, Congress [did] not intend[] for [the Service] to circumvent the fundamental purposes of the RFA by invocation of the certification provision." *N. Carolina Fisheries*, 27 F. Supp. 2d at 661.

> **3.** **The Service Failed To Conduct a Regulatory-Flexibility Analysis With the Final Rule**

The Service admits that it did not prepare a regulatory-flexibility analysis with the Final Rule. *See* Gov't. Answer ¶¶ 32, 46.

**D.** **The Service's Failure To Prepare Regulatory Flexibility Analyses Violates the Regulatory Flexibility Act and the Administrative Procedure Act**

Because of the Service's failure to prepare regulatory flexibility analyses, Plaintiffs are entitled to summary judgment. 5 U.S.C. §§ 611(a)(2), 706(2)(A). An agency's certification that no regulatory flexibility analysis is required based on an incorrect definition of "small entities" is reversible error. *See Nw. Mining Ass'n*, 5 F. Supp. 2d 9.

Further, the service's individual certification failed to apply criteria for its action contained in relevant statutes (proper identification of "small entities"), failed to consider relevant information (the economic impact on small entities), and offered explanations for its action that runs counter to the evidence before it (comment letters advised the Service of the impacts that would be suffered by small entities). *See State Farm*, 463 U.S. at 43. As such, the Government's

actions here are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

Finally, the Service here acted inconsistently with the purpose and intent of the statutes granting it authority. *State Farm*, 463 U.S. at 43. The RFA was designed precisely to protect "small entities" like Plaintiffs. 5 U.S.C. §§ 603, 604. *See also Mid-Tex Elec. Coop. Inc.*, 773 F.2d at 342 (quoting S. Rep. No. 878, 96th Cong., 2d Sess. 3); *see id.* ("Congress was primarily concerned about the high costs of compliance with regulations by small businesses bound to conform their conduct to those regulations.") (citing S. Rep. No. 878, 96th Cong., 2d Sess. 3 at 6–7). For this reason, too, the Government's actions here are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

## III.

### REQUESTED REMEDIES

In granting relief under the RFA, a court "shall order" the agency to "take corrective action consistent with" the RFA and the APA. 5 U.S.C. § 611(a)(4). This relief includes, but is not limited to (A) remanding the rule to the agency and (B) "deferring enforcement of the rule against small entities, unless the court finds that continued enforcement of the rule is in the public interest." *Id.*

*First*, because of the Service's untenable interpretation of the RFA—in particular, its assertion that only federal agencies can be directly regulated by a critical-habitat designation—the Court should declare that a designation of critical habitat under the Endangered Species Act is not categorically exempt from the requirements of RFA sections 603 and 604.

*Second*, the Court should set aside the Service's Final Rule or defer enforcement against small entities like Plaintiffs and their members.

Nor is the continued enforcement of the Final Rule in the public interest. To be sure, the protection of endangered and threatened species is a component of the public interest. But the

public interest requires consideration not only of such laudable purposes, but also the tradeoffs inherent in pursing them. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic cost in return for a few dollars in health or environmental benefits."). In enacting, the RFA, Congress specifically recognized that the public interest could be undermined if regulations—even well-meaning ones—imposed overly burdensome impacts on small business, a key source of economic growth and economic mobility. *See* RFA, Congressional Findings and Declaration of Purpose § (a)(1) ("when adopting regulations to protect the health, safety and economic welfare of the Nation, Federal agencies should seek to achieve statutory goals as effectively and efficiently as possible *without imposing unnecessary burdens on the public*") (emphasis added) (AR 000856); § (a)(4) ("the failure to recognize differences in the scale and resources of regulated entities has in numerous instances adversely affected competition in the marketplace, discouraged innovation and restricted improvements in productivity") (AR000856). *See also Nw. Mining Ass'n*, 5 F. Supp. 2d at 16 ("Effects on small businesses and industry-wide changes in regulatory expenses . . . are precisely what the procedural safeguards of the RFA and the APA are set in place to address.").

Thus, the public interest does not include only government-declared goods. It must—and by laws like the RFA, it does—include minimizing the cost imposed on the individuals and small businesses required by regulation to provide these public benefits. Indeed, the RFA exists so that agencies—and courts upon review—can consider whether, weighing the benefits and costs of a regulation, the public interest will be served. *See Nw. Mining Ass'n*, 5 F. Supp. 2d at 16 ("While recognizing the public interest in preserving the environment, the Court also recognizes the public interest in preserving the rights of parties which are affected by government regulation to be adequately informed when their interests are at stake and to participate in the regulatory process

as directed by Congress."). In short, one cannot decide whether the public interest will be served without considering both the benefits and the costs.

If the case were otherwise, then the government would be free to ignore small-business protections like the RFA, impose burdensome regulations for a purported public interest without considering viable alternatives, and continue enforcement of the regulations while only belatedly considering the costs. This result runs directly counter to the purpose of the RFA and the APA. *See* RFA, Congressional Findings and Declaration of Purpose § (b) (To carry out the purpose of the RFA, "agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration.") (AR 000856).

*Finally*, the Court should remand the Final Rule to the Service and order it to conduct a proper RFA analysis.

<h3 style="text-align:center">CONCLUSION</h3>

The Service erred as a matter of law by speculating that the economic impacts of Proposed and Final Rules would fall only on federal agencies. Therefore, the Service erred as a matter of law in failing to conduct regulatory flexibility analyses as required under the Regulatory Flexibility Act.

With respect to the Proposed Rule, even if the Court were to conclude that the cursory estimates of impacts resulting (only) from Section 7 consultations amount to an initial regulatory flexibility analysis, the Court should hold that it was arbitrary and capricious and otherwise failed to meet the APA standards for agency action.

Therefore, the Court should grant Plaintiffs' Motion for Summary Judgment and enter an Order:

(1) declaring that a designation of critical habitat under the Endangered Species Act is not categorically exempt from the requirements of RFA sections 603 and 604;

(2) setting aside the Service's Final Rule or deferring its enforcement against small entities like Plaintiffs and their members; and

(3) remanding the Final Rule to the Service with an order to complete the initial and final Regulatory Flexibility Analyses.

DATED: August 24, 2018.

Respectfully submitted,

/s/ Oliver J. Dunford
OLIVER J. DUNFORD (Pro Hac Vice)
   Ohio Bar No. 0073933, Cal Bar No. 320143
KAYCEE M. ROYER (Pro Hac Vice)
   California Bar No. 317397
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Email: ODunford@pacificlegal.org
Email: KRoyer@pacificlegal.org

/s/ Jonathan Wood
JONATHAN WOOD*
   D.C. Bar No. 1045015
*Counsel of Record
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 888-6881
Email: jw@pacificlegal.org

*Counsel for Plaintiffs California Cattlemen's Association, et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2018, a copy of the foregoing document was served

electronically through the Court's ECF system on all counsel of record.


<u>    /s/ Oliver J. Dunford    </u>
OLIVER J. DUNFORD