# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CALIFORNIA CATTLEMEN'S ASSOCIATION, *et al.*,

      Plaintiffs,

      v.

UNITED STATES FISH & WILDLIFE SERVICE, *et al.*,

      Defendants

and

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

      Defendant-Intervenors.

CASE NO. 1:17-CV-01536-TNM

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT .............................................................................................................. 5

I.  THE GOVERNMENT ERRONEOUSLY FAILED
    TO PREPARE REGULATORY FLEXIBILITY ANALYSES ...................................... 6

    A.  Plaintiffs and Their Members Are "Small Entities"
    and Are Directly Regulated by the Final Rule ................................... 6

        1.  Plaintiffs and Their Members Are "Small Entities" under the RFA ............ 6

        2.  Plaintiffs and Their Members Are Directly Regulated by the Final Rule .......... 6

        3.  The Service Was Required To Conduct the RFA Analyses .......................... 7

    B.  The Service Is Not Entitled to Deference ......................................... 9

    C.  The Failure To Conduct the RFA Analysis Was Not Harmless .............. 12

    D.  Plaintiffs Are Entitled To Relief Under the RFA and the APA ............... 13

II.  PLAINTIFFS HAVE SUBMITTED SUFFICIENT EVIDENCE
     TO ESTABLISH THIS COURT'S JURISDICTION ................................................ 13

    A.  Plaintiffs Have Standing ............................................................... 14

    B.  Plaintiffs' Claims Are Directly Traceable to the Final Rule .................. 16

    C.  Plaintiffs' Claims Are Ripe for Review ........................................... 19

III.  PLAINTIFFS ARE ENTITLED TO THEIR REQUESTED
      DECLARATORY AND INJUNCTIVE RELIEF ..................................................... 20

CONCLUSION ......................................................................................................... 23

CERTIFICATE OF SERVICE ..................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................... 19, 20

*Am. Trucking Ass'ns Inc. v. EPA,*
    175 F.3d 1027 (D.C. Cir. 1999)......................................................................... 12

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................................... 17

*\*California Cattlemen's Ass'n v. United States Fish and Wildlife Serv.,*
    315 F. Supp. 3d 282 (D.D.C. 2018)........................................................... *passim*

*\*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017)......................................................................... 11, 12

*\*Cement Kiln Recycling Coal. v. EPA,*
    255 F.3d 855 (D.C. Cir. 2001).................................................................... 11, 12

*Chevron v. Natural Res. Def. Council,*
    467 U.S. 837 (1984) ......................................................................................... 9, 10

*Department of Treasury v. FLRA,*
    837 F.2d 1163 (D.C.C. 1988) ............................................................................. 10

*Energy Future Coal. v. EPA,*
    793 F.3d 141 (D.C. Cir. 2015)........................................................................... 19

*Good Samaritan Hosp. v. Shalala,*
    508 U.S. 402 (1993) ........................................................................................... 11

*Idaho Cty. v. Evans,*
    No. CV02-80-C-EJL, 2003 U.S. Dist. LEXIS 23459 (D. Idaho Sept. 30, 2003)..................... 12

*In re Navy Chaplaincy v. United States Navy,*
    697 F.3d 1171 (D.C. Cir. 2012)................................................................... 14, 20

*Marsh v. Or. Nat. Res. Council,*
    490 U.S. 360 (1989) ............................................................................................. 8

*Metro. Stevedore Co. v. Rambo,*
    521 U.S. 121 (1997) ........................................................................................... 10

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015)........................................................................................ 20

*\*Mid-Tex Elec. Co-op. Inc. v. FERC,*
    773 F.2d 327 (D.C. Cir. 1985) .................................................................... *passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ................................................................................................ 8, 9

*N.C. Fisheries Ass'n, Inc. v. Daley,
  16 F. Supp. 2d 647 (E.D. Va. 1997) .................................................................... 12, 21

Nat'l Ass'n of Home Builders v. Army Corps of Engineers,
  417 F.3d 1272 (D.C. Cir. 2005) ............................................................................... 19

Nat'l Women, Infants and Children Grocers Ass'n v. Food and Nutrition Serv.,
  416 F. Supp. 2d 92 (D.D.C. 2006) ............................................................................ 12

NLRB v. Brown,
  380 U.S. 278 (1965) ................................................................................................... 8

*Nw. Mining Ass'n v. Babbitt,
  5 F. Supp. 2d 9 (D.D.C. 1998) ................................................................. 7, 11, 12, 21

*S. Offshore Fishing Ass'n v. Daley,
  995 F. Supp. 1411 (M.D. Fla. 1998) ......................................................................... 12

Sierra Club v. FERC,
  827 F.3d 59 (D.C. Cir. 2016) .............................................................................. 14, 18

WildEarth Guardians v. Jewell,
  738 F.3d 298 (D.C. Cir. 2013) .................................................................................. 14

**Statutes**

5 U.S.C. §§ 601–612 .............................................................................................. 5, 7

*5 U.S.C. § 603 ............................................................................................. 5, 8, 9, 23

5 U.S.C. § 603(a) ...................................................................................................... 2

*5 U.S.C. § 604 ............................................................................................. 5, 8, 9, 23

5 U.S.C. § 604(a) ...................................................................................................... 2

5 U.S.C. § 605(b) ............................................................................................... passim

*5 U.S.C. § 611(a)(1) ................................................................................................ 8

*5 U.S.C. § 611(a)(2) ................................................................................................ 7

*5 U.S.C. § 706(2)(A) ........................................................................................ 7, 8, 9

16 U.S.C. § 1536 ...................................................................................................... 2

16 U.S.C. § 1536(a)(2) .................................................................................. 3, 11, 17

## Other Authorities

*Endangered and Threatened Wildlife and Plants;*
  *Designation of Critical Habitat for the Sierra Nevada*
  *Yellow-Legged Frog, the Northern DPS of the Mountain*
  *Yellow-Legged Frog, and the Yosemite Toad,*
  78 Fed. Reg. 24,516 (proposed Apr. 25, 2013).............................................................. 1

