# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CALIFORNIA CATTLEMEN'S ASSOCIATION**, *et al.*, | )<br>)<br>)<br>) |
| Plaintiffs, | ) Case No: 1:17-cv-01536-TNM<br>) |
| v. | )<br>) |
| **RYAN ZINKE**, *et al.*, | )<br>) |
| Defendants, | )<br>) |
| and | )<br>) |
| **CENTER FOR BIOLOGICAL DIVERSITY**, *et al.*, | )<br>)<br>) |
| Defendant-Intervenors. | )<br>)<br>)<br>)<br>) |

**DEFENDANT-INTERVENORS' REPLY IN SUPPORT
OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.    INTRODUCTION……………………………………………………………………...1

II.   ARGUMENT…………………………………………………………………………...1

      A.    Plaintiffs Fail to Prove the Court has Jurisdiction……………………………1

      B.    The Critical Habitat Designation Does Not Require a Regulatory Flexibility Act
              Analysis Because It Does Not Directly Regulate Small Entities………………...5

      C.    Vacatur of the Critical Habitat Rule Would Not be an Appropriate Remedy…...7

III.  CONCLUSION………………………………………………………………………...9

# TABLE OF AUTHORITIES

**Cases**

*Cal. Cattlemen's Ass'n v. U.S. Fish and Wildlife Service*,
  315 F. Supp. 3d 282 (D.D.C. 2018) ............................................................................. 6

*\*Cement Kiln Recycling Coal. v. U.S. Envtl. Prot. Agency*,
  255 F.3d 855 (D.C. Cir. 2001) ................................................................................ 6, 7

*Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 960 (D.C. Cir. 1990) .................................................................................. 8

*Mich. v. U.S. Envtl. Prot. Agency*,
  135 S. Ct. 2699 (2015) .............................................................................................. 8

*Mich. v. U.S. Envtl. Prot. Agency*,
  213 F.3d 663 (D.C. Cir. 2000) .................................................................................. 7

*\*Mid-Tex Elec. Coop. v. Fed. Energy Reg. Comm'n*,
  773 F.2d 327 (D.C. Cir. 1985) .............................................................................. 5, 7

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) .................................................................................. 8

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
  142 F.3d 449, 467 (D.C. Cir. 1998) .......................................................................... 7

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .................................................................................................. 8

**Statutes**

5 U.S.C. § 603(b)(3) ........................................................................................................ 5

5 U.S.C. § 605(b) ............................................................................................................ 9

16 U.S.C. § 1536(a)(2) .................................................................................................... 7

**Other Authorities**

79 Fed. Reg. 24,256 (April 29, 2014) ............................................................................. 8

81 Fed. Reg. 59,046 (Aug. 26, 2016) ......................................................................... 1, 9

# INTRODUCTION

This case concerns the U.S. Fish and Wildlife Service's ("FWS") designation of critical habitat for three imperiled amphibian species protected under the Endangered Species Act ("ESA"). *See* Administrative Record ("AR") 000007-81 ("Final Rule").[1] Plaintiffs do not challenge the substance of the critical habitat designation; rather, their sole claim is that FWS erred in determining that a Regulatory Flexibility Act ("RFA") analysis was not required, given that the designation will not have a significant economic impact on a substantial number of small entities.

For the reasons discussed below and in the opening brief, Defendants and Defendant-Intervenors are entitled to summary judgment because this Court lacks jurisdiction over Plaintiffs' claims. Specifically, Plaintiffs cannot prove they or their members have suffered or will suffer any injury caused by the critical habitat designation, and, independently, the relief they seek will not redress any injury. Further, even if this Court has jurisdiction, Plaintiffs' claims fail on the merits because the RFA requires an analysis only for "small entities" that are "subject to" a proposed regulation, and only federal agencies are "subject to" requirements imposed by the critical habitat designation at issue here.

