UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CALIFORNIA CATTLEMEN'S ASSOCIATION,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES FISH & WILDLIFE SERVICE,** *et al.*, <br><br> Defendants, <br><br> and <br><br> **CENTER FOR BIOLOGICAL DIVERSITY**, *et al.* <br><br> Defendant-Intervenors. | Case No. 1:17-cv-01536 (TNM) |

**MEMORANDUM OPINION**

The U.S. Fish and Wildlife Service ("FWS") designated over 1.8 million acres in California as critical habitat for three amphibian species. The California Cattlemen's Association, the California Wool Growers Association, and the California Farm Bureau Federation (collectively, the "Cattlemen") now challenge this designation. They argue that the FWS did not evaluate the effects of the critical habitat designation on "small entities," as required by the Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq*. But because the groups lack standing to sue, the Court will dismiss their Complaint for lack of subject matter jurisdiction.

**I. BACKGROUND**

The Sierra Nevada yellow-legged frog and the mountain yellow-legged frog live in California's Sierra Nevada mountain range. 79 Fed. Reg. 24,256, 24,258–59 (April 29, 2014) ("Listing Regulation"). The color on their upper bodies varies, but they are known for their

yellow bellies and hind legs. *Id.* at 24,259. These small frogs inhabit lakes, ponds, marshes, meadows, and streams high in the Sierra Nevadas. *Id.* at 24,259–60. These highly aquatic species rarely hop more than a meter from water. *Id.* at 24,259.

Yosemite toads also inhabit the upper elevations of the Sierra Nevadas. *Id.* at 24,286. They are "[r]obust and stocky with dry, uniformly warty skin."[1] These toads live near wet meadows because of their breeding habits, and adults typically stay near water. *Id.* at 24,285. They can, however, range more than half-a-mile from their breeding meadows—by walking, not hopping. *Id.*

In 2013, the FWS proposed to designate land in California as critical habitat for these amphibians under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.* 78 Fed. Reg. 24,516 (proposed Apr. 25, 2013) ("Proposed Rule"). Under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601, *et seq.*, whenever an agency publishes a general notice of proposed rulemaking, it typically must also prepare an initial regulatory flexibility analysis. 5 U.S.C. § 603(a). The regulatory flexibility analysis must describe the effect of the proposed rule on small entities.[2] *Id.* The FWS, however, certified that the proposed rule would not significantly impact a substantial number of small entities. Proposed Rule, 78 Fed. Reg. at 24,543. So a regulatory flexibility analysis was unnecessary under 5 U.S.C. § 605(b).

A year later, the FWS listed the two frog species as "endangered" and the Yosemite toad as "threatened" under the ESA. Listing Regulation, 79 Fed. Reg. at 24,256. After the FWS listed the species, the U.S. Forest Service recognized that some activities it authorizes, including livestock grazing, may affect the newly-listed species. ESA Section 7 requires federal agencies

---

[1] U.S. Fish and Wildlife Service, *Yosemite Toad*, https://www.fws.gov/nevada/protected_species/amphibians/species/yosemite_toad.html (last updated March 10, 2015).
[2] Small entities are small businesses, organizations, and government jurisdictions. *See* 5 U.S.C. § 601(6).

to ensure that their actions neither "jeopardize the continued existence" of any listed species nor "result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2). So the Forest Service requested a consultation with the FWS to determine whether forest programs would jeopardize the species, and after the consultation the FWS issued a biological opinion explaining their findings. *See* 2014 BiOp, ECF No. 52-2.

The agencies concluded that with appropriate conservation measures the Forest Service's programs would not jeopardize the amphibians. *Id.* at 66. The Forest Service applied the "standards and guidelines" ("S&Gs") and "best management practices" from the 2004 Sierra Nevada Forest Plan Amendment ("2004 SNFPA"). *See id.* at 2, 15. The agency implemented some S&Gs specifically for the Rangeland Management Program. *Id.* at 25–28. For example, "[l]ivestock utilization of grass and grass-like plants [was] limited to . . . 40 percent in late seral stage meadows to minimize the impact of livestock grazing." *Id.* at 25 (derived from S&G 120).