*Endangered and Threatened Wildlife and Plants;*
  *Designation of Critical Habitat for the Sierra Nevada*
  *Yellow-Legged Frog, the Northern DPS of the Mountain*
  *Yellow-Legged Frog, and the Yosemite Toad,*
  81 Fed. Reg. 59,046 (Aug. 26, 2016)........................................................................ 1

S. Rep. No. 878, 96th Cong., 2d Sess. 3 ........................................................................ 9

# INTRODUCTION

1.      Plaintiffs California Cattlemen's Association (CCA), California Wool Growers Association, and California Farm Bureau Federation challenge the designation of over 1.8 million acres as critical habitat for three amphibious species,[1] on the ground that the U.S. Fish & Wildlife Service failed to conduct economic analyses required by the Regulatory Flexibility Act (RFA). The Government[2] admits that it did not prepare a regulatory flexibility analysis. But the Government attempts to excuse its nonperformance based on a legal argument that this Court already rejected. *See California Cattlemen's Ass'n v. United States Fish and Wildlife Serv.*, 315 F. Supp. 3d 282 (D.D.C. 2018) (denying Government's and Intervenors' motions to dismiss) [Dkt. No. 42].

The RFA requires federal agencies to consider the economic impacts that regulations, such as critical-habitat designations, will have on "small entities" (*e.g.*, small businesses and local governments). When a federal agency is required by the Administrative Procedure Act (APA) to publish a general notice of proposed rulemaking, and whenever an agency adopts a final rule, the agency must also publish, respectively, an initial and a final "regulatory flexibility analysis." 5 U.S.C. §§ 603(a), 604(a). An agency must conduct these analyses unless the head of the issuing

---

[1] The designation was initially proposed in 2013. *Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern Distinct Population Segment of the Mountain Yellow-Legged Frog, and the Yosemite Toad*, 78 Fed. Reg. 24,516 (proposed Apr. 25, 2013) (**Proposed Rule**); AR 000579–638.

This proposal was made final in August 2016. *See Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad*, 81 Fed. Reg. 59,046 (Aug. 26, 2016) (**Final Rule**); AR 000007–81.

[2] Plaintiffs sued the U.S. Fish & Wildlife Service (Fish & Wildlife or Service); the United States Department of the Interior (Interior); Ryan Zinke, in his official capacity as Secretary of the Interior; and Greg Sheehan, in his official capacity as Acting Director of the U.S. Fish & Wildlife Service. The Defendants are collectively referred to here as the Government.

The Center for Biological Diversity (CBD), Central Sierra Environmental Resource Center, and Western Watersheds intervened. They are collectively referred to as Intervenors.

agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id*. § 605(b).

Tellingly, neither the Government nor Intervenors dispute (1) that Plaintiffs and their members are "small entities" under the RFA or (2) that if Plaintiffs and their members are directly regulated by the Final Rule, then the Government's RFA obligations are triggered. Instead, the Government and Intervenors repeat arguments from their motions to dismiss [Dkt. Nos. 11 & 36], claiming that the Final Rule does not directly regulate "small entities." According to Defendants, the only entities impacted by the designation are federal agencies, which must engage in "Section 7" consultations under the Endangered Species Act (ESA) (16 U.S.C. § 1536). Therefore, Defendants maintain, since only federal agencies (not Plaintiffs or their members) are directly regulated by the critical-habitat designation and since federal agencies are not small entities, the Service could certify (under 5 U.S.C. § 605(b)) that the Final Rule would not have a significant economic impact on a substantial number of small entities.

But as this Court previously explained, the "ultimate impact of these [Section 7] consultations will be felt by *small entities like the Plaintiffs and their members*." *California Cattlemen's Ass'n*, 315 F. Supp. 3d at 288 (emphasis added). "[A]ny effects felt by this Final Rule will be *direct* effects . . . ." *Id*. In short, the Final Rule—by mandating Section 7 consultations to determine how the land within the designated habitat may be used (or not)—directly affects small entities like Plaintiffs and their members. *See id*. The Court should reject the attempt by the Government and Intervenors to rely on legal arguments that the Court has already resolved.

2.      Defendants claim that Plaintiffs have failed to provide sufficient evidence to succeed at the summary-judgment stage. Here, Defendants reassert (sometimes, verbatim) their standing and ripeness arguments from their motion-to-dismiss briefs. Once again, these arguments

are based on Defendants' erroneous argument that Plaintiffs and their members are not small entities that will be impacted by the critical-habitat designation. According to Defendants, since Plaintiffs could never be (directly) regulated by the Final Rule, no amount of evidence can suffice for Plaintiffs to obtain judgment. But since this Court has already determined that legal question— *i.e.*, that Plaintiffs are small entities that will ultimately suffer the direct impact of the designation—Defendants' arguments are without merit. And as will be discussed below, Plaintiffs have presented sufficient evidence to meet the summary-judgment standard.

3.      Defendants further argue that Plaintiffs cannot establish harm since the rules and regulations that restrict the use of land within the designated habitat were imposed before the effective date of the Final Rule. This argument, too, is based on the erroneous premise that the designation does not *directly* regulate Plaintiffs or their members. As this Court explained, the Government "understates the [critical-habitat designation's] impact." *California Cattlemen's Ass'n*, 315 F. Supp. 3d at 287. The designation "requires not just consultation, but consultation so that federal agencies 'insure' that federally-authorized actions are not 'likely to . . . result in the destruction of adverse modification of [critical] habitat.'" *Id*. at 288 (quoting 16 U.S.C. § 1536(a)(2)). If a consulting agency "determines that one of the Plaintiffs' grazing permits is 'likely to . . . result in [ ] destruction or adverse modification' of critical habitat, then the designation itself operates to forbid the offending permit." *Id*. (quoting 16 U.S.C. § 1536(a)(2)). Therefore, "any effects felt by this Final Rule will be *direct* effects, as federal agencies determine what the critical habitat designation requires in specific cases." *Id*.

An additional flaw in Defendants' argument here is readily apparent once one compares this point—that the designation imposes no new restrictions—with their later contention that, should Plaintiffs prevail, the critical-habitat designation is too important to be enjoined or vacated.

Defendants thus argue, first, that the Final Rule has had no impact on Plaintiffs' use of critical-habitat land and, second, that the Court should remand (if at all) without vacatur of the designation—"in order to protect the species." Gov't Br. at 43.[3] But if the designation has no impact on Plaintiffs' use of the critical-habitat land, why is it critical to continue its enforcement? Why *ever* designate land as critical habitat?