# ARGUMENT

## A. Plaintiffs Fail to Prove the Court has Jurisdiction

To seek to prove Plaintiffs have standing in their opening brief, Plaintiffs relied on the declarations of Sherri Brennan, Marianne Leinassar, and Kirk Wilbur. ECF Nos. 49-2, 49-3, 49-4. Defendant-Intervenors responded with specific evidence proving that none of these declarants satisfies any of the three required prongs for standing. Def.-Ints.' Mot. Summ. J. at 13-18, ECF

---

[1]   Designation of Critical Habitat for the Sierra Nevada Yellow-Legged Frog, the Northern DPS of the Mountain Yellow-Legged Frog, and the Yosemite Toad; Final Rule, 81 Fed. Reg. 59,046 (Aug. 26, 2016).

No. 52-1. Now, in their combined opposition/reply brief, Plaintiffs mostly abandon their previous position that they can prove standing based on the declarations of Ms. Leinassar and Mr. Wilbur. *Cf.* Pls.' Reply 14-19, ECF No. 55. Instead, Plaintiffs now cite those two declarations only once and again broadly assert, without further evidence, that both will "suffer similar injuries" as those alleged by the Brennans. *Id.* at 19.

However, as to Ms. Leinassar, Plaintiffs do not dispute that the allotments on which she declares she has permits to graze sheep—Mill Canyon, Poison Creek, and Rickey—do not include any designated critical habitat for any of the protected amphibian species. *See* Defs.' Mot. Dismiss Ex. 6, at 10 (Table 2), ECF No. 11-8 (2017 Humboldt-Toiyabe National Forest ("HTNF") Biological Opinion ("BiOp")). Accordingly, the Final Rule cannot have caused any of her alleged injuries. She also fails to prove redressability, because even if the Court were to set aside the Final Rule, changes in grazing on her allotments would remain, given that the Forest Service imposed the changes based on the presence of suitable and/or occupied habitat for the Sierra frogs, not the critical habitat designation.[2] *Id.*

Similarly, Plaintiffs do not dispute that changes in allowable grazing on the McKesick allotment, upon which Mr. Wilbur bases his purported injuries, had nothing to do with the designation of critical habitat. In April 2014, two years before FWS designated critical habitat, the Forest Service—not FWS—changed allowable grazing on the McKesick allotment, and it did so based on the presence of suitable—not critical—habitat for the frog. Defs.' Reply Supp. Mot. Dismiss Ex. 6, at 2, ECF No. 39-6. Indeed, Plaintiffs do not dispute that the Environmental

---

[2] Table 2 in the 2017 HTNF BiOp shows that the Mill Canyon, Poison Creek, and Rickey allotments contain suitable habitat for the Yosemite toad and Sierra Nevada yellow-legged frog, but no designated critical habitat. Defs.' Mot. Dismiss Ex. 6, at 10 (Table 2), ECF No. 11-8. The Poison Creek allotment also contains occupied breeding habitat for Yosemite toads. *Id.*

Assessment for the allotment states that the closest then-proposed critical habitat is eleven miles away. *See* Def.-Ints.' Mot. Summ. J. Ex. D, at 97, ECF No. 52-5.

Rather, Plaintiffs now attempt to establish standing by focusing on the Brennans and the Eagle Meadow allotment on the Stanislaus National Forest in California. Ms. Brennan declares that she and her husband hold a Forest Service permit to graze the allotment. [Second] Brennan Decl. ¶ 2, ECF No. 55-1. Her first declaration states that "some of the land" within the allotment was included in proposed critical habitat for the Sierra frogs in 2013. [First] Brennan Decl. ¶ 6, ECF No. 49-2. She generally asserts that after the proposal, the Forest Service restricted grazing in two ways: it "restricted . . . grazing patterns" in one meadow to protect the Yosemite toad, *id*. at ¶ 10, and it reduced allowable utilization on the allotment from 60 to 40 percent "as a result of the Final Rule's critical-habitat designation." *Id*. at ¶¶ 9, 11.