In 2016, the FWS issued the Final Rule designating critical habitat for the amphibians. *See* 81 Fed. Reg. 59,046 (Aug. 26, 2016) ("Final Rule"). The FWS designated as critical habitat land that the three species already occupied and that contained the physical and biological features essential to conservation. *Id.* at 59,066. The FWS designated no areas as critical habitat outside the geographical area occupied by the species because it determined that "occupied areas are sufficient for the [species'] conservation." *Id.*

The FWS again certified that a regulatory flexibility analysis was unnecessary, because the "final critical habitat designation w[ould] not have a significant economic impact on a substantial number of small entities." *See id.* at 59,088. The FWS reasoned that Section 7 consultations, the regulatory means for effectuating critical habitat designations, require only that *federal agencies* ensure that any proposed agency action is unlikely to jeopardize a species or

3

adversely impact critical habitat. *See* Final Rule, 81 Fed. Reg. at 59,088. But federal agencies are not "small entities." *Id.* So FWS concluded that "no small entities are directly regulated by this rulemaking." *Id.*

In June 2017, the Forest Service reinitiated consultation with the FWS to analyze the effects of forest programs on the newly-designated critical habitat. *See* Three Amphibians BO, ECF No. 52-4. And the FWS ultimately concluded that the forest programs, as proposed, were unlikely to jeopardize the species or adversely modify critical habitat. *Id.* at 58. The Three Amphibian BO adopted the same S&Gs from the 2004 SNFPA that were incorporated in the 2014 BiOp. *Compare id.* at 2, 14 *with* 2014 BiOp at 2, 15.

The Cattlemen sued, alleging that the FWS's 2016 failure to conduct a regulatory flexibility analysis violated the RFA and the Administrative Procedure Act. *See* Compl. ¶¶ 45–50, ECF No. 1. They challenge the FWS's assertion that designating critical habitat regulates only federal agencies, not small entities. *Id.* ¶ 46. Section 7 consultations, they argue, can cause restrictions on grazing permits and other hardships. So the RFA required the FWS to conduct a regulatory flexibility analysis, because such consultations ultimately impact "small entities," like farmers, ranchers, and landowners. They ask for declaratory and injunctive relief. *See* Compl. at 13–14.

The Defendants sought dismissal of the Cattlemen's claims, arguing that the Cattlemen lack standing, their claims are not ripe for review, and they are not within the zone of interests protected by the RFA. *See* Gov't Mot. Dismiss, ECF No. 11; Def.-Int. Mot. Dismiss, ECF No. 36. The Court denied these motions, with one exception. *See Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 315 F. Supp. 3d 282 (D.D.C. 2018) ("To the extent that the Plaintiffs

invoke the RFA alone to test compliance with Section 603, that claim must be dismissed for lack of jurisdiction.").

The parties have now filed cross-motions for summary judgment. The Cattlemen maintain that the FWS's failure to conduct a regulatory flexibility analysis violates the RFA and continue to seek declaratory and injunctive relief. *See* Pl.'s Mot. Summ. J. at 13–25, ECF No. 49-1. And the Defendants again claim that the Cattlemen lack standing to sue. *See* Gov't Cross-Mot Summ. J ("Gov't Mot.") at 14–28, ECF No. 51-1; Def.-Int. Cross Mot. Summ. J. ("Def.-Int. Mot.") at 11–18, ECF No. 52-1. Alternatively, the Defendants argue that the FWS reasonably determined that no regulatory flexibility analysis was required. *See* Gov't Mot. at 28–38; Def.-Int. Mot. at 18–22. And in any event, they argue that any relief should be more tailored than the relief the Cattlemen request. *See* Gov't Mot. at 38–44; Def.-Int. Mot. at 22–25.

## II.     LEGAL STANDARDS

"[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* And "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Organizations may establish associational standing to sue on their members' behalf. *See Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016). "An organization has associational standing to bring suit on its members' behalf when: (1) at least one of its members would have standing to sue in his or her own right; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the

5

participation of individual members in the lawsuit.'" *Id.* (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).