The reason, of course, is to provide additional oversight on the use of certain land that is critical to the species. As discussed below, this is precisely what has happened. Because of the critical-habitat designation (issued August 2016), the Forest Service on June 5, 2017, reinitiated Section 7 consultation with Fish & Wildlife to include the critical habitat at issue in this case. And on June 15, 2017, Fish & Wildlife issued an amended biological opinion related to the critical habitat and the three species. As a result, management requirements were imposed on small entities, like the Brennan Ranch, that use land within the critical habitat.

Therefore, the Final Rule itself has caused injuries to Plaintiffs and their members.

4.      Finally, even if the Court determines, despite the evidence, that Plaintiffs have not made a sufficient showing to succeed at the summary-judgment stage, the Court should deny Defendants' motions for summary judgment and proceed with discovery and trial. Because this Court has already determined the dispositive legal issue, any questions that remain are purely factual—*i.e.*, whether and to what extent Plaintiffs and their members have been and will be harmed. Plaintiffs, however, have submitted declarations from CCA's Executive Director and two ranchers whose use of critical-habitat land has been restricted—and who will continue to be

---

[3] Citations to "Gov't Br." refer to the Government's Memorandum in Support of its Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment [Dkt. No. 53-1]. Citations to "Int. Br." refer to the Intervenors' Memorandum in Support of their Cross-Motion for Summary Judgment and Response to Plaintiffs' Summary Judgment Motion [Dkt. No. 52-1].

burdened with, at least, future consultation obligations. And Defendants have presented *no* evidence upon which summary judgment could be granted in their favor. Accordingly, if the Court concludes that Plaintiffs have not yet satisfied their factual burden, they must be permitted the opportunity to meet that burden at trial; and Plaintiffs can, if necessary, present additional evidence at trial from their many thousands of members.

In sum, because there are no disputed questions of material fact, and because Plaintiffs are entitled to judgment as a matter of law, the Court should deny the Government's and Intervenors' Cross-Motions for Summary Judgment [Dkt. Nos. 50 & 52]; grant Plaintiffs' Motion for Summary Judgment [Dkt. No. 49]; and enter Plaintiffs' Proposed Order [Dkt. No. 49.6].

## ARGUMENT

The dispositive issue before the Court is whether the Service erroneously concluded that the Final Rule did not directly regulate Plaintiffs and their members. The Regulatory Flexibility Act (5 U.S.C. §§ 601–612) requires federal agencies to consider the impacts that agency rules will have on "small entities," including small businesses. When an agency publishes a proposed or final rule, it must also prepare, respectively, an initial and a final regulatory flexibility analysis, *id.* §§ 603, 604, *unless* the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities[,]" *id.* § 605(b).

As this Court explained, in the D.C. Circuit, the RFA's requirements apply to "'small entities that would be directly regulated' by a challenged rule." *California Cattlemen's Ass'n*, 315 F. Supp. 3d at 287 (quoting *Mid-Tex Elec. Co-op. Inc. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985)). But Service concluded that *no* small entities would be regulated—directly or otherwise— since the Final Rule affected only other federal agencies (by requiring them to engage in Section 7 consultations), and not Plaintiffs or their members. This Court has already concluded that

Plaintiffs and their members are small entities under the RFA and that they are directly regulated by the Final Rule. *Id.* 287–88.

Defendants seek to avoid these legal conclusions by arguing—again—that Plaintiffs lack standing and that their claims are not ripe for review. The only difference between the current arguments and the arguments raised at the motion-to-dismiss stage is that Defendants now contend that Plaintiffs have failed to supply sufficient evidence to succeed at the summary-judgment stage. As detailed below, Plaintiffs have in fact met their evidentiary burden.

Ultimately, the Service erred as a matter of law in concluding that the RFA did not apply to Plaintiffs. Below, Plaintiffs will discuss this legal issue first, then set forth the facts that establish this Court's jurisdiction (standing and ripeness), and finally, explain why Plaintiffs are entitled to injunctive and declaratory relief.

## I.

### THE GOVERNMENT ERRONEOUSLY FAILED TO PREPARE REGULATORY FLEXIBILITY ANALYSES

**A.   Plaintiffs and Their Members Are "Small Entities" and Are Directly Regulated by the Final Rule**

**1.   Plaintiffs and Their Members Are "Small Entities" under the RFA**

This Court has already concluded that Plaintiffs and their members are "small entities" under the RFA. *California Cattlemen's Ass'n*, 315 F. Supp. 3d at 286–88. *See also* Plaintiffs' Mem. in Supp. [Dkt. No. 49-1] at 13–14. And neither the Government nor the Intervenors contend otherwise.

**2.   Plaintiffs and Their Members Are Directly Regulated by the Final Rule**

The Defendants argue again that Plaintiffs and their members are not directly regulated by the Final Rule. *See* Gov't Br. at 28–38; Int. Br. at 18–22. This issue, too, has been decided already.

Denying the Defendants' motions to dismiss, this Court explained that while the Final Rule "requires one federal agency to consult with another federal agency about the Final Rule's impact on land use," the "*ultimate impact* of these consultations *will be felt by* small entities like the *Plaintiffs and their members*." *California Cattlemen's Ass'n*, 315 F. Supp. 3d at 288. *See also* Plaintiffs' Mem. in Supp. at 15–17.

### 3.      The Service Was Required To Conduct the RFA Analyses

Under the clear terms of the RFA, because the Final Rule directly regulates Plaintiffs and their members, the Service was required to conduct both an initial and a final regulatory analysis. 5 U.S.C. §§ 601–612. Accordingly, the Service violated both the Regulatory Flexibility Act and the Administrative Procedure Act, *id*. §§ 611(a)(2), 706(2)(A), and Plaintiffs are entitled to judgment as a matter of law. *See* Plaintiffs' Mem. in Supp. at 13–22. Most obviously, an agency's certification that no regulatory flexibility analysis is required—based on an incorrect understanding of "small entities"—is reversible error. *See Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9 (D.D.C. 1998).