To corroborate these assertions, Ms. Brennan now attaches to a second declaration the "final" annual operating instructions for the Eagle Meadow allotment for 2017. [Second] Brennan Decl. Ex. 1, ECF No. 55-1. However, the final annual operating instructions disprove her assertions. First, as to the exclusion of grazing from a meadow to protect the Yosemite toad, it is undisputed that the 2016 annual operating instructions for the Eagle Meadow allotment state that the Yosemite toad is found in three locations on the allotment, and that the Forest Service— not FWS—required exclusion of livestock from those areas via either fencing or herding. [First] Brennan Decl. Ex. 1, at 6, ECF No. 49-2. Again, that requirement is not based on the Final Rule: the 2016 annual operating instructions were issued before FWS designated critical habitat. Further, the final 2017 annual operating instructions for the allotment state that this requirement comes from "S&G 53," which refers to one of the Standards and Guides the Forest Service adopted in its 2004 Sierra Nevada Forest Plan Amendment. [Second] Brennan Decl. Ex. 1, at 4,

ECF No. 55-1; *see* Def.-Ints.' Mot. Summ. J. Ex. A, at 2, ECF No. 52-2. In other words, a non-party federal agency adopted those standards more than 10 years before FWS published the Final Rule in 2016.

As to Ms. Brennan's assertion that the Final Rule caused a reduction in the allowable utilization on the Eagle Meadow allotment ([First] Brennan Decl. at ¶¶ 9-13), the 2016 annual operating instructions state an allowable utilization rate of 60 percent., Pls.' Mot. Summ. J. Ex. 1, at 5, ECF No. 49-2. And her newly-filed annual operating instructions for 2017 indicate the allowable utilization rate for meadows in late seral status is 40 percent. [Second] Brennan Decl., Pls.' Reply Ex. 1, at 4, ECF No. 55-1. But the source of that limit is not the critical habitat designation. The Forest Service's 2014 Programmatic Biological Opinion already required that livestock utilization be limited to "40 percent in late seral stage meadows to minimize the impact of livestock grazing to the hydrology of meadow habitats under season-long grazing." Def.-Ints.' Mot. Summ. J. Ex. A, at 25, ECF No. 52-2. In fact, the 2014 Programmatic BiOp and the 2017 annual operating instructions indicate that this requirement actually stems from S&G 120. *Id.*; [Second] Brennan Decl., Pls.' Reply Ex. 1 at 4 (ECF No. 55-1 at 6). Like S&G 53 discussed above, the Forest Service adopted S&G 120 as part of its 2004 Forest Plan Amendment, more than 10 years before publication of the Final Rule. Def.-Ints.' Mot. Summ. J. Ex. A, at 2, ECF No. 52-2. While the 2017 annual operating instructions also cite to "Three Amphibian BO Appendix A," this is no different, as Appendix A (included in the 2014 Programmatic BiOp and the 2017 Reinitiated Programmatic BiOp) simply lists the Standards and Guides from the 2004 Forest Plan Amendment. *Id.*; Def.-Ints.' Mot. Summ. J Ex. C, at 2, ECF No. 52-4. Since these standards for restricting allowable livestock utilization to 40 percent originated well before FWS

4

finalized the critical habitat designation in 2016, the Final Rule was clearly not the basis for any changes the Brennans experienced.

In fact, the final 2017 annual operating instructions note that the Forest Service did not formally submit information related to the Eagle Meadow allotment to FWS until August 9, 2017 "for its consideration and for appendage to the Three Amphibian BO" of a site-specific consultation. Pls.' Reply Ex. 1, at 5, ECF No. 55-1. In other words, when the Forest Service issued its final annual operating instructions for 2017, site-specific consultation as to the effects of grazing on critical habitat on the Eagle Meadow allotment had not been completed, so critical habitat could not be the source of the reduced utilization rate.

Accordingly, Plaintiffs cannot rely on the Brennan declarations to establish jurisdiction. The declarations fail to prove the Final Rule injured any Plaintiff because the rule postdates or is not the source of any of Brennan's ostensible injuries. Second, the Brennan declarations fail to establish causation, given that all the legal authorities for the changes in allowed grazing (1) were made by the Forest Service, not by FWS, and (2) are based on authorities or requirements other than the Final Rule. Third, the Brennan declarations fail to prove redressability. Even if the Court were to grant Plaintiffs' request and set aside the Final Rule, no management requirement or standard related to grazing and the amphibians would change, because they do not stem from the Final Rule.