A plaintiff must establish standing at the outset of each phase of litigation. *Scenic Am., Inc. v. U.S. Dep't of Trans.*, 836 F.3d 42, 48 (D.C. Cir. 2016). "[A] court's determination that a plaintiff has established standing at the motion to dismiss stage by *alleging* sufficient facts in her pleadings is only the first step, because that finding does not obviate the court's responsibility to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek summary judgment." *Id.* (emphasis in original). So "[a] plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015). At the summary judgment stage, "[i]f . . . the court determines that the plaintiff has not introduced sufficient evidence into the record to at least raise a disputed issue of fact as to each element of standing, the court has no power to proceed and must dismiss the case." *Scenic Am., Inc.*, 836 F.3d at 48–49.[3]

### III. ANALYSIS

The Cattlemen have failed to establish standing. They must "show a 'substantial probability' that [they] ha[ve] been injured, that the defendant caused [their] injury, and that the court [can] redress that injury." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) ("*Sierra Club I*"). They have not done so here.

  a. <u>The Cattlemen's alleged harms associated with Section 7 consultations do not establish standing.</u>

The Cattlemen's main beef is with costs arising from participating in Section 7 consultations and associated delays in receiving permits. Tr. at 4 ("Plaintiffs have shown that the

---

[3] So the Court's earlier finding that the Cattlemen had proffered sufficient standing to overcome dismissal because it "must credit [their] general allegations *at this stage*," *Cal. Cattlemen's Ass'n*, 315 F. Supp. at 286 (emphasis added), is not dispositive here.

6

designations have caused injuries to the members; specifically, through delays caused by Section 7 consultations"). And they stake their claims on declarations from Sherri Brennan. *See* Brennan Decl. 1, ECF No. 49-2; Brennan Decl. 2, ECF No. 55-1. *See also* Tr. at 24 ("we think Ms. Brennan's [declaration] is the strongest [for showing injury]").[4]

Ms. Brennan operates Brennan Ranch in Sonora, California, and she has been a member of the California Cattlemen's Association for over 30 years. Brennan Decl. 1 ¶¶ 2, 4. During the summer the ranch operates on three federal-land allotments, including the Long Valley Eagle Meadow Allotment ("Eagle Meadow") in the Stanislaus National Forest. *Id.* ¶¶ 3, 5.

Ms. Brennan alleges that waiting on the Three Amphibian BO forced her into protracted negotiations with the Forest Service over the terms of her 2017 grazing permit. *See* Brennan Decl. 2 ¶ 5; Tr. at 5. And the Cattlemen claim that their members are often involved in these Section 7 consultations, which can be costly. *See* Tr. at 4, 7; Pl.'s Reply in Supp. of Mot. Summ. J. ("Pl.'s Reply") at 18–19, ECF No. 55. The Cattlemen then allege that the Forest Service modified Ms. Brennan's permit to impose stricter grazing standards and monitoring requirements. *See, e.g.*, Pl.'s Reply at 14–16; Pl.'s Supp. Brief ("Pl.'s Supp.") at 2–3, ECF No. 60. According to the Cattlemen, these permit modifications stem from the Final Rule.

But Ms. Brennan's declarations do not establish standing. First, to the extent the Cattlemen allege harms from their voluntary participation in Section 7 consultations, no

---

[4] The Court held a motion hearing to address the standing issue. *See* Dec. 19, 2019, Minute Entry. The Court explained that after considering the declarations and the arguments in the briefing, it was not inclined to find standing at the summary judgment stage. Tr. at 35–37. But the Court allowed the Cattlemen time to submit additional declarations to support their standing arguments. *Id.* The Cattlemen did so. *See* Pl.'s Supp., Ex 1-3, ECF Nos 60-1, 60-2, 60-3. Most of the injuries alleged in the new declarations, *e.g.*, implementation of S&G 53 and increased monitoring requirements, apply to Ms. Brennan. So the Court will consider these injuries in the context of Ms. Brennan's declarations. In any event, the Court has reviewed the supplemental declarations and finds that none independently establishes standing. The Court also considered Kirk Wilbur's original declarations. *See* Wilbur Decl. 1, ECF No. 49-4; Wilbur Decl. 2, ECF No. 49-5. Neither demonstrates a harm fairly traceable to the Final Rule and therefore cannot establish standing.

cognizable injury occurred. Designating critical habitat triggers Section 7 consultations, but ESA Section 7 requires only *federal agencies* to engage in consultations. *See* 16 U.S.C. § 1536. The Cattlemen claim that their participation is important because consultations could cause the Forest Service to "pull" their permits, Tr. at 7, but they have cited no authority requiring that they participate in the consultations.