But the Government contends that while Plaintiffs successfully survived the motion-to-dismiss stage, they are not entitled to judgment here because of the deferential "arbitrary and capricious" standard that applies under the APA. *See* Gov't Br. at 28–38. This argument is without merit.

First, the full APA standard authorizes the Court to set aside an agency's action when it is "arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law*." 5 U.S.C. § 706(2)(A) (emphasis added). An agency falls within this standard when it fails to apply criteria for its action contained in relevant statutes, applies criteria for its decision not authorized by its statutory authority, fails to consider relevant information, fails adequately to explain the basis for

its action or to respond to important public comments, acts inconsistent with the purpose and intent of the statutes granting it authority, or offers an explanation for its action that runs counter to the evidence before it. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In considering whether an agency acted in an arbitrary and capricious manner, a court must carefully review the record to "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Courts should not "rubberstamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291–92 (1965).

Here, this Court already made the legal determination that the Final Rule directly regulates Plaintiffs and their members. *California Cattlemen's Ass'n*, 315 F. Supp. 3d at 287–88. Therefore, the Service's certification failed to apply criteria for its action contained in relevant statutes (proper identification of "small entities"), failed to consider relevant information (the economic impact on small entities), and offered explanations for its action that runs counter to the evidence before it (comment letters advised the Service of the impacts that would be suffered by small entities). *See State Farm*, 463 U.S. at 43. As such, the Government's actions here are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

Further, Plaintiffs' claim under 5 U.S.C. § 604 (requiring a final RFA analysis) has another, independent basis—the RFA itself.[4] *See* 5 U.S.C. § 611(a)(1) ("For any rule subject to this chapter,

---

[4] In its ruling on the Defendants' Motion to Dismiss, the Court held that Plaintiffs' claims under RFA Section 604 could proceed. The Court further ruled that Plaintiffs could challenge the Government's violation of Section 603 only under the APA's arbitrary-and-capricious review, not under the RFA. *California Cattlemen's Ass'n*, 315 F. Supp. 3d at 287.

a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, *604*, 605(b), 608(b), and 610 in accordance with chapter 7 . . . .") (emphasis added). Accordingly, the Service here acted inconsistently with the purpose and intent of the statutes granting it authority. *State Farm*, 463 U.S. at 43. The RFA was designed precisely to protect "small entities" like Plaintiffs. 5 U.S.C. §§ 603, 604. *See also Mid-Tex Elec. Co-op.*, 773 F.2d at 342 (quoting S. Rep. No. 878, 96th Cong., 2d Sess. 3); *see id.* ("Congress was primarily concerned about the high costs of compliance with regulations by small businesses bound to conform their conduct to those regulations.") (citing S. Rep. No. 878, 96th Cong., 2d Sess. 3 at 6–7). For this reason, too, the Government's actions here are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

**B.     The Service Is Not Entitled to Deference**

The Government claims that it is entitled to deference with respect to its "findings" and, further, that it enjoys *Chevron* deference. *See* Gov't Br. at 28–36. Neither argument has merit.

The Government contends that the Court should defer to the Service's "findings with respect to the economic effects" of the Final Rule. Gov't Br. at 29. But the Service did not make *any* findings in that regard. Instead, the Service concluded—erroneously—that the RFA did not apply to Plaintiffs or their members because, it argued, the Final Rule did not directly regulate small entities. In other words, the Service did not "find," under 5 U.S.C. § 605(b), that the Final Rule "[would] not, if promulgated, have a significant economic impact on a substantial number of small entities." The Service never addressed that issue. It simply made an erroneous legal conclusion. The Court cannot defer to a "finding" that was never made.

The Government's request for *Chevron* deference fares no better. The Government contends that deference is owed because the Service was interpreting the ESA, a statute that the Service administers. Gov't Br. at 29. According to the Government, the Service's "determination that no small entities are directly regulated by the final rule was based on its interpretation of the legal effects of a critical habitat designation." *Id.*

*Chevron* deference does not apply unless the statutory language is ambiguous. *Chevron v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984). But here, the Government itself claims that the Service's interpretation is consistent with "the plain language of the ESA." Gov't Br. at 30. With unambiguous language, the statute is not amenable to more than one reasonable interpretation—and the Service's interpretation may not be accorded deference. *See Chevron*, 467 U.S. at 842–43 (If the "intent of Congress is clear," then that "is the end of the matter[,]" because the court, "as well as the agency, must give effect to the unambiguously expressed intent of Congress.") (footnote omitted).

Further, the ESA is not the only applicable statute. The APA and the RFA—in particular, the RFA's definition of "small entities"—also apply. Because the APA and the RFA apply to all administrative agencies, *no* individual agency administers them. *See Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (stating that *Chevron* does not apply to agency interpretations of the APA); *see also Department of Treasury v. FLRA*, 837 F.2d 1163, 1167 (D.C.C. 1988) ("[W]hen an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference"). And the import of the RFA on this question has been clearly understood in this Circuit (and elsewhere) for many years. *See Mid-Tex Elec. Co-op.*, 773 F.2d at 342. *See also Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6

(D.C. Cir. 2017); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001); *Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9.

Even if deference were otherwise appropriate with respect to the statutes at issue—and it is not—no deference is permitted in this instance, in that no heightened deference is afforded an ad hoc interpretation, one which varies according to agency decision. *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993).

Finally, the Government cites to various authorities for the proposition that a critical-habitat designation includes the impacts of Section 7 consultations, which require action by federal agencies. *See* Gov't Br. at 31 (citations omitted). This proposition is true as far as it goes. But the question at issue in this case is whether the Section 7 consultations—arising out of the critical-habitat designation—impose restrictions on small entities like Plaintiffs and their members. Once again, this Court has resolved this question. As this Court explained, the Government "understates the [critical-habitat designation's] impact." *California Cattlemen's Ass'n*, 315 F. Supp. 3d at 287. The designation "requires not just consultation, but consultation so that federal agencies 'insure' that federally-authorized actions are not 'likely to . . . result in the destruction of adverse modification of [critical] habitat.'" *Id*. at 288 (quoting 16 U.S.C. § 1536(a)(2)). If a consulting agency "determines that one of the Plaintiffs' grazing permits is 'likely to . . . result in [ ] destruction or adverse modification' of critical habitat, then the designation itself operates to forbid the offending permit." *Id*. (quoting 16 U.S.C. § 1536(a)(2)). Therefore, "any effects felt by this Final Rule will be *direct* effects, as federal agencies determine what the critical habitat designation requires in specific cases." *Id*.[5]

---

[5] The Government (Gov't Br. at 32–36) and Intervenors (Int. Br. at 18–22) both repeat their arguments concerning the erroneous definition of "small entities" and regulatory impacts of the Final Rule and, in the process, point to cases that have already been discussed at length. Rather

This Court's application of these ambiguous statutes is consistent with this long-standing jurisprudence, and the Government's plea for deference must be rejected.