**B. The Critical Habitat Designation Does Not Require a Regulatory Flexibility Act Analysis Because It Does Not Directly Regulate Small Entities**

Under the RFA, federal agencies need only analyze impacts to "small entities" "subject to the proposed regulation." *Mid-Tex Elec. Coop. v. Fed. Energy Reg. Comm'n*, 773 F.2d 327, 342 (D.C. Cir. 1985) (citing 5 U.S.C. § 603(b)(3)). Defendant-Intervenors do not dispute Plaintiffs' claim that they and their members are "small entities" under the RFA. But Plaintiffs cannot be

"subject to" the Final Rule because critical habitat designation does not trigger any affirmative obligations for private parties like Plaintiffs and their members. Indeed, only federal agencies are "subject to" obligations stemming from the Final Rule. Thus, FWS reasonably determined that a regulatory flexibility analysis was not required.

Rather than respond to Defendant-Intervenors' arguments on the merits, Plaintiffs instead merely point to their prior briefing and the Court's decision on the motions to dismiss. However, the Court based its decision on the "forgiving standards" that apply to review of a motion to dismiss. *Cal. Cattlemen's Ass'n v. U.S. Fish and Wildlife Service*, 315 F.Supp. 3d 282, 288 (D.D.C. 2018). The Court accepted as true Plaintiffs' allegations that their members would be directly affected by ESA consultations relating to the Final Rule, as it must at the motion to dismiss stage. *Id*. at 287-88. Recognizing that the test is "not meant to be 'especially demanding,'" the Court found that Plaintiffs' claims arguably fall within the zone of interests protected under the RFA. *Id*. at 287-88. At summary judgment, however, Plaintiffs may no longer rely on unproved allegations of how their members might be affected by ESA consultation. Now Plaintiffs must prove any such impacts, and they fail to do so. As discussed in the jurisdiction section above, Plaintiffs fail to provide sufficient evidence on summary judgment that the Final Rule caused impacts to their members, as protections in place before publication of the Final Rule are the source of injuries Plaintiffs and their members assert. Def.-Ints.' Mot. Summ. J. at 13-18, ECF No. 52-1.

Even if Plaintiffs can show they experience some ultimate impact from ESA consultations relating to the Final Rule, that would be insufficient to trigger analysis under the RFA. The D.C. Circuit has repeatedly held that only *direct* impacts must be considered under the RFA. *Cement Kiln Recycling Coal. v. U.S. Envtl. Prot. Agency*, 255 F.3d 855, 869 (D.C. Cir.

6

2001); *Mich. v. U.S. Envtl. Prot. Agency,* 213 F.3d 663, 688-89 (D.C. Cir. 2000); *Mid-Tex Elec. Coop.*, 773 F.2d at 342-43. Any impacts to Plaintiffs would be *indirect* impacts resulting from legal obligations that ESA consultation imposes on federal agencies, as the Final Rule does not impose any requirements on Plaintiffs themselves. Only federal agencies, such as the Forest Service, are subject to the substantive duty to prevent adverse modification of the designated critical habitat and must consult with FWS to ensure compliance with that duty. 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat."). Thus, FWS did not have to consider Plaintiffs under the RFA as the D.C. Circuit has "consistently rejected the contention that the RFA applies to small businesses indirectly affected by the regulation of other entities." *Cement Kiln Recycling Coal.*, 255 F.3d at 869 (citing *Mich.*, 213 F.3d at 697; *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 467 (D.C. Cir. 1998); *Mid-Tex Elec. Coop.*, 773 F.2d at 342).