To be sure, it may have been prudent for the Cattlemen's members to participate in these consultations. But their participation was not required. They "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly pending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Indeed, "an injury one brings upon oneself is not a cognizable injury that has been caused by the defendant's conduct." *New England Anti-Vivisection Soc'y v. FWS*, 208 F. Supp. 3d 142, 175 (D.D.C. 2016).

More, neither Ms. Brennan's declarations nor her 2017 permit establishes that Section 7 consultations caused the permitting delays. Ms. Brennan's 2017 permit does not mention Ms. Brennan participating in Section 7 consultations, let alone that consultations delayed the permitting process. *See* 2017 Brennan Permit, ECF No. 51-2. Ms. Brennan states in her declaration that "[d]uring the 2017 Grazing Season, Brennan Ranch and the [] Forest Service spent several months negotiating terms of the 2017 [] Operating Instructions." Brennan Decl. 2 ¶ 5. But it is not clear what caused negotiations to drag on, and neither declaration explicitly states that Section 7 consultations caused the delays. *See* Brennan Decl. 1; Brennan Decl. 2.

And even if the consultation delayed Ms. Brennan's final permit, her herd was still able to graze Eagle Meadow under draft permits. *See* Brennan Decl. 2 ¶ 5. They do not allege that the permitting delay caused a grazing delay, which might have been a cognizable injury. Instead, Ms. Brennan alleges injury from the time she spent negotiating the permit. *See* Tr. 4–5, 17.

But annual operating instructions are subject to negotiation each year, quite apart from any Section 7 consultations. *See, e.g.,* Brennan Decl. 1, Ex. 1 ("2016 Operating Instructions"); *see also* 2014 BiOp at 13 ("Annual Operating Instructions include annual adjustments to management based on monitoring and site specific objectives and are revised to reflect current project design criteria."). Ms. Brennan's time spent doing what she does annually cannot constitute a harm for standing purposes. Cognizable injuries must be "concrete." *See Spokeo*, 136 S. Ct. at 1548–49. And while concreteness is not necessarily synonymous with tangible, *id.* at 1549, amorphous costs related to negotiations—which can vary in complexity from year-to-year for many reasons—constitute no concrete injury here. The Cattlemen have pointed to no authority suggesting otherwise.

What is more, Ms. Brennan ultimately got her permit. When, as here, a party seeks declaratory and injunctive relief, "past injuries alone are insufficient to establish standing." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Rather, the Cattlemen must show that the injury is ongoing or imminent. *See id.* But the Cattlemen have not shown that there are imminent Section 7 consultations that will cause future permitting delays.

They note that the 2017 Operating Instructions state that other site-specific consultations for Eagle Meadow are ongoing. *See* Tr. at 5–6; *see also* Brennan Decl. 2, Ex. 1 ("2017 Operating Instructions") at 5, ECF No. 55-1. But those consultations are complete. *See* Appendage to Three Amphibian BO, ECF No. 39-4. The Cattlemen also argue that the Forest Service can reinitiate consultations "at any point." Tr. at 6. But, of course, it is only conjecture and hypothesis that the Forest Service *will* reinitiate consultations. And standing requires harms whose threats are "actual and imminent." *Summer v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

9

Finally, any future consultations would not be traceable to the Final Rule. The listed amphibians already occupied all the areas that the FWS designated as critical habitat, including Eagle Meadow. *See* Final Rule, 81 Fed. Reg. at 59,066. The Forest Service has an independent obligation to consult with the FWS to ensure that its activities do not jeopardize the listed species. 16 U.S.C. § 1536(a)(2). So any future consultation about Ms. Brennan's allotments would occur even without the Final Rule.