## C.   The Failure To Conduct the RFA Analysis Was Not Harmless

The Government contends that even if Plaintiffs are entitled to relief, the Court should ignore it and find that the Government's error was harmless. Gov't Br. at 36–38. The basis for the Government's argument is that, while the Service did not conduct on RFA, it did "consider the *indirect* economic effects on grazing permittees as part of its analysis under ESA Section 4(b)(2)." *Id.* at 37.

This "analysis," however failed to consider the "direct" impacts that would result from the Final Rule. First, as the Government itself acknowledges, the Service looked only at *indirect* effects—even though the Final Rule directly impacts Plaintiffs and their members. Further, the Government's estimate was based on the "expect[ation]" that no modifications to existing protection measures would flow from the Final Rule. *Id.* As explained below, modifications have in fact occurred. *See*, II. A–B, *infra*.

---

than recite, for the third time, the contrary points, Plaintiffs refer to their previous briefings before the Court. *See* Plaintiffs' Opp. to Mots. to Dismiss [Dkt. No. 37] at 16, 26–29 (discussing *Mid-Tex Elec. Co-op.*), 24, 29–32 (*Cement Kiln Recycling Coal.*); 27–28 (*N.C. Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647 (E.D. Va. 1997)); 29 (*Am. Trucking Ass'ns Inc. v. EPA*, 175 F.3d 1027 (D.C. Cir. 1999) and *Nat'l Women, Infants and Children Grocers Ass'n v. Food and Nutrition Serv.*, 416 F. Supp. 2d 92 (D.D.C. 2006)); 30 (*Idaho Cty. v. Evans*, No. CV02-80-C-EJL, 2003 U.S. Dist. LEXIS 23459 (D. Idaho Sept. 30, 2003)); *see also* Plaintiffs' Mem. in Supp. at 15–16 (*Carpenters Indus. Council*, *Cement Kiln Recycling Coal.*, and *Mid-Tex Elec. Co-op.*); 17–23 (*Nw. Mining Ass'n v. Babbitt*); 18–20 (*S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411 (M.D. Fla. 1998)); 19–21 (*N.C. Fisheries Ass'n*); 22 (*Mid-Tex Elec. Co-op.*).

This Court has agreed with Plaintiffs' explanations. *See California Cattlemen's Ass'n*, 315 F. Supp. 3d at 285–88 (discussing *Carpenters Indus. Council* and *Mid-Tex Elec. Co-op.*).

Ultimately, the Service's failure to conduct an RFA analysis was based on its erroneous legal conclusion that the Final Rule did not directly regulate small entities. That error cannot be fixed or rendered harmless by an estimate of (indirect) effects based on an unmet expectation.

**D.     Plaintiffs Are Entitled To Relief Under the RFA and the APA**

Ultimately, the Defendants raise a non sequitur—that Congress did not require every agency to consider every indirect impact that a regulation may have on any small business. *See*, *e.g.*, Int. Br. at 19. Plaintiffs have never suggested otherwise. What Plaintiffs argue is that *if* small entities are directly regulated by a (proposed or final) regulation, the issuing agency must either conduct an RFA analysis or certify that the Final Rule "[would] not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). Here, Plaintiffs and their members (indisputably, small entities) are directly regulated by the RFA.

Accordingly, Plaintiffs succeed on the dispositive issue for the Court—whether the Service's certification is erroneous as a matter of law. The Court got it right the first time: Plaintiffs and their members are "small entities" directly regulated by the Final Rule. *See California Cattlemen's Ass'n*, 315 F. Supp. 3d at 287–88. As such, the Service erred by failing to conduct the RFA analyses.

## II.

### PLAINTIFFS HAVE SUBMITTED SUFFICIENT EVIDENCE TO ESTABLISH THIS COURT'S JURISDICTION

Defendants take additional bites at the apple and contend that (A) this Court lacks jurisdiction, on the ground that Plaintiffs have not submitted enough evidence to succeed at the summary-judgment stage, (B) the injuries Plaintiffs raise cannot be traced to the Final Rule, *i.e.*, that the restrictions on the use of land within the critical habitat were in place before the Final Rule became effective; and (C) as a result, Plaintiffs' claims are not ripe for review. These arguments,

like all the others, are based in part on Defendants' erroneous conclusion that Plaintiffs and their members are not "small entities" directly regulated by the Final Rule. But in any event, Plaintiffs have submitted more than enough evidence here to obtain summary judgment.

## A.     Plaintiffs Have Standing

A party has associational standing if at least one of its members has standing to sue in her own right, the member's interest is germane to the party's mission, and the member's direct participation in the action is unnecessary. *Sierra Club v. FERC*, 827 F.3d 59, 67 (D.C. Cir. 2016). An individual has standing to sue in her own right if she has suffered a concrete and particularized injury-in-fact that is fairly traceable to the challenged action and that is likely to be redressed by favorable judicial decision. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). The Government and Intervenors contend that Plaintiffs have not submitted sufficient evidence to demonstrate that they have standing or that their claims are ripe for review. *See* Gov't Br. at 14–28; Int. Br. at 11–18.

Plaintiffs' opening brief and declarations establish that, at the least, Plaintiff CCA has associational standing.[6] *See* Plaintiffs' Mem. in Supp. at 7–10, 11 & n.6, 14. Further, CCA itself has standing. *Id.* at 10.