In sum, as discussed above, and more thoroughly in Defendant-Intervenors' opening brief, Def.-Ints.' Mot. Summ. J. at 18-22, ECF No. 52-1, because the Final Rule does not itself impose any requirements on Plaintiffs, they are not "small entities to which the [] rule will apply" and FWS did not have to consider them in an RFA analysis. *Mid-Tex Elec. Coop.*, 773 F.2d at 342-43.

**C. Vacatur of the Critical Habitat Rule Would Not be an Appropriate Remedy**

Should the Court find that FWS erred in deciding not to prepare an RFA analysis, the Court should allow FWS to repair the error without vacating the Final Rule. A decision whether to vacate "depends on [1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change

that may itself be changed." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 755-56 (D.C. Cir. 2002) (quoting *Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)). A failure to prepare an RFA analysis is not a serious deficiency, as it is merely a procedural flaw that would likely be corrected without any substantive changes to the Final Rule. Public policy weighs in favor of keeping critical habitat protections in place during remand, as vacatur of the Final Rule would have disruptive consequences to imperiled species. Indeed, any balance of public interest considerations involving the ESA must consider that "Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).

Plaintiffs cite to *Michigan v. EPA* and its comparison of imposing "billions of dollars in economic cost" versus "a few dollars in health or environmental benefits," but fail to provide any evidence that such a lop-sided balance is present here. Pls.' Reply at 20-21, ECF No. 55) (*quoting Mich. v. Envtl. Prot. Agency*, 135 S.Ct. 2699, 2707 (2015)). In fact, as explained above, the injuries claimed by Plaintiffs are actually attributed to requirements pre-dating the Final Rule. Even if Plaintiffs could show harms stemming from the Final Rule, those harms would be minimal because of the protections already in place.

Even if the Court requires FWS to perform an RFA analysis on remand, FWS is likely to correct the procedural deficiency without making any change to the substance of the Final Rule. Given that FWS designated as critical habitat only those areas considered <u>occupied</u> by one or more of the three species, AR000033-34, legal obligations under the ESA have applied since FWS protected the imperiled frogs in 2014. 79 Fed. Reg. 24,256 (April 29, 2014). Indeed, FWS states in the Final Rule that it does not anticipate "the loss of or reduction in grazing activities on

8

Federal lands designated as critical habitat." AR000016; *see also* Final Economic Analysis,[3] AR000188 ("[I]ncremental project modifications that would be implemented by ranchers are not expected to result from these consultations. Thus, small entities are not expected to be affected."). Given the likely minor impacts from the addition of critical habitat protections, FWS likely will make the same conclusion under the RFA as in the Final Rule and certify that no regulatory flexibility analysis is required because any economic impact of the critical habitat on small entities will not be significant. *See* 5 U.S.C. § 605(b).

Given the strong policy preference for protecting endangered species and the likelihood that the critical habitat designation will not change after an RFA analysis, the Court should keep the Final Rule in place, if it orders FWS to correct any procedural violation of the RFA.

## CONCLUSION

For all these reasons and those in Defendant-Intervenors' Cross-Motion for Summary Judgment and Response to Plaintiffs' Summary Judgment Motion, Defendant-Intervenors respectfully request that the Court grant their Cross-Motion for Summary Judgment and deny Plaintiffs California Cattlemen's Association, *et al.*'s Motion for Summary Judgment.

Dated: November 2, 2018.    Respectfully submitted,

/s/ Jennifer L. Loda
Jennifer L. Loda
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94609
Telephone: (510) 844-7136
Email: jloda@biologicaldiversity.org

---

[3] U.S. Fish and Wildlife Service, Final Economic Analysis of Critical Habitat Designation for Three Sierra Nevada California Amphibians (June 5, 2015).

Ryan Adair Shannon
D.C. Bar No. OR00007
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
Phone: (503) 283-5474 x 407
Email: rshannon@biologicaldiversity.org

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
130 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
Telephone: (541) 359-3238
Email: frost@westernlaw.org

Paul Ruprecht, *pro hac vice*
Western Watersheds Project
P.O. Box 12356
Reno, NV 89510
Telephone: (208) 421-4637
Email: paul@westernwatersheds.org

Attorneys for Defendant-Intervenors