Marianna Leinassar also alleges injuries from delays caused by Section 7 consultations. *See* Leinassar Decl. ¶¶ 7–8, 10, ECF No. 49-3. Ms. Leinassar holds permits for the Mill Canyon Allotment, Poison Creek Allotment, and Rickey Allotment. *Id.* ¶ 3. These allotments were analyzed in the Humboldt-Toiyable National Forest Biological Opinion. *See* HTNF BiOp at 5, ECF No. 11-8.[5] Her specific injury appears to be a delay in moving her herd to higher elevations in the Mill Canyon Allotment during June 2017. *See* Leinassar Decl. ¶ 10; *see also* ECF No. 39-1 (June 8, 2017 Annual Operating Instructions authorizing use of the Mill Canyon Allotment from June 10 through June 25).

But this alleged injury is not traceable to the Final Rule. First, it is not clear that the consultation caused the delay. In June 2017, the Leinassars asked for "extensions for the scheduled use of each of [their] grazing permits . . . due to the weather conditions, lingering snow pack, and range readiness." Leinassar Letter at 1, ECF No. 39-2. The Leinassars mentioned no delays from Section 7 consultations. *See id.*

What is more, the consultation that allegedly delayed the Leinassars' grazing began in 2015 to evaluate impacts on the amphibian species after the FWS listed them as endangered and threatened. *See* HTNF BiOp at 3. Since the Leinassars' allotments are only suitable habitat, it is

---

[5] None of these allotments is critical habitat. *See* HTNF BiOp at 10 Table 2.

unclear how the Final Rule may have affected the FWS's analysis of those allotments. Under Section 7, consultation is required only for "critical habitat," not "suitable habitat." *See* 16 U.S.C. § 1536(a)(2). Indeed, the Cattlemen admit that "[i]t is not clear from how the Leinassars' property was handled, whether it's being treated as a jeopardy analysis or an adverse modification analysis or both." Tr. at 24. The Cattlemen have not shown the necessary link between the Leinassars' alleged harm and the final rule as required to establish standing. *See Humane Soc'y v. Perdue*, 290 F. Supp. 3d 5, 17 (D.D.C. 2018).

More still, as with Ms. Brennan, it is unclear that this injury will reoccur. The consultation that allegedly caused the delay is complete. *See* HTNF BiOp at 1. The Cattlemen have pointed to no evidence that future consultations are imminent, and "past injuries alone are insufficient to establish standing." *Dearth*, 641 F.3d at 501. "The fact that a plaintiff may have suffered an injury in the past does not indicate that there is a 'real and immediate threat' of it happening again in the future." *Ellis v. IRS*, 181 F. Supp. 3d 61, 63 (D.D.C. 2012).

And any future delays from consultations would not be traceable to the Final Rule. Section 7 consultations are not required for "suitable habitat," only for "critical habitat" and to avoid jeopardizing listed species. 16 U.S.C. § 1536(a)(2). Since Ms. Leinassar's allotments are only "suitable habitat," any future consultations affecting her allotments would stem from the Forest Service's desire to avoid jeopardizing the listed amphibian species. But that consultation requirement derives from the Listing Regulation, not the Final Rule.

b. <u>The Cattlemen's alleged harms from permit modifications do not establish standing.</u>

The alleged modifications to Ms. Brennan's permits are also unavailing. First, the Cattlemen allege that before the FWS published the Three Amphibian BO, Ms. Brennan could herd her cattle away from Shell Meadow until the Yosemite toad completes metamorphosis, after

11

which they could herd cattle into the enclosure. Pl.'s Supp. at 2 (citing Brennan Decl. 1 ¶ 10). After the Three Amphibian BO, they argue, Ms. Brennan must keep her cattle out of Shell Meadow for the entire grazing season. *Id.* (citing Brennan Decl. 1 ¶ 14). But Ms. Brennan's herding practices in Shell Meadow changed in 2014, before the Final Rule. *See* Brennan Decl. 1 ¶ 10 ("*Before 2014*, Brennan Ranch kept its cattle out of . . . Shell Meadow, while the Yosemite Toad undergoes metamorphosis.") (emphasis added). Thus, the alleged harm is not traceable to the Final Rule.[6]

The Cattlemen cite other permit modifications, but these do not establish standing. The Cattlemen allege that because of the Final Rule the Forest Service reduced Brennan Ranch's utilization standard[7] for Eagle Meadow, limiting the number of cattle that could graze on the allotment, and included burdensome monitoring requirements. *See* Brennan Decl. 1 ¶ 11; Pl.'s Supp. at 1–3. These modifications, the Cattlemen argue, stem from the Three Amphibian BO's desire to "effective[ly] implement[]" Standard and Guide ("S&G") 53.[8] *See* Pl.'s Supp. at 1–3.