***Brennan Ranch***, a member of Plaintiff CCA, has suffered and continues to suffer economic losses as a result of the critical-habitat designation. *See* Aug. 21, 2018, Declaration of Sherri Brennan (Brennan Decl. 1) ¶¶ 2, 4 [Dkt. No. 49-2]. Brennan Ranch is a small, family-owned cattle ranch in Sonora, California. *Id.* ¶ 2. The Ranch has grazing permits (called "Annual Operating Instructions") issued by the Service, including a permit to graze cattle in the Long Valley

---

[6] Because CCA has associational standing, the Court may address the claims advanced in this action without determining whether any other Plaintiff has standing. *In re Navy Chaplaincy v. United States Navy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

Eagle Meadow Allotment, which is located within the critical-habitat designation at issue here. *Id*. ¶¶ 5–8; *see also* Oct. 11, 2018, Declaration of Sherri Brennan (Brennan Decl. 2) ¶ 6, and Exhibit.[7]

Because of the designation, Brennan Ranch's grazing has been restricted, imposing compliance costs and resulting in business losses. For example, before the Final Rule was adopted, Brennan Ranch was permitted a 60% utilization of the Eagle Meadow Allotment. Brennan Decl. 1, Ex. 1, *2016 Grazing Permit*, III.B. "Utilization" refers to the maximum amount of forage (or plant material) permitted to be consumed by animals during a grazing period in a particular allotment. Brennan Decl. 1 ¶ 9. Therefore, a 60% utilization meant that Brennan Ranch's cattle were permitted to consume no more than 60% of the forage in the Eagle Meadow Allotment. *2016 Grazing Permit*, III.B.

After the Final Rule was issued (August 26, 2016), the Service reduced Brennan Ranch's use of the Eagle Meadow Allotment to 40% utilization. Brennan Decl. 2, Ex., *2017 Final Grazing Permit*, II.E.1. To meet this reduced utilization maximum, Brennan Ranch was forced to reduce its turnout numbers in the "Niagara Unit" of the Eagle Meadow Allotment from 150 cow/calf pairs to 120 cow/calf pairs. Brennan Decl. 1 ¶ 12. To feed the remaining 30 pairs, Brennan Ranch must send them to Stanislaus County, California, for "winter pasture." *Id*. The additional cost to do so equals approximately $900 per month (which does not include the additional cost of travel to the winter pasture and related management costs). *Id*.

---

[7] While preparing this Combined Opposition and Reply Brief, Plaintiffs' counsel was made aware that Ms. Brennan unintentionally relied on and provided a copy of a *draft* of the 2017 permit. Brennan Decl. 2 ¶¶ 3–4. Ms. Brennan explains in her new declaration, attached here, that the Brennan Ranch and the Forest Service spent significant time in 2017 negotiating the terms of the 2017 permit, and the final version was not completed until September 2017. *See Id*. at ¶ 5. But as discussed below, the restrictions identified by Ms. Brennan in her original declaration are reflected in the Final 2017 Grazing Permit. A true and correct copy of the Final 2017 Grazing Permit is attached to this second declaration. *Id*. ¶ 6. Plaintiffs apologize to the Court and the other parties for this inadvertent error.

Further, because the Eagle Meadow Allotment has been the most productive allotment permitted for use by the Brennan Ranch, the Ranch has suffered losses resulting from slimmer cattle. Before the Final Rule was adopted, Brennan Ranch's calves had weighed (on average) approximately 50 to 75 pounds more than calves who fed off other allotments. This additional weight equated to approximately $17,000 worth of increased pounds gained each year. The Ranch has therefore incurred these losses because of the critical-habitat designation. Brennan Decl. 1 ¶ 13.

Finally, because of the designation, Brennan Ranch must—each year—erect, monitor, and remove fencing on the Eagle Meadow Allotment to protect the habitat of the protected Yosemite Toad. Brennan Decl. 1 ¶¶ 14–16; *2017 Final Grazing Permit*, II.E., II.F. This fence restricts Brennan Ranch's grazing in the allotment, and it also imposes maintenance and monitoring costs. *Id.*

***Plaintiffs' members, as well as Plaintiff CCA itself***, have also incurred compliance costs resulting from the Service's Rule and the mandatory Section 7 consultation process. Brennan Decl. 1 ¶¶ 6–9, Declaration of Marrianne F. Leinassar (Leinassar Decl.) ¶ 6, [Dkt. No. 49-3], Mar. 8, 2018, Declaration of Kirk Wilbur (Wilbur Decl. 1) ¶¶ 2-6 [Dkt. 49-4]. This Court previously recognized that, "even when consultations allow grazing permits to continue, associated delays and requirements impose economic costs." *California Cattleman's Ass'n*, 315 F. Supp. 3d at 286 (citing Wilbur Decl. 1 ¶¶ 2–5; Leinassar Decl. ¶¶ 2–6).

Accordingly, Plaintiffs have established that, at the least, Plaintiff CCA has associational standing (through Brennan), and that Plaintiffs' members and CCA itself have standing due to delays, requirements, and costs associated with the Section 7 consultation process.

**B.    Plaintiffs' Claims Are Directly Traceable to the Final Rule**

The Government and Intervenors do not challenge the substance of Plaintiffs' declarations, so much as they argue that the injuries complained of do not result from the Final Rule. According

to the Defendants, the restrictions on the use of land within the critical habitat were imposed before the Final Rule as part of the Forest Service's effort to protect the three amphibian species, two of which were listed as endangered, and one listed as threatened, in 2014. (AR 000008). According to the Government, these species were identified as "sensitive species" in 1998. Gov't Br. at 17 n.4. Therefore Defendants say, because restrictions to protect these species existed before the critical habitat was designated, Plaintiffs cannot point to any additional restrictions imposed as a result of the critical-habitat designation itself. *See* Gov't Br. at 17; Int. Br. at 11–18.[8]

In fact, additional restrictions and Section 7 consultations have resulted directly from the Final Rule. Therefore, Plaintiffs can trace, and have traced, their injuries directly to the critical-habitat designation itself.