These permit modifications, however, do not establish standing. First, the Final Rule did not force Ms. Brennan to reduce her cattle turnout numbers. In 2016, the Forest Service permitted Ms. Brennan to have 150 cow/calf pairs on Eagle Meadow. *See* 2016 Operating Instructions at 1. So too in 2017. *See* 2017 Operating Instructions at 1.

---

[6] Ms. Brennan also alleged injuries related to fencing requirements on parts of Eagle Meadow and Shell Meadow. *See* Brennan Decl. 1 ¶¶ 14–16. But at the motions hearing, the Cattlemen stated that they were no longer relying on fencing requirements as evidence of injury. *See* Tr. at 21–22.
[7] Utilization is the maximum amount of plant material animals may consume during a grazing period. *See* Brennan Decl. 1 ¶ 9. Permittees may not exceed their utilization standards. *Id.*
[8] The S&Gs were first adopted in the 2004 Sierra Nevada Forest Plan Amendment, and they were incorporated into the 2014 BiOp and Three Amphibians BO. *See* 2014 BiOp at 2; Three Amphibians BO at 2. S&G 53 provides:
> Exclude livestock from standing water and saturated soils in wet meadows and associated streams and springs occupied by Yosemite toads or identified as 'essential habitat' in the conservation assessment for the Yosemite toad during the breeding and rearing season (through metamorphosis) . . . . If physical exclusion of livestock is impractical, then exclude grazing from the entire meadow.

*See* 2014 BiOp at 87.

Nor can the Cattlemen rely on reduced utilization numbers or allegedly "increased monitoring requirements," *see* Wilbur Decl. 3 ¶ 15, ECF No. 60-2. True, Brennan Ranch's allowable use percentage changed from 60 percent in 2016, to 40 percent in 2017. *Compare* 2016 Operating Instructions at 5 *with* 2017 Operating Instructions at 6. But by the Cattlemen's own admission, "we don't know why [the Forest Service] did that." Tr. at 20. And the Court does not know because the Cattlemen did not ask. *See id.* at 20–21. They speculate that "it is very possible that in anticipation of changes it could have been done," but "we don't know." *Id.* at 21.

"Very possible" might suffice to establish traceability at the motion to dismiss stage, but the Court may not hop to conclusions at the summary judgment stage. *See Scenic Am., Inc.*, 836 F.3d at 48. And the Cattlemen have not shown a "substantial probability" that the change in use derives from the Final Rule. *See Sierra Club I*, 292 F.3d at 899. That is especially true when the Defendants offer a reasonable explanation for the 40 percent allowable use standard in 2017. They point out that the 2004 SNFPA's S&Gs, adopted by the 2014 BiOp and the Three Amphibians BO, set the allowable use percentage from late seral meadows, like Eagle Meadow, at 40 percent. *See* Gov't Mot. at 24–25; Def.-Int. Reply in Supp. of Cross Mot. Summ. J. at 4, ECF No. 58; *see also* 2014 BiOp at 94. So the 2017 Operating Instructions were arguably instituting the 2004 S&Gs, not the 2016 Final Rule at issue.

The Cattlemen's argument that the Final Rule caused the Forest Service to implement new monitoring requirements is also unpersuasive. First, the language incorporated into the Cattlemen's permits under "Monitoring" almost entirely describes the *Forest Service's* monitoring practices. *See* Royer Decl., Ex. 1 at 3, ECF No. 60-1 ("The Forest Service regularly conducts two types of monitoring . . . to meet the monitoring requirements described in the Three

Amphibian BO"). Extra monitoring requirements imposed on the Forest Service do not harm the Cattlemen. The only direction to permittees is that they "take appropriate action and/or monitoring" to ensure compliance with the terms and condition of their grazing permit. *Id.*

But permittees needed to monitor their allotments even before the Final Rule. *See* 2016 Operating Instructions at 5. It is true that Brennan Ranch's forage monitoring requirements are different for the 2016 and 2017 permits. But much like the change in utilization, the Cattlemen have pointed to no evidence showing that the change derives from the Final Rule.