First, after the Final Rule was published on August 26, 2016, the Forest Service on June 5, 2017, reinitiated formal (Section 7) consultation on impacts to critical habitat, and on June 15, 2017, Fish & Wildlife issued an amendment to the programmatic biological opinion to address

---

[8] The Government again relies on part in the flawed premise that the Final Rule does not directly regulate small entities like Plaintiffs and their members. It contends that the Final Rule did not impose any restrictions on land use within the critical habitat; rather, "any conservation measures applying to such allotments are traceable to decisions by the Forest Service." Gov't Br. at 15. As Plaintiffs explained in their Brief in Opposition to the Motions to Dismiss [Dkt. No. 37] (at 21), any regulation could be reframed as a regulation of how an agency official regulates the public, but artful drafting cannot defeat regulated parties' standing to challenge regulations that directly harm them. In *Bennett v. Spear*, for instance, irrigation districts sued the U.S. Fish and Wildlife Service over a biological opinion issued under the ESA that regulated the Bureau of Reclamation's ability to deliver water to the districts. 520 U.S. 154 (1997). The Supreme Court expressly rejected the argument that an agency channeling its regulation of the public through another agency defeats standing. *Id.* at 168–71 (standing exists if the challenged agency action has a "powerful coercive effect" on the cause of plaintiffs' injury). Here, the Final Rule imposes a powerful coercive effect on Plaintiffs' grazing rights by controlling other agencies' permitting processes. The ESA requires all agencies to "insure" that the actions they approve, including grazing, will not "result in the destruction or adverse modification of habitat" designated as critical habitat. 16 U.S.C. § 1536(a)(2).

impacts to critical habitat. This amendment is called the "Three Amphibian BO."[9] *See also* Brennan Decl. 2, Ex., *2017 Final Grazing Permit*, II.E., IIG. This Three Amphibian BO confirms that it was prepared because of the Final Rule's designation of critical habitat:

> Critical habitat for the three listed amphibians was not designated at the time of issuance of the original December 19, 2014, Programmatic Biological Opinion. Critical habitat was designated on August 26, 2016, and you [Forest Service] have requested reinitiation of the Programmatic Biological Opinion to analyze effects of the proposed action on critical habitat for these three species.

Ex. 1, *Three Amphibian BO* at 1.

Further, the management requirements imposed on the Brennan Ranch "are required by" a Forest Plan Direction, as amended by, among other things, the Three Amphibian BO—which, again, was issued after, and as a result of, the Final Rule designating critical habitat. Brennan Decl. 2, Ex., *2017 Final Grazing Permit*, II.E. Therefore, the restrictions imposed on Brennan Ranch were in fact amended after and as a result of the Final Rule. Since Brennan Ranch is a member of Plaintiff CCA, and since Brennan Ranch has suffered injuries caused by the Final Rule, Plaintiffs have established that Plaintiff CCA has associational standing. *Sierra Club*, 827 F.3d at 67.

Finally, Plaintiffs' members and Plaintiff CCA itself have suffered and will continue to suffer damages in the form of delays, participation, and costs associated with the Section 7 consultations. As stated in the Brennan Ranch *2017 Final Grazing Permit*, the Forest Service on August 9, 2017, "formally submitted information regarding grazing on the Eagle Meadow allotment to [Fish & Wildlife] its consideration and for appendage to the Three Amphibian BO." *Id.*, II.G. *See also id.* ("Independently and in the interim until site-specific consultation is complete,

---

[9] A copy of the Three Amphibian BO, which references the Forest Service's reinitiation of Section 7 consultation following the Final Rule (p. 2), can be found on Intervenor CBD's website. *See* https://www.biologicaldiversity.org/campaigns/amphibian_conservation/pdfs/Sierra_Nevada_Forests_Endangered_Frogs_Biological_Opinion.pdf. A copy is attached here as Exhibit 1.

the Forest Service will comply with its obligations under ESA Section 7(d) and make any necessary adjustments to this 2017 AOI [Final Grazing Permit].”). Accordingly, Brennan Ranch will be required to expend time and resources and suffer economic injury in the form of delays, participation, and cost associated with Section 7 consultation. Brennan Decl. 1 ¶¶ 6-9. Plaintiff CCA itself and Plaintiff California Wool Growers Association member (FIM Corporation) will suffer similar injuries. Leinassar Decl. ¶¶ 5–6; Wilbur Decl. 1 ¶¶ 2- 6. *See California Cattleman's Ass'n*, 315 F. Supp. 3d at 286 (citing Wilbur Decl. 1 ¶¶ 2–5; Leinassar Decl. ¶¶ 2–6).

As noted above, because of negotiations between Brennan Ranch and the Service, the 2017 Final Grazing Permit was not executed until September 2017. Brennan Decl. 2 ¶ 5, Ex., *2017 Final Grazing Permit*, at p. 7. Thus, Plaintiff' and their members' injuries are imminent, even though the Service did not immediately roll out the restrictions. It would be unfair to deny Plaintiffs' standing when it's clear that regulations are being imposed and will continue to be.

In sum, Plaintiffs can trace their injury—and their expectation that the injury will continue—directly to the Final Rule. Accordingly, Plaintiffs have standing.

### C.    Plaintiffs' Claims Are Ripe for Review

Ripeness requires evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). "[F]itness of an issue for judicial decision depends on [1] whether it is purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final." *Energy Future Coal. v. EPA*, 793 F.3d 141, 146 (D.C. Cir. 2015) (quoting *Nat'l Ass'n of Home Builders v. Army Corps of Engineers*, 417 F.3d 1272, 1281 (D.C. Cir. 2005)). The Government does not dispute that the issues here are purely legal, or that the Final Rule is final. The Government claims that Plaintiffs have not established an

injury resulting from the Final Rule. Gov't Br. at 27–28. But as discussed above, Plaintiffs have in fact tied their injuries to the Final Rule.

Further, as this Court previously observed, the ultimate issue in this analysis is whether the Service erroneously concluded that the Final Rule does not directly regulate small entities (and, therefore, that no RFA analyses were required). *California Cattleman's Ass'n*, 315 F. Supp. 3d at 286 (citing 5 U.S.C. § 605(b) and *Mid–Tex Elec. Co-op.*)). Because this issue "has so little to do with any particular injury," and because Plaintiffs have tied their injuries to the Final Rule, "additional concrete facts would be of little benefit." *Id.* at 287. The injuries to Plaintiffs "are 'sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage.'" *Id.* (quoting *Abbott Labs.*, 387 U.S. at 153).