Finally, the Cattlemen have not shown an injury traceable to the Final Rule from the Forest Service's application of S&G 53.[9] The Cattlemen note that the Forest Service added language to permits explicitly detailing S&G 53. *See* Wilbur Decl. 3 ¶¶ 6–14. But the Forest Service adopted S&G 53 well before the Final Rule. *See, e.g.,* 2014 BiOp at 2, 87. And the language added to the Eagle Meadow permit mirrors the language in S&G 53. *Compare* Wilbur Decl. ¶ 6 ("Under the Plan . . . livestock are excluded from occupied Yosemite toad breeding habitat during the breeding and rearing season (through metamorphosis")) *with* 2014 BiOp at 87 (S&G 53). Indeed, permits as far back as 1995 contain similar language. *See* Wooster Decl., Ex. 1 at 2, ECF No. 60-3.

Even so, the Cattlemen argue that before the Final Rule the Forest Service had a "pattern of either not applying, or loosely applying, S&G 53." Wilbur Decl. 3 ¶ 14. But their evidence is unpersuasive. They point to a 2013 Guidance Letter that states, "local line officers should not consider themselves bound by S&G 53 and 54." Wooster Decl., Ex 2 at 4. This, however, does not establish evidence of a pattern or practice of ignoring or departing from S&G 53.

---

[9] The Cattlemen rely on declarations from Mr. Wilbur, *see* Wilbur Decl. 3, and Kelly Wooster, *see* Wooster Decl., ECF No. 60-3.

First, the letter was published before the FWS published the Listing Regulation and the 2014 BiOp. But the 2014 BiOp adopted the S&Gs from the 2004 SNFPA, like S&G 53. *See* 2014 BiOp at 87. Moreover, the guidance document instructs local line officers to discuss alternative approaches with the Regional Office before varying from S&Gs 53 and 54. *Id.* The Cattlemen have pointed to no evidence that any officer did such a consultation to circumvent S&G 53.

These permit modifications also present a redressability problem. The Forest Service is responsible for issuing grazing permits. *See, e.g.*, 2017 Brennan Permit. But the Forest Service is not a party here, and the Cattlemen seek no relief directed at the Forest Service. *See* Compl. at 1, 13–14.

So even if the Court invalidated the Final Rule, whether that relief would redress the Cattlemen's injuries depends on an unknowable factor: how the Forest Service will react. The Cattlemen have pointed to no evidence suggesting that the Forest Service would revise Brennan Ranch's utilization to 60 percent or absolve permittees from monitoring their allotments. Indeed, existing authorities, like the 2004 SNFPA and 2014 BiOp, would still require the Forest Service to impose permit terms to protect the listed amphibians. For example, S&G 53 would still apply. *See, e.g.,* 2014 BiOp at 2, 87.

In sum, it is unclear that the Forest Service would modify the Cattlemen's permits even if the Court granted the requested relief. But to satisfy the redressability prong "the prospect of obtaining relief from the injury as a result of a favorable ruling cannot be too speculative." *See Abulhawa v. U.S. Dep't of the Treasury*, 239 F. Supp. 3d 24, 36 (D.D.C. 2017) (cleaned up). Relief is too speculative here.

## IV. CONCLUSION

Ultimately, the Cattlemen have failed to establish that any of their members have suffered an injury in fact traceable to the Final Rule, rather than the pre-existing requirements. Nor have they shown that the relief sought would redress the injuries alleged. Thus, because the Cattlemen's members lack standing to challenge the Final Rule, the Cattlemen lack organizational standing to sue on their members behalf. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). The Court therefore lacks jurisdiction. *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012).

For all these reasons, the Court will dismiss the Plaintiffs' Complaint for lack of jurisdiction.[10] A separate order will issue.

Dated: March 27, 2019                                         TREVOR N. McFADDEN, U.S.D.J.

---

[10] Because the Court lacks jurisdiction, it will deny the parties' motions for summary judgment as moot.