Accordingly, Plaintiffs' claims are ripe for review.

## III.

### PLAINTIFFS ARE ENTITLED TO THEIR REQUESTED DECLARATORY AND INJUNCTIVE RELIEF

Finally, both the Government and Intervenors urge the Court, should it rule in Plaintiffs' favor, to limit the remedy. *See* Gov't Br. at 38–44; Int. Br. at 22–25. As noted above, while the Defendants spend the majority of their briefs arguing that the Final Rule has no real impacts, due to the existence of significant restrictions previously adopted to protect the endangered/threatened species, they end their briefs declaring the importance of the Final Rule for protecting the species. Gov't Br. at 40; Int. Br. at 23.

In any event, Plaintiffs have acknowledged that species protection is part of the public interest—but that is not the whole of the public interest. Therefore, the analysis is not "the public interest" versus Plaintiffs and their claims. Rather, the livelihoods of Plaintiffs' members are themselves part of the public interest. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("One

would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic cost in return for a few dollars in health or environmental benefits."). *See also* RFA, Congressional Findings and Declaration of Purpose § (a)(1) ("when adopting regulations to protect the health, safety and economic welfare of the Nation, Federal agencies should seek to achieve statutory goals as effectively and efficiently as possible *without imposing unnecessary burdens on the public*") (emphasis added) (AR 000856); § (a)(4) ("the failure to recognize differences in the scale and resources of regulated entities has in numerous instances adversely affected competition in the marketplace, discouraged innovation and restricted improvements in productivity") (AR000856).

As the court in *Nw. Mining Ass'n*, explained, "While recognizing the public interest in preserving the environment, the Court also recognizes the public interest in preserving the rights of parties which are affected by government regulation to be adequately informed when their interests are at stake and to participate in the regulatory process as directed by Congress." 5 F. Supp. 2d at 16. Therefore, because of the importance of the issue before the Court and the significant harms that Plaintiffs' members are suffering and will suffer, the Court should set aside the Service's Final Rule or defer its enforcement against small entities like Plaintiffs and their members; and further, remand the Final Rule to the Service with an order to complete the initial and final Regulatory Flexibility Analyses.

Defendants further argue that vacatur is improper since the Service will "likely" correct the procedural deficiencies. Gov't Br. at 42; Int. Br. at 24. Of course, as discussed above, the Government attempted to defend its failure to conduct an RFA analysis on the ground that it conducted an analysis of indirect effects based on an "expectation" that never materialized. *See* I.C., *supra.* Indeed, the Government repeats this claim, stating that there is "a substantial likelihood

that, on remand, [the Service] could once again certify that no regulatory flexibility analysis is required because any economic impact on small entities will not be significant." Gov't Br. at 42. The Government offers no evidence for this assertion. And its initial certification was not, of course, based on a finding of the Final Rule's impact on small entities; it was based on the Service's conclusory assertion that critical-habitat designations do not directly impact small entities at all.

As noted above, the very purpose of the RFA is based on Congress's belief that the required analysis will have a constraining impact on agencies. *See* RFA, Congressional Findings and Declaration of Purpose § (a)(1) ("when adopting regulations to protect the health, safety and economic welfare of the Nation, Federal agencies should seek to achieve statutory goals as effectively and efficiently as possible *without imposing unnecessary burdens on the public*") (emphasis added) (AR 000856). It would be anomalous to allow an agency to avoid compliance by simply declaring that impacts do not exist.

The Government also states that any vacatur should be narrowly tailored to those portions of the habitat where Plaintiffs' members have grazing allotments. Gov't Br. at 43. But the entire critical habitat is at issue, and Plaintiffs have thousands of members. The Government's request would simply add costs.

Finally, the Government appears to misstate part of the relief sought by Plaintiffs. The Government claims that Plaintiffs seek a "broad declaration that all critical habitat designations are subject to the RFA . . . ." Gov't Br. at 39. In fact, Plaintiffs ask for a declaration that a critical-habitat designation "is not categorically exempt from the requirements of RFA sections 603 and 604." Plaintiffs' Mem. in Supp. at 25. Plaintiffs recognize that agencies may, in good faith, determine that a "rule [would] not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). But what the Government and Intervenors

seek here is a categorical rule that a critical-habitat designation could *never* trigger the RFA obligations since, they contend, these critical-habitat designations never directly regulate small entities. Plaintiffs therefore ask the Court to declare that such a categorical rule is erroneous as a matter of law.

CONCLUSION

The Service erred as a matter of law by speculating that the economic impacts of Proposed and Final Rules would fall only on federal agencies. Therefore, the Service erred as a matter of law in failing to conduct regulatory flexibility analyses as required under the Regulatory Flexibility Act.

With respect to the Proposed Rule, even if the Court were to conclude that the cursory estimates of impacts resulting (only) from Section 7 consultations amount to an initial regulatory flexibility analysis, the Court should hold that it was arbitrary and capricious and otherwise failed to meet the APA standards for agency action.

Therefore, the Court should grant Plaintiffs' Motion for Summary Judgment and enter an Order:

(1) declaring that the designation of critical habitat under the Endangered Species Act is not categorically exempt from the requirements of RFA sections 603 and 604;

(2) setting aside the Service's Final Rule or deferring its enforcement against small entities like Plaintiffs and their members; and

(3) remanding the Final Rule to the Service with an order to complete the initial and final Regulatory Flexibility Analyses.

DATED: October 12, 2018.             Respectfully submitted,

/s/ Oliver J. Dunford
OLIVER J. DUNFORD (*Pro Hac Vice*)
   Ohio Bar No. 0073933; Cal. Bar No. 320143
KAYCEE M. ROYER (*Pro Hac Vice*)
   Cal. Bar No. 317397
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Email: ODunford@pacificlegal.org
Email: KRoyer@pacificlegal.org

/s/ Jonathan Wood
JONATHAN WOOD*
   D.C. Bar No. 1045015
*Counsel of Record*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 888-6881
Email: jw@pacificlegal.org

*Counsel for Plaintiffs California*
*Cattlemen's Association, et al.*

### CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, a copy of the foregoing document was served electronically through the Court's ECF system on all counsel of record.

/s/ Oliver J. Dunford
_____
OLIVER J. DUNFORD
